**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC., *et al.*, | Case No. 22-10493 (CTG) |
| Debtors.[1] | Jointly Administered |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P., | Adv. Proc. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants*, | Case No. 1:22-mc-00298-UNA |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Appellee,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor Defendant-Appellee.* | |

**APPELLEES' RESPONSE TO
EMERGENCY MOTION FOR STAY PENDING APPEAL**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77002.

## DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, the below-described debtors and debtors in possession (each a "Debtor," and together, the "Debtors"), by and through the undersigned counsel, state as follows:

1.      On June 1, 2022, TPC Group Inc., Debtor and Appellee in this appeal, and its Debtor affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code. The remaining Debtors are TPC Holdings, Inc., TPC Group LLC, Texas Butylene Chemical Corporation, Texas Olefins Domestic International Sales Corporation, TPC Phoenix Fuels LLC, Port Neches Fuels, LLC, and TP Capital Corp.

2.      Debtor TPC Phoenix Fuels LLC, a limited liability company formed under the laws of the state of Texas, owns 100% of the membership interests in Debtor Port Neches Fuels, LLC.

3.      Debtor TPC Group LLC, a limited liability company formed under the laws of the state of Texas, owns 100% of the common stock or membership interests, as applicable, in the following Debtor entities: TPC Phoenix Fuels LLC; TP Capital Corp.; Texas Butylene Chemical Corporation; and Texas Olefins Domestic International Sales Corporation.

4.      Debtor TPC Group Inc., a corporation organized under the laws of the state of Delaware, owns 100% of the membership interests in Debtor TPC Group LLC.

5.      Debtor TPC Holdings, Inc., a corporation organized under the laws of the state of Delaware, owns 100% of the common stock in Debtor TPC Group, Inc.

6.      Sawgrass Holdings L.P., a limited partnership formed under the laws of the state of Delaware, owns 100% of the common stock in Debtor TPC Holdings, Inc.

*[Remainder of page intentionally left blank]*

The Ad Hoc Noteholder Group ("**Intervenors**") and TPC Group Inc. ("**TPC**", and with its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases, collectively, the "**Debtors,**" and together with the Ad Hoc Noteholder Group, the "**Appellees**"), hereby submit this consolidated opposition (the "**Opposition**") to the Emergency Motion for Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal Pursuant to Bankruptcy Rule 8007 (the "**Motion**") filed by Bayside Capital, Inc. ("**Bayside**") and Cerberus Capital Management, L.P. ("**Cerberus**," and collectively with Bayside, the "**Appellants**"), which seeks to stay the effectiveness of the Bankruptcy Court's order dated July 8, 2022 [A.D.I. 74][2] (the "**Order**") and Judgment dated July 8, 2022 [A.D.I. 75] (the "**Judgment**").

## **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

1.     Staying proceedings so that Appellants may pursue what will be an unsuccessful appeal would result in serious harm and uncertainty for the Debtors, a company in bankruptcy that operates in a cash-intensive and highly volatile industry. Indeed, as explained in detail in the Declaration of Robert Del Genio in Support of Consolidated Response to Motion to Stay [A.D.I. 85] (the "**Del Genio Dec.**"; attached hereto as **Exhibit 1**) and Declaration of Zul Jamal in Support of

---

[2]   "D.I." is used to reference items filed on the docket in the main bankruptcy case (Case No. 22-10493 (CTG)), while "A.D.I." is used to reference items filed on the docket in the adversary proceeding (Adv. Pro. No. 22-50372 (CTG)).

Consolidated Response to Motion to Stay [A.D.I. 84] (the "**Jamal Dec.**"; attached hereto as **Exhibit 2**), failure to timely obtain final approval of the pending Debtor-in-Possession (DIP) financing ("**DIP Financing**") until after the appeal concludes would result in a default under the Debtors' existing DIP Term Loan. Moreover, it would also cause a potential chain reaction, jeopardizing the Debtors' ABL DIP Facility and then the Debtors' other contractual and financial relationships with vendors and customers who look to the DIP Financing for assurance of payment and stability in transacting with the Debtors, as well as its plan for the restructuring and ultimate timeline for emerging from chapter 11. *See, e.g.*, Del Genio Depo. Tr. at 147:5-12 (excerpts of which are attached hereto as **Exhibit 15**) (indicating customers' "expectation that the[] [bankruptcy proceedings] would move the process [of resolving July payments] quickly).

2.      To say it bluntly, a stay pending appeal is an "extraordinary remedy" that is not issued as of right. *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018). To obtain such extraordinary relief, Appellants are required to satisfy a balancing test by demonstrating (1) a strong showing that they are likely to succeed on appeal, (2) irreparable injury absent a stay, (3) that a stay will not substantially injure other parties to the proceeding, and (4) that a stay is in the public interest. *Id.*

3.      As with any standard in equity, permeating this balance are fundamental questions of fairness and propriety. Indeed, "one who comes in equity

2

must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court." *Honeywell Intern., Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 321 (D. Del. 2004), *aff'd*, 488 F.3d 982 (Fed. Cir. 2007). Likewise, "'equity disfavors undue and prejudicial delay by a person who may have an interest in the property of another.'" *Intellectual Ventures I LLC v. Toshiba Corp.*, No. CV 13-453-SLR, 2016 WL 4690384, at *2 (D. Del. Sept. 7, 2016) (quoting *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed. Cir. 1994)).

4.      Here, the Bankruptcy Court, exercising its sound discretion on a practically identical stay motion, previously determined that Appellants cannot satisfy their burden and that the balance of the factors forecloses the emergency relief they seek. That decision was correct, for numerous reasons. This Court, likewise, should deny the Motion.

5.      As a threshold matter, Appellants cannot demonstrate a likelihood of success on the merits. The Bankruptcy Court has said so—twice, in fact—once, in a Memorandum Opinion [A.D.I. 72] (the "**Opinion**") granting Intervenors' summary judgment motion and then, again, in an Order Denying Emergency Motion to Stay [A.D.I. 87] (the "**Initial Stay Decision**"), in which it concluded and reiterated no less than four times that Appellants were "unlikely to prevail on the merits." Initial Stay Decision. at 5; *see also id.* at 6-7, 12, 15, 22 (noting Appellants' arguments

3

regarding contract construction were "***illogical***" and "demonstrate why they are ***unlikely to prevail on the merits***", remarking "their ***likelihood of success on the merits . . . remains low***," and stating that Appellants' reading of the contracts does "***not make sense***"). Nor can Appellants demonstrate irreparable injury if a stay is not entered. Any injury Appellants might suffer (no matter how remote) can be remedied with monetary damages.

6.     At the same time, as the Bankruptcy Court held, delaying proceedings here would ***significantly*** prejudice Debtors and other parties in interest. *Id*. at 16. After giving Appellants the benefit on the likelihood of success (albeit narrowly) and irreparable harm factors, the Bankruptcy Court found that the equities <u>overwhelmingly</u> favor the Debtors and proceeding in the Bankruptcy Cases without delay because—considering all competing interests—the Appellants' purported harm is "***swamped by the potential harm on the other side of the ledger***." *Id*. (emphases added). In light of the harms, the scales of equity weighed heavily in favor of denying a stay, as, even "without minimizing [Appellants'] ***potential economic harm*** . . . the magnitude of that harm (especially when ***discounted by the fact that their likelihood of success on the merits, while more than negligible, remains low***) is ***thoroughly overwhelmed by the harm that the debtor and its other creditors would suffer***." *Id*. at 16-17 (emphases added).

7.     Ensuring liquidity is of paramount importance to the Debtors' business,

4

which is capital and cash-intensive. The Debtors' liquidity and cashflows track the volatility of the commodities industry—an industry which has fluctuated wildly over the past two years. *See* Declaration of Robert Del Genio in Support of First Day Motions [D.I. 27] (the "**First Day Dec.**"; attached hereto as **Exhibit 3**); *see also* Del Genio Dec. ¶¶ 18-22.

8.     In the time leading up to the commencement of the Bankruptcy Cases, the Debtors' liquidity has fluctuated significantly. For example, on January 7, 2022, the Debtors' total liquidity was $169,742,000, but dropped over $100 million in the next month, for a total liquidity of $65,458 on February 11, 2022. Del Genio Dec. ¶ 21. In the week prior to the commencement of these Bankruptcy Cases, the Debtors' liquidity was $69,452,000 only to, as of the week of July 1, 2022, increase to $211,726,000—accounting for insurance proceeds projected to be (but not yet received) after commencement. *Id.*  This volatility largely has tracked swings in the commodities industry which fluctuated significantly during the same period. *Id.* ¶¶ 18-22. For example, crude was priced at $76/barrel in January of 2022, jumped to $124/barrel by early March 2022, retreated to $95/barrel by mid-March, before jumping close to its March 1 pricing by the month's end. *Id.* ¶ 19. And, since the Bankruptcy Cases were filed on June 1, 2022, crude has dropped from $121/barrel to $102/barrel. *Id.* Given current economic uncertainty and the potential for an upcoming recession, this fluctuation is likely to continue. *Id.*

9.     But commodity pricing fluctuation and associated market uncertainty are only part of the risks faced by the Debtors. *Id.* ¶¶ 23-25. They also face ever-present risks from equipment and operational issues, including those caused by natural disasters, which are common along the Gulf Coast. *Id.* During February of 2021, the Debtors suffered a significant loss to revenue when Winter Storm Uri shut down their Houston plant's boilers for weeks. *See generally* First Day Dec. ¶¶ 53, 58-59; Del Genio Dec. ¶ 24. Similar concerns continue to abound, as hurricane season descends upon the Texas Gulf Coast and places the Debtors' primary operating facility—their Houston ("**HNO**") facility located on Houston's ship channel—in direct harm's way if a storm hits Southeast Texas. Del Genio Dec. ¶ 25. And these concerns are all compounded by current forecasts for oil and gas, which vary widely, in part because of economic uncertainty and potential for a recession.

10.     Appellants' stay request merely exacerbates these concerns, as Appellants casually claim that the Debtors have adequate liquidity without obtaining DIP financing (a determination that will be made, in any event, by the Bankruptcy Court at the hearing to consider the DIP financing). That claim is sorely mistaken. The Debtors' July 1, 2022 forecast of $211 million depends on the Debtors timely receiving final approval of the DIP Term Loan and ABL DIP Facility. *Id.* ¶ 6. Take the anticipated DIP financing away and that picture dramatically and quickly changes. First, as it stands, Debtors owe $43,132,000 in unpaid May supplier

6

payments (which because of the commencement of these Bankruptcy Cases, will be paid in July)—this alone places its adjusted ending liquidity for July 1, 2022 at $168,594,000. *Id.* ¶¶ 8-9. When adjusting further for a projected loss of the amounts contested at the DIP Hearing—*i.e.*, the pre-petition bridge notes, the DIP Term Loan, and the ABL DIP Facility, all of which become due if the DIP financing is not ordered—Debtors' forecasted liquidity drops to, at most, $20,407,000. This is far below the forecasted amount and well below the minimum liquidity the Debtors have historically enjoyed.[3] *Id.* ¶¶ 10-16.

11.    The District Court should follow the Bankruptcy Court's lead and, for the reasons below, deny Appellants' request for a stay pending appeal.

## BACKGROUND

12.    TPC is a leading producer, marketer, and value-added processor of intermediate and specialty chemicals, fuel derivatives, and petroleum byproducts.

---

[3] As explained further, below, the factors militating against a stay are buttressed by one additional point that is tellingly not mentioned in Appellants' "emergency" motions: Appellants' own year-long delay in seeking judicial relief. The purported emergency Appellants complain of is of their own making. Despite the alleged breach of the 10.5% Notes Indenture occurring almost a year and a half ago, Appellants acquiring an interest in the 10.5% Notes a year ago and Appellants first alleging a breach in January 2022, Appellants strategically did not seek any judicial relief until June 2022—after the Bankruptcy Cases were filed. In short, Appellants chose to sit on their rights for months and yet now declare an "emergency," asking this Court for an indefinite stay. Rewarding such inaction by granting the requested stay would be manifestly unfair—and contrary to the guiding principles of equity.

Over the past two years, the Debtors' business and liquidity has been impacted by several adverse events including an explosion on November 27, 2019 at its facility in Port Neches, Texas (the "**PNO Incident**"), the 2020 oil and gas market crash, the COVID-19 pandemic, Winter Storm Uri (and lingering effects on equipment), and a shutdown of parts of the HNO Facility (for portions of September through November 2021) to repair boilers that supply steam to various part of the HNO Facility.

13.     On June 1, 2022 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Cases**"). The next day, on June 2, 2022, Appellants filed an adversary proceeding in the Bankruptcy Court (the "**Adversary Proceeding**") alleging that TPC breached two agreements—the 10.5% Notes Indenture and 2019 Intercreditor Agreement—and pursuing causes of action for declaratory judgment seeking to invalidate the Supplemental Indenture, 10.875% Notes Indenture, and 2021 Intercreditor Agreement (each defined below).

**A.     The 2019 10.5% Notes Indenture**

14.     TPC issued the 10.5% Notes on August 2, 2019. The Notes had a face amount of $930 million. The terms of the 10.5% Notes, and the rights and responsibilities of TPC, the noteholders, the Trustee (U.S. National Bank), and various guarantors are set forth in an Indenture signed that same day (the "**10.5%**

**Notes Indenture**"; attached hereto as **Exhibit 4**). New York law governs the 10.5% Notes Indenture. 10.5% Notes Indenture § 14. Several provisions of the 10.5% Notes Indenture are relevant here.

15.     In the vast majority of situations, the 10.5% Notes Indenture provides that the Company can act in relation to the 10.5% Notes with the approval of a majority, or in some cases supermajority, of the noteholders.

16.     First, the default rule is set out in Section 9.02(a). It allows TPC and U.S. Bank, as trustee and collateral agent, to amend or supplement the 10.5% Notes Indenture or 10.5% Notes with the consent of only a simple majority of the holders of the outstanding principal. Section 9.02(a) provides, in pertinent part, as follows:

> Except as provided in this Section 9.02, *the Issuer, the Guarantors and the Trustee and, if applicable, the Collateral Agent, may amend or supplement this Indenture* (including, without limitation, Sections 4.08 and 4.12 hereof) and the Notes or the Note Guarantees *with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class* (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes) . . . .

10.5% Notes Indenture § 9.02(a) (emphasis added).

17.     Second, Section 9.02(e) specifically addresses amendments and modifications which have the effect of releasing the collateral or modifying the Intercreditor Agreement, upon the approval of two-thirds, *i.e.*, a super-majority, of the holders the outstanding principal:

Any amendment to, or waiver of, the provisions of this Indenture, any Security Document or any other indenture governing Permitted Additional Pari Passu Obligations that has the effect of *releasing all or substantially all of the Collateral from the Liens securing the Notes* or otherwise modifies the Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the Holders will *require the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes* and any Permitted Additional Pari Passu Obligations then outstanding.

*Id*. at § 9.02(e) (emphasis added).

18.   Third, under Section 9.02(d), only in limited, specific cases not implicated here, is unanimous consent required. These "sacred rights" include specific situations where amendments generally impact the amount of principal, the way principal is repaid, or "change the provisions in the Intercreditor Agreement or this Indenture dealing with the *application of proceeds of Collateral* that would adversely affect the Holders." *Id.* at § 9.02(d)(1)-(10) (emphasis added).

19.   Section 4.07 of the 10.5% Notes Indenture expressly provides for the incurrence of additional debt by TPC. *See generally Id.* at § 4.07. Section 4.07(b)(1) provides for the incurrence of debt "not to exceed the greater of . . . $300.0 million and . . . the Borrowing Base."   *Id.* at § 4.07(b)(1). Likewise, Section 4.07(b)(15) provides for TPC's incurrence of additional debt "not to exceed the greater of . . . $50 million and . . . 5.0% of Total Assets." *Id*. at § 4.07(b)(15).

20.   The Supplemental Indenture (attached hereto as **Exhibit 5**) amends Section 4.07(d) of the 10.5% Notes Indenture to note that additional debt of $113

million in the 10.875% Notes was incurred under Section 4.07(b)(1) and $40 million was incurred under Section 4.07(b)(15). Supp. Indenture § 4.07(d).

**B.      The 2021 Supplemental Indenture and 10.875% Notes Indenture**

21.      After the issuance of the 10.5% Notes, TPC's business and liquidity was impacted by several material adverse events, including the PNO Incident, the oil and gas market crash, and the COVID-19 pandemic. TPC began pursuing multiple strategies to address its liquidity and capital structure. TPC explored options for issuing new secured notes to improve its liquidity position and, in this regard, received several offers from potential lenders.

22.      On February 2, 2021, TPC publicly announced that it would be issuing the 10.875% Notes in an aggregate principal amount of $153 million. *See* Feb. 2, 2021 Press Release, *TPC Group Successfully Enters into Note Purchase Agreement* (attached hereto as **Exhibit 6**). To allow for the issuance, TPC amended the 10.5% Notes Indenture by executing a supplemental indenture (the "**Supplemental Indenture**"), executed an indenture for the 10.875% Notes (the "**10.875% Notes Indenture**"; attached hereto as **Exhibit 7**), and executed a new intercreditor agreement (the "**2021 Intercreditor Agreement**"; attached hereto as **Exhibit 8**).

23.      The net proceeds from the 10.875% Notes offering were to be used, inter alia, to repay and terminate an existing $70 million loan with Apollo. *See* Feb. 2, 2021 Press Release, *TPC Group Successfully Enters into Note Purchase*

*Agreement.* TPC's press release announcing the issuance was explicit that the 10.875% Notes would be "effectively senior to all of the Company's and the Subsidiary Guarantors' existing and future unsecured indebtedness and the existing 10.5 percent Notes . . . to the extent of the value of the [10.5% Notes] collateral." *Id.* Following the announcement, bond prices for the 10.5% Notes barely fluctuated, moving from $94.83, on February 1, 2021, to $94.50 by February 4, 2021. *See* Secondary Market Activity Chart (reflecting price of 10.5% Notes from January 2021 to May 2022) (attached hereto as **Exhibit 9**).

24.     TPC unfortunately continued to experience challenges after the issuance of the 10.875% Notes. For example, only weeks after issuance, Winter Storm Uri struck Texas, causing, among other impacts, lasting damage to TPC's critical equipment at its HNO Facility. This ultimately required a two-month shut down of parts of the facility. *See generally* First Day Dec. ¶¶ 53, 58-59

25.     In conjunction with TPC's efforts to improve the company's capital structure, Appellants submitted a proposal to provide DIP financing to TPC in connection with a bankruptcy restructuring. Appellants' DIP proposal (attached hereto as **Exhibit 10**) would be senior to the 10.5% Notes held by Bayside, Cerberus, and others, but junior to other preexisting debt including the 10.875% Notes.

26.     TPC, in the exercise of its business judgment, determined that Appellants' DIP Proposal was not in the best interests of the Company. *See* Jamal

12

Dec. ¶¶ 14-16; *see also* June 2, 2022 Hearing Tr. at 177:11-12 (attached hereto as **Exhibit 11**) (Mr. Jamal testifying "the ad hoc group proposal provided the only viable path.").

27.     TPC did not receive any formal written complaint about the 10.875% Notes and related transaction until March 31, 2022, when Milbank LLP, counsel for Appellants at the time, sent a letter (attached hereto as **Exhibit 12**) to TPC's counsel asserting that the 10.875% Notes, Supplemental Indenture, and 2021 Intercreditor Agreement were ineffective. March 31, 2022 Milbank Ltr. to TPC. Subsequently, on April 26, 2022, Appellants wrote a letter (attached hereto as **Exhibit 13**) to the Trustee requesting that it "decline to follow any directions from Cross-Holders [holders of the 10.875% Notes] with respect to the DIP or the Company's bankruptcy filings that would be prejudicial to the rights of [Appellants]."   April 26, 2022 Milbank Ltr. to U.S. Bank.

28.     When TPC issued the 10.875% Notes, Appellants did not have a stake in the 10.5% Notes. Rather, Appellants acquired their less than 10% interest in the 10.5% Notes through purchases made between July 2021 and January 2022—*i.e.*, months after the widely publicized issuance of the 10.875% Notes. *See, e.g.*, June 29, 2022 Hearing Tr. 109:24-25 (attached hereto as **Exhibit 14**) (counsel for Appellants acknowledging: "yes, we acquired the debt subsequently.") Appellants

13

were therefore on notice of the 10.875% Notes' seniority prior to acquiring their interest in the 10.5% Notes and chose to acquire their interest anyway.

## C. Adversary Proceeding

29.    Appellants could have brought a claim in 2021 after acquiring their interest, but they did not. Appellants were on notice of their potential claims when they acquired the 10.5% Notes.  Appellants, however, did not seek judicial relief until June 2, 2022, when they filed their Adversary Proceeding. At the Debtors' "First Day" hearing, Appellants made clear they wanted that Adversary Proceeding (which challenges the priority of the 10.5% Notes and 10.875% Notes) decided before the upcoming hearing on Debtors' DIP Motion, ostensibly to help streamline the resolution of Appellants' claims by the time the Debtors sought approval of their DIP Motion on a final basis. *See* June 2, 2022 Hearing Tr. at 84:15-85:4.

30.    Nevertheless, both the Court and the other parties in the Bankruptcy Cases agreed to Appellants' request that the Adversary Proceeding proceed on a fast track. That request was not only met, it was exceeded. In the course of just a few weeks, the parties completed discovery, agreed to an expedited briefing schedule (involving three summary judgment motions, various procedural motions, motions to dismiss), and appeared for in-person oral argument before the Bankruptcy Court—all to resolve what Appellants contend was "a pure legal issue, th[e] question of seniority."  June 2, 2022 Hearing Tr. at 84:20-21. Indeed, the summary judgment

motions were originally scheduled to be heard on the same day as the Final DIP hearing.

31.     And, for its part, the Bankruptcy Court matched Appellants' demand for expedience. At the June 29, 2022 hearing at which it heard argument on Appellants' claims, the Bankruptcy Court made clear it "appreciate[d] that time is of the essence" and was, therefore, "going to endeavor to process this, to write something that is understandable, and get something to folks as quickly as I can." June 29, 2022 Hearing Tr. at 112:12-19. All of this of course was with an eye towards hopefully streamlining issues for the DIP hearing.

32.     The Bankruptcy Court did exactly that. On July 6, 2022, the Bankruptcy Court issued its well-reasoned Opinion [A.D.I. 72] rejecting Appellants' challenge to the 2021 transaction as a matter of law and holding that Section 9.02(d)(10) of the 10.5% Notes Indenture—the "sacred right" provision dealing with the "application of proceeds of collateral"—addressed only the ratable distribution of proceeds to noteholders in a class, and not subordination. Op. at at 24-25. In reaching this decision, the Bankruptcy Court relied on well-settled canons of construction. In particular, the Bankruptcy Court cited the "context . . . provided by the other terms of the 2019 Indenture itself," noting for example, the "anomaly" under Appellants' proposed reading, which would allow for the release of all or substantially all of the underlying collateral with only 2/3 of noteholders' support (as Section 9.02(e) of the

15

10.5% Notes Indenture does) but require unanimous approval for mere subordination. The Bankruptcy Court ultimately concluded: "[i]n sum, contrary to the argument advanced by the objecting noteholders, . . . [Section] 9.02(d)(10) of the 10.5% Notes Indenture is primarily directed at protecting the holders' rights to ratable treatment and should not be read as an anti-subordination provision in disguise." *Id.* at 27-28.

33.     The Court then issued an Order and Final Judgment [A.D.I. 75] consistent with the Opinion on July 8, 2022.

**D.     Bankruptcy Court Rejects Appellants' Request for a Stay**

34.     On July 8, 2022, Appellants moved for a stay pending appeal of the Bankruptcy Court's Order and Judgment. [A.D.I. 79]. The Bankruptcy Court swiftly denied the motion and issued the Initial Stay Decision.

35.     In the Initial Stay Decision, the Bankruptcy Court first questioned whether a stay of its Order was procedurally appropriate because the motion sought a stay of a declaratory judgment. The Bankruptcy Court concluded that the Order could properly be the subject of a stay because the practical effect of such decision was that "it will *inform* the Court's consideration of the motion to approve the DIP loan."  Initial Stay Decision at 4-5 (emphasis added).

36.     The Bankruptcy Court proceeded to assess the four factors relevant to a stay request. With respect to Appellants' likelihood of success on the merits, the

Bankruptcy Court re-affirmed that the Order "*is correct and unlikely to be reversed on the merits*." *Id.* at 5 (emphasis added). The Bankruptcy Court, however, noted that it would "resist the human tendency to overrate the quality of [its] own analysis," and concluded that the Appellants' likelihood of success was more than negligible but still far from likely or probable. *Id.* In doing so, the Bankruptcy Court re-emphasized that the basis for its findings below, including that the hierarchy of consents set forth in section 9.02 of the 10.5% Notes Indenture made it illogical to read section 9.02(d)(10) as an anti-subordination provision. *Id.* at 6. Such a reading, in the Bankruptcy Court's own words, is "readily apparent." *Id*. at 7. Moreover, the Bankruptcy Court noted that Appellants' recitation of their arguments, rather than move the needle in their favor, actually "demonstrate why they are unlikely to prevail on the merits," in part because their reading would render section 9.02(e) superfluous and meaningless and because subordination equally affects all 10.5% Noteholders. *Id.* at 7-8. The Bankruptcy Court also explained that the reference to "custom and usage" in the Order, and any related observations, were intended to simply concern the context in which to review the agreements at issue, and regardless, "has no effect on [the Bankruptcy] Court's bottom-line conclusion." *Id.* at 9-12.

37.    With respect to irreparable harm, the Bankruptcy Court held that, because it planned to proceed with a hearing on the final approval of the DIP Facility

17

on the premise that its Order was correct, Appellants have a substantial case for irreparable injury. At the same time, the Bankruptcy Court acknowledged that "[i]t is not certain that the [DIP Facility] loan will be approved" and that "there are potential bases for objecting to the [DIP Facility] loan that do not depend on the declaratory judgment ruling." *Id.* at 12. Indeed, such objections to the DIP Motion have been raised by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") and Appellants.

38.    To the Bankruptcy Court, however, the balancing of equities weighed heavily in favor of denying a stay. The Bankruptcy Court held that the determinative factor in denying a stay was the dire harm that would occur to the Debtors' bankruptcy estates should the DIP Motion not be determined as scheduled, which greatly outweighed the harm alleged by Appellants. Although Appellants face a potential reduction in their recoveries on their approximately $90 million of funded debt (less than 10% of the amount outstanding on the 10.5% Notes), the Bankruptcy Court recognized that such potential harm "is swamped by the potential harm on the other side of the ledger." *Id.* at 16. Noting that the DIP Financing would only be approved if the Debtors succeed in demonstrating that the loan "is ***necessary*** to preserve the assets of the estate" (internal citations omitted) (emphasis added), in such circumstance, prohibiting entry of the loan "will lead to the destruction of value," which destruction would harm the company's nearly 500 employees,

creditors holding over $1 billion of funded debt, and the various tort plaintiffs, and could also threaten the Debtors' relationships with its vendors and suppliers. *Id.* at 16-17. The Bankruptcy Court found that the potential harm asserted by Appellants, and their low likelihood of success on the merits, was "thoroughly overwhelmed" by the harm that the Debtors and their constituents would suffer if the stay was granted and the Debtors were preventing from obtaining final approval of the DIP Financing, and denied the stay on such basis. *Id.*

39.     On July 13, 2022, Appellants filed the Motion, which seeks to stay all proceedings in the Bankruptcy Cases pending this appeal. On July 13, 2022, this Court issued an oral order, ordering a temporary stay, "[t]o permit time for briefing and consideration of [Appellants'] Emergency Motions," through and including July 25, 2022, that any response to the Emergency Motions shall be filed no later than Monday, July 18, 2022, and that any reply in further support of the Emergency Motions shall be filed no later than Wednesday, July 20, 2022.

40.     Consistent with this Court's oral order, the hearing on the DIP Motion did not proceed on July 15, 2022, as had been scheduled. The Bankruptcy Court has not yet rescheduled the DIP Hearing, but based on instruction from the Bankruptcy Court, the parties have held July 29, 2022 as the tentative date for the DIP Hearing.

## **ARGUMENT**

**A.    The Motion should be denied because Appellants fail to establish any of the four factors necessary to stay proceedings.**

41.    A stay pending appeal is an "extraordinary remedy" that is rarely issued. *El v. Marino*, 722 F. App'x at 267. To obtain this extraordinary relief, the movant must carry the "burden of establishing that imposition of a stay is warranted." *In re MTE Holdings, LLC*, No. 19-12269, 2021 WL 4203339, at *3 (Bankr. D. Del. Sept. 15, 2021). Courts—whether Bankruptcy or District—must consider the following four factors in assessing whether the movant has met that burden:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id*.

42.    These four factors are "similar to those considered in ruling on applications for preliminary injunctions." *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 771 (3d Cir. 2019); *see also Nken v. Holder,* 556 U.S. 418, 434 (2009) (noting that there is substantial overlap between the factors assessed in motions for stays and preliminary injunctions because "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined").

43.     Each of these factors is important. Courts must "'balance[] them all' and 'consider the[ir] relative strength . . . .'" *S.S. Body Armor I*, *Inc*., 927 F.3d at 772 (citations omitted) (alteration in original). Nonetheless, the "most critical" factors are the first two (*i.e.*, likelihood of success on appeal, and irreparable harm absent the stay). *Id.*

44.     Although both are necessary, of the two, "'the former is arguably the more important piece of the stay analysis.'" *Id.* (citations omitted). This factor— likelihood of appellate success—requires demonstrating "'a reasonable chance, or ***probability***, of winning,'" *id.* (internal citations and quotations omitted) (emphasis added), *i.e.*, "significantly better than negligible but not greater than 50%." *MTE Holdings, LLC*, 2021 WL 4203339, at *3 (internal citations and quotations omitted). The second—irreparable harm to movant—requires "demonstrat[ing] that irreparable injury is *likely* [not merely possible] in the absence of a stay," meaning "more apt to occur than not." *S.S. Body Armor I., Inc.*, 927 F.3d at 772 (internal citations and quotations omitted) (alteration and emphasis in original).

45.     If the movant does not make the requisite showings on *either* of these first two factors, there is no need to further examine the remaining factors and the motion should be denied without further analysis. *See id.* As such, *only if* the movant establishes the first two factors should this Court then proceed to "balance the

relative harms considering all four factors using a 'sliding scale' approach." *MTE Holdings, LLC*, 2021 WL 4203339, at *3 (internal citations and quotations omitted).

46.     As the Third Circuit has explained, the "sliding scale" works as follows: "The more likely the [movant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more [heavily] need [the balance of harms] weigh in [its] favor." *S.S. Body Armor I., Inc.*, 927 F.3d at 772 (internal citations and quotations omitted).

47.     The "four stay factors," which are "interconnected," are then balanced, as follows:

> 'Did the applicant make a sufficient showing that [(1)] it can win on the merits[— ] significantly better than negligible but not greater than 50%[—]and [(2)] will suffer irreparable harm absent a stay?
>
> If it has, we 'balance the relative harms considering all four factors using a 'sliding[-]scale' approach. However, if the movant does not make the requisite showings on either of these [first] two factors, the[ ] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis.'

*Id.* (internal citations omitted) (alterations in original).

48.     Here, Appellants fail to establish any of the four factors. ***First***, Appellants' likelihood of succeeding on the merits is not significantly greater than negligible. As the Bankruptcy Court correctly found—twice, in fact—Appellants' consent rights dealing with the application of proceeds of collateral was (notwithstanding their tortured interpretation of the 2019 Indenture's plain language)

simply not implicated by the complained-of 2021 transaction that issued the senior 10.875% Notes. *Second*, Appellants will suffer no injury—let alone an immediate, irreparable one—in the absence of a stay; and, even if they could, such alleged injury can be adequately compensated by contract damages. *Third*, as the Bankruptcy Court strongly held in denying Appellants a stay below, it is the Debtors and their bankruptcy estates, far more than Appellants, who will be damaged if a stay is issued. *Fourth*, and finally, the public interest militates against a stay.

49.     Although, standing alone, Appellants' failure to establish the first two factors would be sufficient to deny relief, even if this Court did address the equities, the balance, as the Bankruptcy Court held below, overwhelmingly favors denying the stay. This is especially true here, because Appellants hold approximately 10% of the 10.5% Notes and thus face only a reduction in their percentage recovery on those holdings.

### 1. Appellants are unlikely to succeed on appeal.

50.     To satisfy the first prong to obtain a stay pending appeal—likelihood of success on the merits—Appellants must make a "strong showing" that they are likely to prevail on appeal, and, to do so, they must show "a reasonable chance, or probability, of winning" on appeal—meaning a "significantly better than negligible" chance of success. *S.S. Body Armor I., Inc.*, 927 F.3d at 772–73 (internal citations omitted). Appellants fail to meet their burden. Indeed, Appellants do nothing more

in the Motion than regurgitate the same failed arguments previously raised before and rejected by the Bankruptcy Court, in the thorough and well-reasoned written Opinion (supplemented by the equally well-reasoned Initial Stay Decision), after hearing several hours of oral argument and reading dozens if (not hundreds) of pages of briefing. Nor can Appellants cite to anything in the Opinion or Initial Stay Decision that is contradicted by the plain language of the 10.5% Notes Indenture. Accordingly, any chance of success on Appellants' appeal is, *at best*, negligible— and therefore insufficient to justify a stay pending appeal. Indeed, the Third Circuit, in *S.S. Body Armor*, noted that likelihood of success is "arguably the most important piece of the stay analysis" as, barring the showing of a probable right to relief, there is simply no basis for invoking this Court's equity jurisdiction. *Id.* (internal citations and quotations omitted) (affirming denial of the stay after finding the first factor alone was fatal to movant's request for a stay).

51.     Although this Court will review Appellants' appeal *de novo* (Mot. ¶ 7), it will affirm the Bankruptcy Court's grant of summary judgment to Appellees as to the interpretation of the 10.5% Notes because "the contractual language is subject to only one reasonable interpretation." *Sanford Inv. Co. Inc. v. Ahlstrom Mach. Holdings, Inc.*, 198 F. 3d 415, 42-21 (3d Cir. 1999) (internal citations and quotations omitted). As the Bankruptcy Court correctly recognized in its Opinion and again in the Initial Stay Decision, the only reasonable interpretation of Section 9.02(d)(10)

of the 10.5% Notes Indenture, considered in context, is that the provision "is primarily directed at protecting the holders' rights to ratable treatment and should not be read as an anti-subordination provision in disguise" [Op. at 27-28]. Said differently, it would be "illogical to read § 9.02(d)(10) as applying to an amendment that would permit subordination." Initial Stay Decision at 6.

52.     Try as they might, Appellants cannot salvage an argument to support their exaggerated and conclusory view that they are likely to succeed on the merits of their appeal, despite their best efforts to cherry pick certain words in the Opinion and Initial Stay Decision and use them out of context in the hopes of giving their arguments more credence in front of this Court. First, Appellants renew their argument that Section 9.02(d)(10) is a "sacred right" that required their consent to the Priming Notes Transaction, again arguing that the changes made to Section 12.01(c) and Section 4.10(a) of the 10.5% Notes Indenture dealt with the application of Collateral proceeds. *See* Mot. ¶¶ 34-37. But, of course, those changes did not "deal with" application of proceeds of Collateral, and Appellants cannot show how their purported interpretation of the contract comports with reason. By its unambiguous terms, Section 9.02(d)(10) applies only to payment waterfalls for the distribution of collateral, and the *only provisions* in the 10.5% Notes Indenture and the ABL ICA "dealing with the application of proceeds of Collateral" are (i) Section 4.1(a) of the ABL ICA (which deals with the priorities between the 10.5%

Noteholders (via the 10.5% Notes Trustee), on the one hand, and the ABL Representative, on the other hand), and (ii) Section 6.10 of the 10.5% Notes Indenture (which deals with the "Priorities" among the 10.5% Noteholders themselves). As a result, Section 9.02(d)(10) does not apply to priorities between the two different tranches of notes, the 10.875% Notes and the 10.5% Notes. The Bankruptcy Court correctly held as much: "the only provision of the 10.5% Notes Indenture that 'deals with the application of proceeds of collateral" is Section 6.10, which addresses the waterfall for how the trustee should distribute monies it receives under the indenture (including the distribution of proceeds of collateral)." Op. at 21. Appellants still offer no reasonable contrary interpretation, and their counsel could not do so during oral argument before the Bankruptcy Court, either, for the simple reason that none exists.[4]

53.    Appellants next renew their argument that Section 9.02(d)(10) is, in effect, an anti-subordination provision, although no such words exist in the plain language of that section. Appellants again primarily rely upon *Audax Credit Opportunities Offshore v. Tmk Hawk Parent*, 150 N.Y.S.3d 894 (Sup. Ct. 2021) ("***Trimark***"), which they, once again, incorrectly posit supports their interpretation

---

[4]    *See* June 29, 2022 Transcript at 44-45 (to Bankruptcy Court's question to cite to "specific" provisions of the agreement that pertain to the "application of the proceeds of collateral" as that term is used in Section 9.02(d)(10), Appellant's counsel responds "I cannot give you a comprehensive list.").

of the phrase "application of proceeds."  Mot. ¶¶ 38-50. Yet, the Bankruptcy Court
has now stated on multiple occasions, including in its Opinion and in the Initial Stay
Decision, that *Trimark* was addressing a motion to dismiss and did not resolve the
question as to whether the prohibition on subordination was a "sacred right" in the
context of the agreement at issue there. Op. at 24. Moreover, as the Bankruptcy Court
***underscored*** in its Initial Stay Decision, there is nothing in the *Trimark* opinion
suggesting that the indenture at issue there contained such a provision as 9.02(e)
here. Said another way, *Trimark* is irrelevant to the key factor in the Bankruptcy
Court's analysis in this case—the "more telling context" provided by the "the
hierarchy" of consent rights among several different provisions of the 2019
Indenture—a hierarchy which did not exist in *Trimark*. Initial Stay Decision at 7-8;
Op. at 25-26.

54.     Further, the issues in *Trimark* (as well as its context) were significantly
different than those here such that the Appellants continued reliance on the *Trimark*
decision as some sort of *fait accompli* for judgment in their favor here is completely
flawed. *Trimark* involved amendments to a provision concerning the "application of
proceeds" *(id.* at *11-12), but the *Trimark* decision relied upon language in the
applicable sacred rights provision referring to amendments, waivers, or
modifications to such sacred rights "***pursuant to an agreement or agreements***"—
language that, of course, is absent from, and broader than, Section 9.02(d)(10) of the

10.5% Notes Indenture. *Id.* at \*11 (emphasis added). Further, although the specific contractual language in *Trimark* enabled that court to look beyond the credit agreement, notwithstanding the absence of any amendment to the applicable "sacred rights" provision, *see id.*, here, as the Bankruptcy Court held, the only applicable provision of the 10.5% Notes Indenture that "deals with" application of proceeds of Collateral is Section 6.10. And of course, in *Trimark*, unlike here, the transaction at issue was an "uptier," through which certain lenders elevated their loans into new loans that had a priority over other loans that were originally issued under the same credit agreement. *See* Op. at 2 (noting that the Priming Notes Transaction "is somewhat less aggressive than the paradigmatic 'uptier' transaction described above").

55.    The weaknesses of Appellants' merits arguments are also apparent from their efforts, both in the stay motion before the Bankruptcy Court and their Motion here, to manufacture legal error based on a ***single sentence***[5] in the Opinion reflecting on "customs and usage that are common in the trade." Op. at 24-25. First, Appellants' claim of error is hypocritical on its face because it was Appellants' counsel, during argument, who repeatedly injected issues of market practice and custom into Appellants' presentation to the Bankruptcy Court. *See* June 29 Tr. at 40

---

[5]    Appellants dedicate a staggering two-and-a-half pages in their stay motion before the Bankruptcy Court, and another four paragraphs in this Motion, addressing this single sentence.

("[W]e have seen credit agreements, indentures …"); *id.* at 50 (referring to the term "dealing with" as "commonly understood to mean 'concerning' or 'having to do with'"); *id.* at 111 ("I think that 9.02(d)(10), in our experience, is customary formulation and it's – we've seen it in a number of credit agreements, if not indentures . . . .").

56.     However, even more telling as to the true strength of Appellants' argument is their decision to ignore that the Bankruptcy Court clarified in its Initial Stay Decision the point it had intended to make. The Bankruptcy Court explained that in construing the language of a contract "even without extrinsic evidence of custom and usage, the context and subject of the agreement can help lend clarity to terms that might otherwise be ambiguous." Initial Stay Decision at 9-10. The Bankruptcy Court noted that in the context of a leverage loan agreement, "one would not expect parties who intend to prohibit subordination to do so by amendments that deal with the allocation of the proceeds of collateral."   *Id.* at 10. And, most importantly, the Bankruptcy Court made clear that the principal basis for granting summary judgment in favor of the Appellees (and denying Appellants' summary judgment motion) was "***the structural one about 'hierarchy of consents' contained in the indenture***"—a fundamental concern which had nothing to do with custom and usage. *Id*. at 11-12 (emphasis added). Tellingly, Plaintiffs' Motion, when cherry-picking portions of the Bankruptcy Court's Initial Stay Decision, omits the

conclusion that "***the inclusion of this [custom and usage] language does not give rise to a substantial likelihood that objecting noteholders will prevail on the merits of their appeal.***" *Id.* at 12 (emphasis added). It is therefore disingenuous for Appellants to continue to claim that the Bankruptcy Court committed reversible error when the Bankruptcy Court explained that its Order was in no way premised on industry custom and norms.

57.     Finally, Appellants' repeated contention that a release of collateral can be less drastic than subordination continues to be fundamentally flawed on many levels. Mot. ¶¶ 51-57. Despite again attempting to illustrate this contention with a hypothetical, Appellants continue to miss the mark. First, as in the proceedings before the Bankruptcy Court, Appellants' hypothetical illogically presumes that upon a release of the liens, the debtor would not obtain new secured financing on the now unencumbered assets, in which case the recovery to all (now unsecured) creditors would actually be zero, not 67% as Appellants' faulty math would indicate. Second, Appellants' hypothetical once again erroneously (but intentionally) tries to equate the transaction involving 10.875% Notes (where all 10.5% Notes were equally subordinated to the 10.875% Notes) to a *Trimark*-like uptier transaction whereby a majority group of noteholders jump their existing debt ahead of a minority group whose notes are left behind, thereby resulting in a full recovery to the majority, with no recovery to the remaining minority. Try as Appellants might, those are not

the facts here—a point that the Bankruptcy Court understood perfectly when it rejected Appellants' hypothetical in issuing its Initial Stay Decision. Initial Stay Decision at 8. As the Bankruptcy Court wisely recognized: "[Appellants] go on to argue that the release of collateral is not more drastic than subordination, because the release of collateral affects every holder equally while the subordination at issue here singled them out for disfavored treatment. But that is incorrect. ***Subordinating one loan to another, just like releasing all collateral, is equally prejudicial to old lenders***." *Id.* (emphasis added).

58.     For all of the foregoing reasons and those set forth in the Opinion and the Initial Stay Decision, the 10.5% Notes Indenture is capable of only one reasonable and logical interpretation—that Section 9.02(d)(10) is not an anti-subordination provision and therefore did not require Appellants' consent to the Priming Notes Transaction. Appellants therefore cannot satisfy the first prong to establish a strong showing that they are likely to succeed on appeal.

### 2. Appellants will not suffer irreparable harm absent a stay pending appeal.

59.     Although Appellants' failure to demonstrate a likelihood of success on appeal is reason enough to deny their motion to stay, Appellants fail on the other factors as well. To begin with, Appellants have not articulated any irreparable harm that they would suffer should this Court not stay these proceedings. Moreover,

Appellants' complained-of injuries are either impermanent or compensable by money damages, both of which militate against issuance of a stay.

60.     To prove irreparable harm, Appellants are required "demonstrate that irreparable injury is likely in the absence of the stay" and "is an injury that cannot be redressed by a legal or equitable remedy following a trial." *State of the Netherlands v. MD Helicopters, Inc. (In re MD Helicopters, Inc.)*, No. 22-10263-KBO, 2022 U.S. Dist. LEXIS 116583, at *24 (D. Del. July 1, 2022) (internal citations and quotations omitted).

61.     "A purely economic injury generally is not irreparable harm." *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW), 2021 WL 3410242, at *6 (D. Del. Aug. 4, 2021); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 207 (D. Del. 2012) (noting that courts hold that "monetary loss alone cannot constitute irreparable harm" and finding that that alleged monetary damages asserted "do not equate to . . . un-redressable harm"). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Maxus Energy Corp.*, 633 B.R. 215, 220 (Bankr. D. Del. 2021) (internal citations and quotations omitted); *see also In re Mallinckrodt plc*, Civ. No. 22-215-TLA [D.I. 48 at 2] (D. Del. Apr. 22, 2022) ("A harm is 'irreparable' for stay purposes when it 'cannot be prevented or fully rectified by a successful appeal.") (citation omitted).

62.     Here, a stay is not warranted because Appellants have failed to demonstrate that any harm would be actual and imminent, let alone irreparable, because monetary damages would be sufficient. Even assuming Appellants were correct that the Bankruptcy Court got it wrong and that the issuance of the 10.875% Notes and complained-of amendments violated the 10.5% Notes Indenture and 2019 Intercreditor Agreement, at most, Appellants would be entitled only to money damages.

63.     Appellants' complained-of harm is purely economic: the loss of access to proceeds of collateral. Mot. ¶ 60. The Bankruptcy Court recognized this in issuing its Order, describing the injury in question to Appellants primarily as being "potential economic harm." Op. at 17. And Appellants themselves all but admit this point. Even in couching their harms as "constitutional harm" to their Fifth Amendment rights (again, due to the loss of potential collateral proceeds and the dilution of security interest, quintessentially economic loses), Appellants take issue with the potential impact on their "recoveries"—*i.e.*, of money—in the Bankruptcy Cases. Mot. ¶ 66, 67, 70 (complaining of the "violence" inflicted on appellants that "at least ***$23.8 million of Collateral value*** that would otherwise flow to Appellants ***will be redistributed to*** the Usurping Noteholders, without any adequate protection or a valid waiver") (emphases added). The Bankruptcy Court similarly described the

injury from Appellants' potential loss of appellate rights as, although potentially substantial, nothing more than harmful "economic effect[s]."  Op. at 13.

64.     No amount of argument—however artful—can transform Appellants' purely economic injury (loss of proceeds, dilution of security interests) into injuries of a different nature. As such, on this point, Appellees respectfully diverge from the Bankruptcy Court's Initial Stay Decision; Bankruptcy Court's conclusion that Appellants' injury could be irreparable is, at best, charitable.

65.     Indeed, here, Appellants' chief complaint is that proceeding to the DIP Hearing with the Bankruptcy Court's Order intact and issuing relief unfavorable to them pending appeal would irreparably harm their property right to their interest in the 10.5% Notes by diluting their security interest. *See* Mot. ¶ 70 (complaining that, "[i]f the Proposed DIP is approved and the Usurping Notes are rolled up under an Order and Judgment that are later reversed on appeal, the financing arrangement will be difficult to unwind, and the Usurping Noteholders will effectively lock in greater potential recoveries at the expense of the Non- Consenting Senior Noteholders").

66.     But, again, Appellants are mistaken. First, assuming that the Bankruptcy Court approves the roll-up on a final basis at the hearing on the DIP Motion (the main reason Appellants' seek a stay in the first place), the 10.875% Notes are not automatically canceled when tendered into the automated tender offer program (ATOP) until (at the earliest) the expiration of the Creditors' Committee's

challenge period. Second, as set forth above, Appellants' remedy if they are right and the rollup cannot be unwound would be money damages.

67. Appellants only other complaint is that Section 364(e) of the Bankruptcy Code could possibly moot Appellants' appeal is insufficient to establish irreparable harm. But "it is well established that the possibility that an appeal may become moot does not constitute irreparable harm for purposes of obtaining a stay." *In re Swift Energy Company*, Civ. No. 16-404 (GMS), 2016 WL 3566962, at *7 (D. Del. 2016); *see also, e.g., In re Color Spot Holdings, Inc.*, No. 18-1246, 2018 WL 3996938, *3 (D. Del. Aug. 21, 2018) (holding that the possibility that an appeal would become statutorily moot "does not alone constitute irreparable harm for purposes of obtaining a stay"); *In re Global Home Products, LLC*, No. 06-508, 2006 WL 2381918 (D. Del. Aug. 17, 2006) (holding that the possibility that an appeal could be rendered moot absent a stay "does not in and of itself constitute irreparable harm"); *W.R. Grace & Co.*, 475 B.R. at 207 ("The Third Circuit and courts within its appellate jurisdiction have previously recognized, however, that the risk of equitable mootness by itself is insufficient to demonstrate irreparable injury for purposes of a stay. Indeed, if equitable mootness alone could serve as the basis of irreparable injury, a stay would be issued in every case of this nature pending appeal.") (internal citations omitted). Appellants are required to do more than speculatively complain that their appeal may become moot in order to establish

irreparable harm. And what they do complain of—that "approval of the DIP would

. . . allow hundreds of millions of dollars of debt to leapfrog them in priority"—does

not by itself constitute an irreparable injury that could not be remedied by monetary

damages. The Bankruptcy Court's meretricious invocation of "common sense,"

Initial Stay Decision at 14-15, however charitable in nature, cannot transform an

economic injury into an irreparable injury of different character altogether.

68.     In short, there is no harm here to Appellants, let alone irreparable harm.

Appellants fall short of their burden to justify imposition of a stay.

### 3. A stay pending appeal would substantially harm the Debtors and other parties.

69.     As a preliminary matter, under the balancing test articulated by the

Third Circuit, this Court need not even reach this factor of because Appellants have

failed to show (i) a likelihood of success on the merits and (ii) that they will suffer

irreparable harm if a stay pending appeal is not granted. However, if this Court does

reach this factor, it should—like the Bankruptcy Court—deny emergency relief

because staying proceedings pending appeal would substantially injure the Debtors

and other parties with an interest in the Bankruptcy Cases (in a manner that far

outweighs any potential injury to Appellants).

70.     In their Motion, Appellants mischaracterize the delay that will result

from their requested stay as merely delaying proceedings "*past this week*." Mot. ¶

77. This contention is disingenuous, at best—as this Court knows, appeals last longer

than just a week.[6]  But, more importantly, as Appellees explained in detail in their response and as the Bankruptcy Court held in its Initial Stay Decision, even a truly "slight" delay would cause serious harm to Debtors. In their Consolidated Response to Plaintiffs' Motion to Stay [A.D.I. 86], Appellee's provided substantial evidence of harms the Debtors would face from loss or delay of the DIP Facilities. Appellants provide no substantive response to this evidence. Rather, they flatly (and incorrectly) claim that Debtors do not need access to the DIP funding (which, in any event, is an issue for the Bankruptcy Court to ultimately decide at the hearing on the DIP Motion). Mot. ¶ 78.

71.    Appellants thus invite this Court not only to ignore the Debtors' business judgment (in favor of Appellants' judgment, which is based solely on their own pecuniary interests), but also to ignore a number of critical, uncontroverted facts that Appellants mention nowhere in their papers: (i) Debtors currently have over $43,000,000 in vendor and supplier bills from May that are due in July, *see* Del

---

[6]   According to Lex Machina, the average time for a ruling to issue on appeal from the Bankruptcy Court to the Delaware District Court is approximately one year and 21 days (386 days) and the average duration of a follow-up appeal to the Third Circuit is an additional 274 days. Available at https://law.lexmachina.com/court/ded/cases?pending-from=2017-07-09&pending-to=2022-07-09&resolution-include=CW_DoBA&resolution-include=CDW_DoBA&filters=true&tab=timing&view=analytics&cols=475%; https://law.lexmachina.com/federal-court/appeals/court/ca3/cases?filed_on-from=2012-01-01&district_court_case_types-include=36&filters=true&tab=federal_appeals_timing&view=analytics

Genio Dec. ¶¶ 8-9; (ii) with the rise in commodity prices, vendor and supplier expenses have risen to between $100,000,000 and $150,000,000 per month, *id*. at ¶ 20; (iii) the inherent risks that come with the Debtors' business, which can cause large variances in liquidity needs, making the historical minimum liquidity threshold a less than perfect indicator of the Debtors' future liquidity needs, *id*. at ¶ 18-22; (iv) failure to obtain the Final DIP Order would result in a substantial erosion of the liquidity the Debtors currently enjoy from the Interim DIP Loan, ABL DIP Loan Facility, and the Bridge Loan, *id*. at ¶ 6-16; and (v) the failure to obtain the Term DIP Loan Facility on a final basis would result in a default of the Interim DIP Loan, thereby obligating Debtors, under the terms of those agreements, to repay the current draw of $32,000,000, as well as $59,000,000 under the Bridge Loan, and further eroding the Debtors' liquidity by that amount, *id*. at ¶ 10-12.

72.     Appellants also claim that this Court—sitting as an appellate court and not a finder of fact—should not credit the sworn testimony of Zul Jamal that, based on his conversations with Eclipse, the ABL DIP Lender, that even slight delay could trigger an Event of Default under Section 7.01(k)(iii)(c) of the Term DIP Loan Agreement and ABL DIP Loan Agreement by preventing entry of a Final DIP Order by end of day July 18, 2022. Jamal Dec. ¶ 13. Appellants' argument to the contrary is unsupported and a red herring. Mr. Jamal's testimony is clear: Eclipse's willingness to provide the ABL DIP Loan Facility—which no party disputes is

38

necessary—on the existing negotiated terms is contingent upon approval of the Term DIP Loan Facility on a final basis. Jamal Dec. ¶¶ 14-15; *see also* June 2, 2022 Hearing Tr. at 180:16-181:22 (Mr. Jamal testifying that, for Eclipse, "[t]he entire basis for their underwrite was that the expectation that there would be new money coming in in the form of the [DIP] term loan"). If that does not occur, there is no guarantee that Eclipse will continue to provide the ABL DIP Loan Facility (or on what terms). Jamal Dec. ¶¶ 14-15. Thus, if the Debtors lose access to the Term DIP Loan Facility due to delays caused by the stay, which will cause an Event of Default, then the ABL DIP Loan Facility will also be in jeopardy, eroding the Debtors' available liquidity and forcing the repayment of amounts borrowed thereunder.

73.     In short, none of Appellants' arguments undercut Debtors' view that even a further short delay of the DIP Hearing, as sought by the Appellants, could cause the Debtors to lose over $140,000,000 in liquidity. Del Genio Dec. ¶¶ 6-16. Along with the over $43,000,000 owed to vendors and suppliers for May orders, this would leave the Debtors substantially short of the bare minimum $50,000,000 in liquidity to operate its business. *Id*. ¶ 8-9, 16. Such an occurrence would irreversibly damage relationships with the Debtors' key business partners, the Debtors' workforce, and commercial counterparties by disrupting the Debtors' ordinary-course operations and causing them to fail to meet their financial commitments. Del Genio Dec. ¶¶ 28-30.

74.     It would present substantial, if not insurmountable, challenges in holding vendor and supplier relationships—parties that provide better terms and credit when the Debtors can show substantial liquidity exists. *Id*. Indeed, vendors have been clear they expect the Bankruptcy Cases to proceed expediently and even the specter of delay or an indication (however remote) that DIP Financing may ultimately not be available, would have dramatic consequences for the Debtors. Del Genio Depo. Tr. at 139:14—140:5 (Mr. Del Genio confirming that delays in resolution of financing would "not be well-received by [the Debtors'] vendor base"). Without access to the DIP Facilities, the Debtors risk facing a value-destructive interruption to their businesses and losing their best chance for negotiating and consummating a comprehensive and orderly restructuring and successful emergence from Chapter 11. *See generally* Del Genio Dec.

75.     Appellants also do nothing to address the near omnipresent risks associated with the Debtors' business. The Debtors operate in an extremely volatile business, one that can be severely impacted by shifts in commodity prices and other factors beyond the Debtors' control, including weather and natural disasters. Del Genio Dec. ¶¶ 17-25. This is particularly true because the Debtors operate a cash-intensive business with accounts payable and accounts receivables that can vary widely.

76.     Appellants' assertion that the Debtors have alternative postpetition financing available is meritless—and beside the point. First, it totally discounts the Debtors' business judgment in concluding that the Term DIP Facility is the best and only actionable postpetition financing proposal available to the Debtors. Jamal Dec. ¶ 14-16. There is no question that the DIP Facility was negotiated at arms' length and does not require nonconsensual priming of existing prepetition liens. *Id*. As the Debtors are unable to provide adequate protection to the 10.5% Notes collateral agent on account of nonconsensual priming, and the 10.5% Notes collateral agent has not consented to priming by liens other than those securing the Term DIP Facility, Appellants' assertions regarding an "alternative proposal" are belied by the facts. *Id*.; *see also* June 2, 2022 Hearing Tr. at 194:17-23.

77.     Moreover, as Mr. Jamal has testified without dispute, the Term DIP Facility and the RSA provide the Debtors with new money on reasonable terms under the circumstances and provide a path to emergence from these chapter 11 cases. *Id*. The Debtors determined in their business judgment that the RSA transactions constitute the best and only restructuring transactions available to the Debtors and maximize value for the benefit of all parties in these chapter 11 cases. *Id*. Appellants' requested relief would put the Debtors into default under their DIP Facilities and allow the RSA to be terminated without providing any alternative viable path forward for the Debtors. *Id.* ¶¶ 11-13. There is simply no basis for this

Court to grant such relief, particularly where Appellants have had all of the process to which they are due on a schedule to which they consented. Appellants' claim that because their DIP financing proposal was "more economically attractive" the Debtors should have tossed aside their business judgment (buttressed by all the above facts) is absurd.

78.     Appellants' mention of the "alternative proposal" reveals their ulterior motive in seeking to delay approval of the DIP Motion. Mot. ¶ 73. If Appellants successfully delay the approval of the DIP Motion and put the Term DIP Loan Facility in jeopardy by preventing the Debtors from meeting contractual milestones, they will gain leverage in the Debtors' Bankruptcy Cases to unjustly benefit Appellants at the expense of the Debtors and other creditors. As the Bankruptcy Court correctly noted in its Opinion—Appellants' real complaint is not the 2021 transaction, but rather that they, after acquiring their interest in the 10.5% Notes months after the 2021 transaction, have not been able to participate in the economic terms of the restructuring negotiated between the Debtors and the Ad Hoc Noteholders Group.  Allowing a stay in these circumstances would conflict with the requirement that a "stay should not operate to give an appellant a tactical advantage it would not have enjoyed had it been successful in the lower court." *In re Strawberry Square Assocs.*, 152 B.R. 699, 702 (Bankr. E.D.N.Y. 1993). Such a result would be plainly inequitable.

79.    Finally, each month of delay resulting from the requested stay will dramatically drain the Debtors' estate. Del Genio Dec. ¶¶ 26-27. In professionals' fees alone, the Debtors expect to spend between $8 million to $10 million monthly. *Id*. This forecast—which assumes professional fees of $9.3 million and $7.3 million for June and July, respectively—was conceptualized on proceeding consensually through the bankruptcy and does not contemplate the level of litigation currently occurring. *Id*. Extending this process for months to well-over a year would dramatically, and needlessly, drain estate resources. *Id*. Again, Appellants do nothing to address these costs.

### 4.  A stay would not be in the public interest.

80.    In addition to the above factors, Appellants have also not met their burden of showing that a stay would serve the public interest. Appellants' first and second justifications for why a stay is in the public interest depend on their position regarding lien priority and contractual obligations to be correct—which the Bankruptcy Court has already ruled it is not. Because Appellants cannot show a likelihood of success on the merits, their reasons for why a stay is in the public interest fail.

81.    Appellants' third justification is a red herring, that fares no better. Self-serving claims that "the outcome here will have outsized importance for the credit market" is of no relevance here. Indeed, that again goes to the ultimate success on

the merits (something the Bankruptcy Court already found unlikely). But, in the event that Appellants are correct, as they contend, that would correct any "implications" to the credit market. In short, this argument has nothing to do with whether a stay is proper or not.

82.     Contrary to Appellants' arguments, denial of the stay would serve the public interest. It is well recognized that there is a "strong public 'need for finality of decisions, especially in bankruptcy proceedings.'"  *See In re Calpine Corp.*, No. 05-60200-BRL, 2008 WL 207841, at *7 (Bankr. S.D.N.Y. Jan. 24, 2008) (citations omitted); *see also W.R. Grace*, 475 B.R. at 208 ("In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgments."). Similarly, courts recognize that the public interest requires prompt and efficient resolution of Bankruptcy Cases. *See*, *e.g.*, *id.* ("Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies.") (internal citations omitted); *U.S. v. LCI Holdings Co.* (*In re LCI Holding Co.*), 519 B.R. 461, 466 (D. Del. 2014), *aff'd sub nom.*, 802 F.3d 547 (3d Cir. 2015) (denying motion to stay sale order in part because "[t]he public interest is better served by allowing the estates to be administered swiftly and efficiently and with the sale remaining in effect by the continuation of jobs . . . and . . . services."). A stay would only hinder the administration of the chapter 11 cases, create uncertainty that will harm the Debtors and other creditors, and delay and hinder the

Debtors' successful emergence from Chapter 11. This is particularly true here, given wide-ranging consequences that an open-ended stay of these proceedings would have.

83.    Finally, the equities—broadly speaking—strongly disfavor staying these proceedings. It is not a stretch to say that the "emergency" Appellants complain of is simply one of their own making. After all, Appellants bought their interest in the 10.5% Notes months after the 2021 transaction they complained of and continued to acquire them through January 2022. As the Bankruptcy Court recognized, such a fact is relevant to an "equitable claim," like the current request for stay. June 29, 2022 Hr. Tr. at 31:1-14. After their purchase, Appellants never raised any complaint regarding their interpretation of the 10.5% Notes and the 2021 Transaction for months. The first formal complaint issued from Appellants regarding these transactions was in March of 2022. March 31, 2022 Milbank Ltr. to TPC.  And, even then, they did not file suit immediately, but waited for yet more months until after the Bankruptcy Cases were filed—bringing their Adversary Proceeding on June 2, 2022. Finally, as noted above, Appellants themselves were crystal clear they wanted their claims resolved expediently and before the upcoming DIP hearing. After sitting on their hands for months until bankruptcy was filed, demanding a break-neck briefing and discovery schedule, and requesting relief on an expedited basis from the Bankruptcy Court, Appellants complain things are going too fast to preserve their

rights. Appellants' start-stop complaints are meritless and—even if not legally baseless—the equities strongly weigh against delay and highlight their actual intent is, as noted above, to use the judicial procedural mechanisms to obtain leverage in a business negotiation among sophisticated parties. *See Honeywell Intern., Inc.*, 343 F. Supp. 2d at 321 ("'equity disfavors undue and prejudicial delay by a person who may have an interest in the property of another.'") (citations omitted); *Intellectual Ventures I LLC*, 2016 WL 4690384, at *2 ("[O]ne who comes in equity must come with clean hands and keep those hands clean throughout the pendency of the litigation even to the time of ultimate disposition by an appellate court.") (citations omitted). The maxims of equity strongly counsel against issuing a stay in such instances.

84.     Accordingly, a stay is unsupported and contrary to public policy and the policy of the Bankruptcy Code. The public interest is best served by denying the stay.

**B.     Should a stay be granted, Appellants should be required to post a substantial bond.**

85.     As described above, Appellees firmly believe that Appellants cannot satisfy their high burden of demonstrating that a stay pending appeal is necessary. However, if a stay is nevertheless granted, Appellants should be required to post a substantial bond.

86.     "It is well established that the reason for requiring a bond is to secure the prevailing party against any loss that may be sustained as a result of an ineffectual appeal." *In re Sphere Holding Corp.*, 162 B.R. 639, 644 (E.D.N.Y. 1994). Courts typically require the movant to post a bond equal to the amount of potential risk to the non-movants. *See, e.g., In re HNRC Dissolution Co.*, No. 04-158 HRW, 2005 WL 1972592, at *4 & n.6 (Bankr. E.D. Ky. Aug. 16, 2005) (noting that union challenging sale of debtors' assets under 11 U.S.C. Section 363 was required to post a bond of at least $500 million to obtain stay pending appeal); *ACC Bondholder Group v. Adelphia Comm. Corp.* (*In re Adelphia Comm. Corp.*), 361 B.R. 337, 368 (S.D.N.Y. 2007) (requiring appellants to post a bond in the amount of $1.3 billion, based upon estimation of potential harms caused by risk that the confirmed plan would fall apart); *In re Calpine Corp.*, 2008 WL 207841, at *7 (noting that if the motion to stay were granted—which it was not—the court would require a bond "in the range of $900 million to $1 billion" to compensate for aggregate additional interest the debtors would incur if they were unable to close on their existing exit financing). It is the movant's burden to demonstrate why a bond is not necessary. *See*, *e.g.*, *In re W.R. Grace & Co.*, 475 B.R. at 209 ("It has been recognized that 'if the movant seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security

requirement.'") (internal quotation marks omitted) (emphasis added); *De La Fuente v. DCI Telecommc'ns, Inc.*, 269 F.Supp.2d 237, 240 (S.D.N.Y. 2004).

87.    Here, although Appellants casually claim that a bond is not necessary, they have failed to demonstrate that no bond is required. Their arguments largely piggyback off their no-harm theory, which fails for the myriad reasons discussed above (including but not limited to the jeopardy a stay puts on Debtors' business and on the Plan proposed by the Debtors). Moreover, as extremely well-capitalized financial institutions, each of the Appellants is fully capable of posting a bond in order to protect the bankruptcy estates from the significant risks of harm detailed above.

88.    As for the appropriate bond amount, the Debtors and Intervenor respectfully suggest that this issue be deferred until after this Court decides whether a stay is warranted. Unless this Court prefers a different approach, the parties will file supplemental submissions to address the bond amount if that proves necessary.

## **CONCLUSION**

For the foregoing reasons, Appellees request that the District Court (i) deny the Motion and (ii) waive or reject any further stay, including any stay under Rule 8025 of the Federal Rules of Bankruptcy Procedures.

Dated:  July 18, 2022
        Wilmington, Delaware

/s/ Curtis S. Miller

| | |
|---|---|
| **BAKER BOTTS L.L.P.** | **MORRIS, NICHOLS, ARSHT &** |
| James R. Prince (*pro hac vice* pending) | **TUNNELL LLP** |
| Kevin Chiu (*pro hac vice* pending) | Robert J. Dehney (No. 3578) |
| 2001 Ross Avenue, Suite 900 | Curtis S. Miller (No. 4583) |
| Dallas, Texas 75201-2980 | Daniel B. Butz (No. 4227) |
| Telephone:  (214) 953-6500 | Matthew O. Talmo (No. 6333) |
| Facsimile:   (214) 953-6503 | Brian Loughnane (No. 6853) |
| Email: jim.prince@bakerbotts.com | 1201 N. Market Street, 16th Floor |
|         kevin.chiu@bakerbotts.com | P.O. Box 1347 |
| | Wilmington, Delaware 19899-1347 |
| -and- | Telephone: (302) 658-9200 |
| | Facsimile: (302) 658-3989 |
| BAKER BOTTS L.L.P. | Email:    rdehney@morrisnichols.com |
| Scott R. Bowling (*pro hac vice* pending) |          cmiller@morrisnichols.com |
| 30 Rockefeller Plaza |          dbutz@morrisnichols.com |
| New York, New York 10112 |          mtalmo@morrisnichols.com |
| Telephone:  (212) 408-2500 |          bloughnane@morrisnichols.com |
| Facsimile:   (212) 259-2501 | |
| Email: scott.bowling@bakerbotts.com | |

-and-

BAKER BOTTS L.L.P.
David R. Eastlake (*pro hac vice* pending)
Lauren N. Randle (*pro hac vice* pending)
910 Louisiana Street
Houston, Texas 77002
Telephone:  (713) 229-1234
Facsimile:   (713) 229-1522
Email: david.eastlake@bakerbotts.com
        lauren.randle@bakerbotts.com

*Attorneys for TPC Group Inc.*

**PAUL HASTINGS LLP**

Kristopher M. Hansen, Esq. (*pro hac vice* pending)
Kenneth Pasquale, Esq. (*pro hac vice* pending)
Jonathan D. Canfield, Esq. (*pro hac vice* pending)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
         kenpasquale@paulhastings.com
         joncanfield@paulhastings.com


*Counsel to Intervenor Defendant*
*The Ad Hoc Noteholder Group, solely*
*with respect to the claims asserted by*
*plaintiff Cerberus Capital*
*Management, L.P*

*/s/ Robert F. Poppiti, Jr.*

**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**

Matthew B. Lunn, Esq. (No. 4119)
Robert F. Poppiti, Jr., Esq. (No. 5052)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 576-3312
Email: mlunn@ycst.com
         rpoppiti@ycst.com


*Counsel to Intervenor Defendant*
*The Ad Hoc Noteholder Group*

.

## <u>RULE 8015(H) CERTIFICATION</u>

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this response contains 11,728 words, which exceeds the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A).  By a separate motion, the Appellees have requested entry of an order authorizing the Appellees to exceed the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A). The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

Dated: July 18, 2022                                   */s/ Brian Loughnane*
                                                                    Brian Loughnane (No. 6853)

1