## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: TPC GROUP INC., *et al.*, | : | Chapter 11 |
| | : | Case No. 22-10493-CTG |
| Debtors. | : | (Jointly Administered) |
| | : | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P., | : | |
| | : | |
| | : | |
| Appellant, | : | |
| v. | : | Adv. Proc. No. 22-50372-CTG |
| | : | |
| TPC GROUP INC. and the AD HOC NOTEHOLDER GROUP, | : | Misc. No. 22-298-RGA |
| | : | |
| Appellee, | : | |
| | : | |
| -and- | : | |
| | : | |
| THE AD HOC NOTEHOLDER GROUP, | : | |
| | : | |
| Intervenor. | : | |

---

## <u>MEMORANDUM OPINION</u>

Jennifer Selendy, Andrew R. Dunlap, Oscar Shine, Max H. Siegel, Selendy Gay Elsberg PLLC, New York, NY; Laura Davis Jones, Timothy P. Cairns, Pachulski Stang Ziehl & Jones LLP, Wilmington, DE, attorneys for Appellants.

James R. Prince, Kevin Chiu, Baker Botts LLP, Dallas, TX; Scott R. Bowling, Baker Botts LLP, New York, NY; David R. Eastlake, Lauren N. Randle, Baker Botts LLP, Houston, TX; Robert J. Dehney, Curtis S. Miller, Daniel B. Butz, Matthew O. Talmo, Brian Loughnane, Morris Nichols Arsht & Tunnell LLP, Wilmington, DE, attorneys for appellee TPC Group Inc.

Kristopher M. Hansen, Kenneth Pasquale, Jonathan D. Canfield, Paul Hastings LLP, New York, NY; Matthew B. Lunn, Robert F. Poppiti, Jr., Young Conaway Stargatt & Taylor, LLP, attorneys for appellee the Ad Hoc Noteholder Group.

July 26, 2022

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This dispute arises in the chapter 11 cases of TPC Group Inc. (together with certain

affiliates, "Debtors"), a Texas-based petrochemical company.  Appellants Bayside Capital, Inc. and

Cerberus Capital Management, L.P. ("Appellants") filed a complaint for declaratory judgment,

initiating the above-captioned adversary proceeding,[1] and later sought summary judgment to

adjudicate their purported rights under applicable loan documents.  The dispute is over the

construction of a 2019 indenture governing $930 million in notes ("10.5% Notes") issued by the

Debtor.  The fundamental question is whether a series of amendments to the 2019 indenture, made

in 2021, which sought to authorize a new loan that would come in senior to the 10.5% Notes, were

consistent with the terms of the 2019 indenture.  Appellants have appealed the Bankruptcy Court's

July 6, 2022 Memorandum Opinion (Adv. D.I. 72; Appx Ex. 1), and the accompanying July 8, 2022

Order (Adv. D.I. 74; Appx 2) and Judgment (Adv. D.I. 75; Appx 3), which held that the 2021

amendments comported with the terms of the 2019 indenture, denied Appellants' summary

judgment motion, and granted the cross-motion for summary judgment filed by the Ad Hoc

Noteholder Group (as intervenors).

Pending before the Court is Appellants' *Emergency Motion for Stay of Effectiveness and*

*Enforcement of Order and Judgment Pending Appeal* (D.I. 1, 4, 25, 27) ("Emergency Stay

Motion"), which seeks a stay of the Order and Judgment pending an expedited appeal.  Critically,

such a stay would further delay the Bankruptcy Court's ability to approve, on a final basis, the

Debtors' proposed debtor-in possession ("DIP") financing.   Debtors and the Ad Hoc Noteholder

---

[1] The docket of the adversary proceeding, captioned *Bayside Capital, Inc. et al. v. TPC Grp. Inc.,*
Adv. No. 22-50372 (CTG) (Bankr. D. Del.), is cited herein as "Adv. D.I. __," and the docket of the
Chapter 11 cases, captioned *In re TPC Group Inc.*, No. 22-10493-CTG (Bankr. D. Del.), is cited
herein as "B.D.I. __." Exhibits to the Appellants' appendix (D.I. 4) filed in support of the
Emergency Stay Motion is cited herein as "Appx Ex. __."

Group ("Appellees") filed a consolidated opposition to the Emergency Stay Motion. (D.I. 10).

Also pending before the Court is Appellants' *Emergency Motion to Expedite Appeal* (D.I. 7)

("Emergency Motion to Expedite"), which seeks an order setting an expedited schedule for briefing

and argument of the merits of the appeal.[2]   Appellees filed a consolidated opposition to that motion

as well. (D.I. 12). The Emergency Motions are fully briefed. For the reasons set forth herein, the

Court will deny both Emergency Motions.

## I.   BACKGROUND

The Memorandum Opinion contains a detailed description of the factual and procedural

background of this dispute. (Mem. Op. 1-14). Because I write primarily for the parties, and am

ruling on an expedited basis, this background is not repeated herein. No party contends that there is

a disputed question of fact, and all parties agreed that the question before the Bankruptcy Court was

"a pure question of contractual interpretation that can be resolved on the undisputed factual record

before the Court." (Mem. Op. 15).

### A.   The 2019 10.5% Notes Indenture

TPC issued the 10.5% Notes on August 2, 2019, with a face amount of $930 million. The

terms of the 10.5% Notes, and the rights and responsibilities of TPC, the noteholders, the Trustee

(U.S. National Bank), and various guarantors are set forth in an Indenture signed that same day (D.I.

10 Ex. 4) (the "10.5% Notes Indenture"). New York law governs the 10.5% Notes Indenture. (*Id.* §

14). Three provisions of the 10.5% Notes Indenture are particularly relevant here.

First, the default rule, set out in Section 9.02(a), allows TPC and U.S. Bank, as trustee and

collateral agent, to amend or supplement the 10.5% Notes Indenture or 10.5% Notes with the

consent of only a simple majority of the holders of the outstanding principal. Section 9.02(a)

---

[2] The appeal of the Order was filed separately from the Emergency Motions and is pending at Civ.
No. 22-927-RGA.

3

provides, in pertinent part, as follows:

> Except as provided in this Section 9.02, the Issuer, the Guarantors and the Trustee and, if applicable, the Collateral Agent, may amend or supplement this Indenture (including, without limitation, Sections 4.08 and 4.12 hereof) and the Notes or the Note Guarantees with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes) ….

(*Id.* § 9.02(a)).  Second, Section 9.02(e) addresses amendments and modifications which have the effect of releasing the collateral or modifying the 2019 Intercreditor Agreement (defined below), upon the approval of two-thirds, *i.e.*, a super-majority, of the holders the outstanding principal:

> Any amendment to, or waiver of, the provisions of this Indenture, any Security Document or any other indenture governing Permitted Additional Pari Passu Obligations that has the effect of releasing all or substantially all of the Collateral from the Liens securing the Notes or otherwise modifies the Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the Holders will require the consent of the holders of at least 66- 2/3% in aggregate principal amount of the Notes and any Permitted Additional Pari Passu Obligations then outstanding.

(*Id.* § 9.02(e)).  Third, Section 9.02(d) sets forth the instances where unanimous consent is required. These "sacred rights" include situations where amendments generally impact the amount of principal, the way principal is repaid, or "change the provisions in the Intercreditor Agreement or this Indenture dealing with the ***application of proceeds of Collateral*** that would adversely affect the Holders."  (*Id.* at § 9.02(d)(1)-(10) (emphasis added)).

Section 4.07 of the 10.5% Notes Indenture expressly provides for the incurrence of additional debt by TPC.  (*See* § 4.07).  Section 4.07(b)(1) provides for the incurrence of debt "not to exceed the greater of . . . $300.0 million and . . . the Borrowing Base."  (*Id.* at § 4.07(b)(1)). Likewise, Section 4.07(b)(15) provides for TPC's incurrence of additional debt "not to exceed the greater of . . . $50 million and . . . 5.0% of Total Assets." (*Id.* at § 4.07(b)(15)).

**B.     2019 Intercreditor Agreement**

At the same time that TPC issued the 10.5% Notes, it also entered into an asset-based

revolving loan facility (referred to as the "ABL facility") with an availability of up to $200 million (subject to a borrowing base), under which Bank of America served as administrative agent and collateral agent. The ABL facility was secured by a first lien on the Debtors' accounts receivable, deposit accounts, inventory, and other assets, and a second lien on those assets that secure the 10.5% Notes. Because the holders of the 10.5% Notes also took a security interest in the same collateral—though, with respect to the accounts receivable and deposit accounts, one that was junior to that held by the lenders under the ABL facility—the parties also entered into an intercreditor agreement setting forth the parties' respective rights. (Appx Ex. 21) ("2019 Intercreditor Agreement"). Section 4.1(a) of the 2019 Intercreditor Agreement explains that the holders of the 10.5% Notes are paid first out of the proceeds of the collateral as to which those holders have a senior lien, with the lenders of the ABL facility being paid second. The priority of payment is reversed with respect to accounts receivable, deposit accounts, inventory, and other assets as to which the lenders under the ABL facility have a first lien. For that collateral, the proceeds are paid first to the lenders under the ABL facility, with the holders of the 10.5% Notes being paid second.

### C   The 2021 Transaction

After the issuance of the 10.5% Notes, TPC's business and liquidity was impacted by several adverse events. To address its need for greater liquidity, in February 2021, TPC issued $153 million in new notes, maturing in 2024 and bearing interest at 10.875 percent ("10.875% Notes"). (*See* (D.I. 10 Ex. 7) ("10.875% Notes Indenture"). In 2022, TPC issued an additional tranche of $51.5 million in 10.875 percent notes, on substantially the same terms as those issued in 2021. The parties intended for these tranches of 10.875% Notes to be secured by the same collateral as the 10.5% Notes, but with a lien that would become senior to the lien securing the 10.5% Notes, thus necessitating various amendments to the 10.5% Notes Indenture and the 2019 Intercreditor Agreement. Because, however, at the time of the 2021 transactions, the holders under the 10.875%

5

Notes also held a majority (indeed, a super-majority of more than 67 percent) of the then-outstanding 10.5% Notes, they had the authority to amend the 10.5% Notes Indenture in any way that did not violate a holder's "sacred rights" set out in § 9.02(d) of that indenture.

To allow for the issuance, TPC amended the 10.5% Notes Indenture by executing a supplemental indenture. (D.I. 10 Ex. 5) ("Supplemental Indenture"). The Supplemental Indenture contains amendments to the 10.5% Notes Indenture intended to permit the issuance of the 10.875% Notes. The parties also entered into a new intercreditor agreement (D.I. 10 Ex. 8) ("2021 Intercreditor Agreement") which operates to subordinate the 10.5% Notes to the 10.875% Notes with respect to the common collateral securing both sets of notes. The consents executed by more than 67% of the holders of the 10.5% Notes authorized the entry into both the Supplemental Indenture and the 2021 Intercreditor Agreement.

Appellants acquired their less than 10% interest in the 10.5% Notes through purchases made between July 2021 and January 2022—i.e., months after the issuance of the first tranche of 10.875% Notes. On March 31, 2022, prior counsel for Appellants sent a letter to TPC's counsel asserting that the 10.875% Notes, Supplemental Indenture, and 2021 Intercreditor Agreement were ineffective.

### D.     The Chapter 11 Cases Adversary Proceeding

TPC continued to experience challenges after the issuance of the 10.875% Notes. On June 1, 2022 ("Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. Debtors filed motions to approve a proposed DIP loan and restructuring support agreement ("RSA"). On June 2, 2022, Appellants filed the adversary proceeding alleging that TPC breached the 10.5% Notes Indenture and 2019 Intercreditor Agreement and seeking a declaratory judgment invalidating Supplemental Indenture, 10.875% Notes Indenture, and 2021 Intercreditor Agreement. Appellants requested expedited consideration of the adversary proceeding so that their

6

claims could be considered prior to final approval of the Debtors' DIP financing including a term loan from the Ad Hoc Noteholder Group.[3]  (Appx 25, B.D.I. 148 ("6/2/2022 Tr.") at 84:15-85:4). Because the DIP loan would "roll up" the 10.875% Notes that purport to be senior to the 10.5% Notes, the question was whether the 10.875% notes are actually senior, or were (as Appellants contend) junior to the 10.5% Notes on account of a violation of the 10.5% Notes Indenture.  The Bankruptcy Court agreed to fast track the adversary proceeding.

The Memorandum Opinion, issued on July 6, 2022, following expedited discovery, briefing, and argument, rejected Appellants' challenge to the 2021 transaction as a matter of law and held that Section 9.02(d)(10) of the 10.5% Notes Indenture—the "sacred right" provision dealing with the "application of proceeds to Collateral"—addressed only the ratable distribution of proceeds to noteholders in a class, and "should not be read as an anti-subordination provision in disguise." (Mem. Op. 27-28).  The Bankruptcy Court then issued an Order and Judgment consistent with the Opinion on July 8, 2022.

## E.     The Initial Stay Motion

The same day, Appellants filed their notice of appeal and moved the Bankruptcy Court for a stay pending appeal of the Order and Judgment.  (Adv. D.I. 79).  On July 11, 2022, the Bankruptcy Court issued a decision denying the request (Adv. D.I. 88) ("Initial Stay Decision").[4]

With respect to Appellants' likelihood of success on the merits, the Bankruptcy Court

---

[3] Pursuant to the DIP Motion, the Debtors seek authority to obtain secured post-petition financing consisting of (i) a secured asset-based revolving credit facility in a maximum committed amount of up to $200 million (the "ABL DIP Facility") and (ii) a priming secured term loan facility in an aggregate amount of $323 million (the "Term DIP Facility").

[4] Although the Order is a declaratory judgment, the Bankruptcy Court determined that the Order could properly be the subject of a stay because the practical effect of such decision was that "it will inform the Court's consideration of the motion to approve the DIP loan."  (Initial Stay Decision 4-5 (citing *United States v. Safehouse*, 468 F. Supp. 3d 687 (E.D. Pa. 2020) (declaratory judgment is properly the subject of a stay where it will have an obvious practical effect)).

concluded that the Appellants' likelihood of success was more than negligible without concluding that it is likely or probable.  (*Id*. at 5).  In reaching this conclusion, the Bankruptcy Court re-emphasized that the hierarchy of consents set forth in Section 9.02 of the 10.5% Notes Indenture made it illogical to read section 9.02(d)(10) as an anti-subordination provision.  (*Id*. at 6).  Such a reading, in the Bankruptcy Court's own words, is "readily apparent."  (*Id*. at 7).  The Bankruptcy Court further noted that Appellants' arguments, rather than move the needle in their favor, "demonstrate why they are unlikely to prevail on the merits."  In the Bankruptcy Court's view, Appellants' reading would render Section 9.02(e) superfluous and meaningless because subordination equally affects all 10.5% Noteholders.  (*Id*. at 7-8).  The Bankruptcy Court further explained that the reference to "custom and usage" in the Order, and any related observations, were intended to simply concern the context in which to review the agreements at issue, and regardless, "has no effect on [the Bankruptcy] Court's bottom-line conclusion."  (*Id*. at 9-12).

With respect to irreparable harm, the Bankruptcy Court held that, because it planned to proceed with a hearing on the final approval of the DIP Facility on the premise that its Order was correct, Appellants had a substantial case for irreparable injury.  At the same time, the Bankruptcy Court acknowledged, "It is not certain that the [DIP Facility] loan will be approved," and that "there are potential bases for objecting to the [DIP Facility] loan that do not depend on the declaratory judgment ruling."  (*Id*. at 12).

The Bankruptcy Court concluded that the balancing of equities weighed heavily against a stay.  Should the DIP Motion not be determined as scheduled, the Bankruptcy Court noted, the resulting harm to the Debtors' bankruptcy estates would greatly outweigh the harm alleged by Appellants.  Although Appellants face a potential reduction in their recoveries on their approximately $90 million of funded debt, the Bankruptcy Court recognized that such potential harm "is swamped by the potential harm on the other side of the ledger."  (*Id*. at 16).  Noting that

8

the DIP loan would only be approved if the Debtors succeed in demonstrating that the loan "is necessary to preserve the assets of the estate," in such a circumstance, prohibiting entry of the loan "will lead to the destruction of value," which destruction would harm the company's nearly 500 employees, creditors holding over $1 billion of funded debt, and the various tort plaintiffs, and could also threaten the Debtors' relationships with their vendors and suppliers. (*Id.* at 16-17). The Bankruptcy Court found that the potential harm asserted by Appellants, and their low likelihood of success on the merits, was "thoroughly overwhelmed" by the harm that the Debtors and their constituents would suffer if the stay were granted and the Debtors were prevented from obtaining final approval of the DIP Financing, and denied the stay on such basis. (*Id.*)

### F.     The Emergency Motions and Temporary Stay

On July 13, 2022, Appellants filed the Emergency Stay Motion with this Court along with the Motion to Expedite. In light of the impending hearing to approve the DIP loan on a final basis ("DIP Hearing"), which was then scheduled for July 15, 2022, this Court ordered a temporary stay through and including July 25, 2022, and ordered expedited briefing of the Emergency Motions. The hearing on the DIP Motion did not proceed on July 15, 2022. Based on instruction from the Bankruptcy Court, the parties have held July 29, 2022 as a tentative date for the rescheduled DIP Hearing.

## II.     JURISDICTION

The Court has jurisdiction over appeals from final judgments, orders, and decrees of the bankruptcy court. *See* 28 U.S.C. § 158(a)(1). No issue remains to be decided in the adversary proceeding, and the Order and Judgment are final.

## III.     STANDARD OF REVIEW

This Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World*

9

*Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998).  The parties agree (D.I. 1 ¶ 33; D.I. 10 ¶ 51) that this appeal presents matters of pure contractual interpretation, which this Court reviews *de novo. See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).

## IV.   ANALYSIS

### A.   Emergency Stay Motion

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001).  Appellants bear the burden of showing that a stay of the Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).  The most critical factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  The Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) [it] will suffer irreparable harm absent a stay?  If it has, we balance the relative harms considering all four factors using a 'sliding scale' approach.  However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*In re Revel AC*, 802 F.3d at 571 (emphasis in text) (internal quotations and citations omitted).

### 1.   Likelihood of Success on the Merits

As to the first factor—whether the stay applicant has made a strong showing that it is likely

to succeed on the merits—a sufficient degree of success for a strong showing exists if there is "a

reasonable chance, or probability, of winning." *In re Revel AC*, 802 F.3d at 568-69 (quoting *Singer*

*Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). It "is not enough

that the chance of success on the merits be better than negligible," but the likelihood of winning on

appeal need not be "more likely than not." *Id.* at 569 (internal quotations omitted). The question

the Third Circuit asked in *Revel* was, "Did the applicant make a sufficient showing that . . . it can

win on the merits" by a showing "significantly better than negligible but not necessarily greater than

50%." *In re Revel AC*, 802 F.3d at 571.

The central issue on appeal is whether the adoption of the Supplemental Indenture or the

2021 Intercreditor Agreement violates Section 9.02(d)(10) of the 10.5% Notes Indenture, which

provides that "an amendment, supplement or waiver under this Section 9.02 may not (with respect

to any Notes held by a non-consenting Holder) … make any change in the provisions of the

Intercreditor Agreement or this Indenture ***dealing with the application of proceeds of Collateral***

***that would adversely affect the Holders*** ." (10.5% Notes Indenture § 9.02(d)(10)). The parties

dispute how broadly or narrowly to read the term "dealing with the application of proceeds of

Collateral." Appellants read the language broadly, arguing that any change that would put new debt

ahead of them with respect to the right to recover out of the Collateral "deal[s] with the application

of proceeds of Collateral." (D.I. 1 at 14 ("That broad language covers any amendments that would

alter the order in which Collateral proceeds are to be distributed—whether among the Senior

Noteholders, between the Senior Noteholders and the ABL Lenders, or between those classes and

the new [10.875%] Noteholders.")). Appellants thus argue that the amendments to the 10.5% Notes

11

Indenture made by the Supplemental Indenture (including subjecting the 10.5% Notes Indenture to the 2021 Intercreditor Agreement) were covered by Section 9.02(d)(10) and required their consent.

Appellees counter that those changes did not "deal with" application of proceeds of Collateral. According to Appellees, the only provision of the 10.5% Notes Indenture that "deals with the application of proceeds of collateral" is Section 6.10, which addresses the waterfall for how the trustee should distribute monies it receives under the indenture (including the distribution of proceeds of collateral). That provision states that, after the payment of the trustee's fees, such funds are to be distributed "ratably" among holders. (10.5% Notes Indenture § 6.10(a)). Thus, if the agreement were amended so that certain holders would be paid ahead of others out of the proceeds of collateral, such an amendment could not be effective under Section 9.02(d)(10), as against an adversely affected objecting holder. On the other hand, so long as the proceeds of collateral that comes into the hands of the trustee are to be distributed ratably among the noteholder—as remained the case after the adoption of the Supplemental Indenture—then the indenture has not been amended in any way that "deal[s] with the application of the proceeds of Collateral." (10.5% Notes Indenture § 9.02(d)(10)).

Looking at the words in isolation, the Bankruptcy Court observed, "reasonable arguments could be made on either side." (Mem. Op. 22). But based on the "context . . . provided by the other terms of the 2019 [10.5% Notes] Indenture itself," the Bankruptcy Court adopted Appellees' narrower reading. The Bankruptcy Court focused on an "anomaly" that would result under Appellants' proposed reading, which would allow for the release of all or substantially all of the underlying collateral with only 2/3 of noteholders' support (as Section 9.02(e) of the 10.5% Notes Indenture does) but require unanimous approval for subordination. The Bankruptcy Court ultimately concluded: "In sum, contrary to the argument advanced by the objecting noteholders, . . . [Section] 9.02(d)(10) of the 10.5% Notes Indenture is primarily directed at protecting the holders'

12

rights to ratable treatment and should not be read as an anti-subordination provision in disguise."
(*Id.* at 27-28).

In my view, Appellants have not demonstrated a significantly better than negligible chance
that they can prevail on the merits of their appeal.   First, I find no support for Appellants' argument
in the text of the agreements.   By its unambiguous terms, Section 9.02(d)(10) encompasses
amendments "dealing with the application of proceeds of Collateral."   I agree that the only
provision of the 10.5% Notes Indenture that "deal[s] with the application of proceeds of Collateral"
is Section 6.10, which addresses the waterfall for how the trustee should distribute monies it
receives under the indenture (including the distribution of proceeds of collateral).   The only
provisions in the 10.5% Notes Indenture and the 2019 Intercreditor Agreement "dealing with the
application of proceeds of Collateral" are (i) Section 4.1(a) of the Intercreditor Agreement (which
deals with the priorities between the 10.5% Noteholders (via the 10.5% Notes Trustee), on the one
hand, and the ABL representative, on the other hand), and (ii) Section 6.10 of the 10.5% Notes
Indenture (which deals with the "Priorities" among the 10.5% Noteholders themselves).   As a result,
Section 9.02(d)(10) does not apply to priorities between the two different tranches of notes, the
10.875% Notes and the 10.5% Notes.

Appellants' argument relies solely on § 9.02(d)(10).   Appellants argue for "a commonsense
reading" of that section: that "dealing with the application of Collateral proceeds" covers more than
just amendments affecting the ratable distribution of such proceeds within a single class of
noteholders; rather, "[a]pplication of proceeds covers the order and manner in which proceeds of
Collateral are paid out;" "subordination is, by its very definition, a matter of application of
proceeds;" and because the 2021 transaction changed the order in which proceeds are paid,
Appellants' consent was required.   (D.I. 25 at 2, 5, 15).

13

I find little support for Appellants' interpretation of Section 9.02(d)(10) as an anti-subordination provision.  No such words exist in the plain language of that section.  Section 9.02(e), which immediately follows that section, permits, with the consent of a supermajority of the 10.5% Noteholders, an amendment to, or waiver of, provisions of the 10.5% Notes Indenture that modifies the 2019 Intercreditor Agreement "***in any manner adverse in any material respect to the Holders***." (10.5% Notes Indenture § 9.02(e) (emphasis added)).  As a result, any transaction that had the effect of amending the 2019 Intercreditor Agreement would be permissible so long as a supermajority of holders consented to such transaction, and it is undisputed that a supermajority of 10.5% Noteholders consented to the 2021 transaction.

In support of their reading of 9.02(d)(10) as an anti-subordination provision, Appellants rely (D.I. 1 at ¶¶ 38-50) upon *Audax Credit Opportunities Offshore v. TMK Hawk Parent*, 150 N.Y.S.3d 894 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) ("*TriMark*"), a case which also involved amendments to a provision concerning the "application of proceeds."  *TriMark* involved a slightly different "uptier" transaction, whereby a majority group of noteholders jump their existing debt ahead of a minority group whose notes are left behind, thereby resulting in a full recovery to the majority.  (*See* Mem. Op. at 2 (noting that the 2021 transaction—in which the majority 10.5% noteholders continued to own all 10.5% notes even after the 10.875% notes were issued—"is somewhat less aggressive than the paradigmatic 'uptier' transaction").  The transaction in *TriMark* was challenged by the noteholders who were "left behind" on the basis that the amendments to the agreement to authorize that transaction required their consent pursuant to a clause providing that an amendment could not revise Section 4.02 of the collateral agreement "in a manner that would by its terms alter the application of proceeds" without "the written consent of each Lender directly and adversely affected thereby."  *Id.* at *11.  Section 4.02 set up a waterfall among three separate constituents in the credit agreement.  The *TriMark* court observed that one "reasonable way" to read the provision is as a

14

prohibition on subordination—to prohibit the parties "from placing any tranche of debt above Plaintiffs' place in the waterfall, even if the order of distribution" is not affected. *Id.* at *12. Under this reading, even if the objectors' rights were not affected vis-à-vis the other holders in their same tranche, the objectors still "have a plausible argument that the [transaction] required their consent … because it altered the application of proceeds by subordinating Plaintiffs' priority interest to the new Super-Priority Intercreditor Agreement." *Id.* (internal quotation marks omitted). The *TriMark* court noted the counter-argument by defendants that "application of proceeds" refers "only to the Administrative Agent's application of proceeds among the categories covered by the agreement." *Id.* Under this view, "the Administrative Agent's task remains the same before and after the amendment—it still applies the 'proceeds' (whatever is left of them) in the order specified" in the agreement. *Id.*

"Even assuming the Defendants' interpretation is plausible," the *TriMark* court noted, "it is not the only reasonable way to read the contract." *Id.* Because the *TriMark* court found that the objectors' reading to be a plausible one, it denied a motion to dismiss the complaint and allowed the litigation to proceed. *Id.* The case settled thereafter. Thus, *TriMark* did not resolve the question as to whether the prohibition on subordination was a "sacred right" in the context of the agreement at issue there. (Mem. Op. at 24). The *TriMark* court never reached a definitive construction of the language at issue and *TriMark* does not create a likelihood of success on the merits.

The Bankruptcy Court cited *Serta*, a case in which the U.S. District Court for the Southern District of New York declined the invitation to construe a similar sacred rights provision as an anti-subordination clause. *See LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022). In that case, the sacred rights provision at issue required "consent from all affected Lenders for any waiver, amendment, or modification of the provisions of section 2.18(b) or (c) … *in a manner that would by its terms alter the pro rata sharing of payments required*

15

***thereby***.  *Serta*, 2022 WL 953109, at *2 (emphasis added).  Like the Bankruptcy Court here, the

*Serta* court declined the invitation to read this provision as an anti-subordination provision in

disguise:

> While the Amendments had the effect of extinguishing certain first-lien lenders'
> loans in exchange for an elevation of their priority rights under a new class of debt,
> the Amendments left untouched the pro rata rights of first-lien lenders vis-à-vis other
> first-lien lenders. At base, Plaintiffs' objection to the Transaction is not the
> interruption of their pro rata payment rights within the same class of lenders —
> which remain fully intact — but rather the subordination of their first-lien loans.
> Despite Plaintiffs' protestations, anti-subordination is not a sacred right protected by
> Section 9.02(b)(A)(6), or any other provision of Section 9.02.  Thus, the Agreement
> permitted such changes to be made with the consent of only a majority of lenders.

*Id*. at *10.  The Bankruptcy Court cited *Serta* in support of its proposition that "a provision

providing for ratable distribution (in the absence of an express anti-subordination clause) would

more naturally apply to distributions within a class, and not prohibit subordination of an entire class

to another, different class."  (Mem. Op. 25 n.75).

Appellants argue that *Serta* does not apply here because the sacred rights provision in *Serta*

protects "only 'pro rata' rights" and therefore "concerns only rights within [a] class of

shareholders."  (D.I. 1 at 13-14).  According to Appellants, the use of "application of proceeds of

Collateral" in the 10.5% Notes Indenture "refers to the ***complete*** waterfall by which proceeds are

applied," and "not merely a single step of that waterfall that requires *pro rata* sharing, which is a

distinct concept."  (*Id*. at 13) (emphasis in original).  According to Appellants, the only authority

interpreting the broader "application of proceeds" phrase in this context is *TriMark*, which supports

their interpretation.  (*Id*. at 5-6).  As discussed, *TriMark* did not reach a definitive construction of

the language at issue.  Appellants are correct that *Serta* considered different language, but *Serta*

supports the Bankruptcy Court's interpretation insomuch as it also rejected a broad interpretation of

the sacred rights provision as an anti-subordination provision and limited the unanimous consent

requirement to only those sacred rights specifically "enumerated." *See Serta,* 2022 WL 953109 at *9-10.

Appellants also dispute the Bankruptcy Court's hierarchy of consent analysis. While noting that both constructions of the language at issue in *TriMark* "were plausible based on the language in isolation," the Bankruptcy Court concluded that the language at issue here, read in the context of "the other terms of the 2019 [10.5% Notes] Indenture itself," compelled a narrower reading of Section 9.02(d)(10). (Mem. Op. 25-26). Indeed, the 10.5% Notes Indenture created a hierarchy of consents needed for particular amendments—it generally provided for control by the majority; stated that a super-majority of two-thirds was required to release all or substantially all of the collateral; and then identified ten "sacred rights" that required unanimous consent of affected holders. The Bankruptcy Court observed that the logic of this hierarchy suggests that the matters included among the ten "sacred rights" would be actions that are—at least from the perspective of an individual holder—more problematic or prejudicial than the kinds of actions that can be taken simply with the approval of a simple or two-thirds majority.   It would create an anomaly to read the 10.5% Notes Indenture to permit a two-thirds majority to take a more drastic action of releasing all collateral but give every holder the right to block the less extreme measure of subordination. Reading § 9.02(d)(10) to be limited to protecting the right to *pro rata* distributions is consistent with this structure, the Bankruptcy Court reasoned, as an individual holder would be severely prejudiced if the other holders all agreed that they would be paid in full out of the distribution of the proceeds of collateral before that individual holder received any distribution.  Reading § 9.02(d)(10) to treat any subordination as violating a "sacred right," on the other hand, would be inconsistent with this hierarchy, the Bankruptcy Court reasoned, because subordination of a lien to that of another lender is a less drastic intrusion on the rights of an individual holder than simply releasing all of the collateral. "There are many reasons why a lender might agree to subordinate its lien to one in favor

of a new lender." (Mem. Op. at 26-27). "In circumstances in which a borrower is facing a liquidity constraint, an old lender that is unwilling or unable to make a further loan might be very happy to subordinate its lien if that is the most cost-effective way for the borrower to attract new capital and thus avoid the greater threat to the lender's collateral that a default would precipitate." (*Id.*)

Appellants argue on appeal that the Bankruptcy Court erred in applying this hierarchy as "neither the contract nor any caselaw provides that actions implicating sacred rights, and requiring consent of all adversely affected Holders, must be more "drastic" than those which can be undertaken by a supermajority." (D.I. 25 at 9). The touchstone of contract interpretation is the text of the contract, Appellants argue, and not a court's opinion of how the text could be made more sensible (*Id.* (citing *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)). But the Bankruptcy Court's reading of the 10.5% Notes Indenture is a reasonable one harmonizing § 9.02(d)(1) with § 9.02(e). As the Bankruptcy Court observed, under any reading of § 9.02(d)(10) that was broad enough to cover subordination, it would *also* cover the release of collateral. Because § 9.02(e) requires only a two-thirds majority to release all of the collateral, any reading of § 9.02(d)(10) that would require the consent of every holder for the release of collateral would conflict with § 9.02(e). "The import of this construction is that § 9.02(d)(10) needs to be read more narrowly than the objecting noteholders contend." (Initial Stay Decision at 6). It is logical for § 9.02(d)(10), which would require unanimous consent, to apply to an amendment that would be more drastic or prejudicial to an individual noteholder than the release of collateral. Reading § 9.02(d)(10) as treating the right to ratable treatment as a "sacred right" that cannot be amended away without the consent of each affected holder is consistent with the language and more consonant with the overall structure and hierarchy of consents reflected in the indenture. The strained hypothetical posed by Appellants (D.I. 1 at 20) does not give rise to a likelihood of success.

18

Finally, the Bankruptcy Court acknowledged that the question before the Bankruptcy Court was "a pure question of contractual interpretation that can be resolved on the undisputed factual record before the Court." (Mem. Op. at 15). According to Appellants, the Bankruptcy Court therefore committed reversible error because it looked to "the customs, practices, usages and terminology as generally understood in the particular trade or business" to interpret the Section 9.02(d)(10), rather than relying on the plain text of the indenture. (D.I. 1 at ¶ 47 (citing Mem. Op. at 24-25)). The Memorandum Opinion noted that a provision providing for ratable distribution (in the absence of an express anti-subordination clause) would more naturally apply to distributions within a class, and not prohibit subordination of an entire class to another, different class—indeed, when the parties adopted the Supplemental Indenture, they included such a standard anti-subordination clause. (Supplemental Indenture § 9.02(f) ("Notwithstanding the foregoing in this Section 9.02, no amendment, supplement or waiver to the Indenture or any other Note Document shall subordinate the Lien securing the Notes Obligations to any other Lien (and the Trustee shall not enter into any intercreditor agreement providing for such subordination) without the consent of the holders of at least 66-2/3% in aggregate principal amount of the Notes then outstanding."))

But the Bankruptcy Court clarified in its Initial Stay Decision the point it had intended to make: that in construing the language of a contract "even without extrinsic evidence of custom and usage, the context and subject of the agreement can help lend clarity to terms that might otherwise be ambiguous." (Initial Stay Decision at 9-10). In the context of a leveraged loan agreement, the court noted, "one would not expect parties who intend to prohibit subordination to do so by amendments that deal with the allocation of the proceeds of collateral." (*Id*. at 10). The court further clarified that the principal basis for granting summary judgment in favor of the Appellees (and denying Appellants' summary judgment motion) was "the structural one about 'hierarchy of consents' contained in the indenture'"—a fundamental concern which had nothing to do with

custom and usage. (*Id.* at 11-12). Indeed, while referencing the customs and practices in the context of an indenture, the Memorandum Opinion itself makes clear that the "[e]ven more telling context" is that "provided by the other terms of the 2019 [10.5% Notes] Indenture itself." (Mem. Op. 24-25). Based on the foregoing, I agree that the inclusion of the language about "customs, practices, usages and terminology as generally understood in the particular trade or business" does not give rise to a substantial likelihood that Appellants will prevail on the merits of their appeal.

I find that Appellants have not made a significantly better than negligible showing that they are likely to succeed on the merits of the appeal.

### 2.    Irreparable Harm Absent a Stay

The applicant for a stay must "demonstrate that irreparable injury is likely in the absence" of the stay. *Winters v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm is an injury that "cannot be redressed by a legal or equitable remedy following a trial." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002).

Appellants assert "three independent irreparable harms." (D.I. 1 at ¶ 60). First, without a stay pending appeal, Appellants will lose access to the proceeds of Collateral without adequate protection or a valid waiver, in violation of the Fifth Amendment. (*Id.*) Second, proceeding to the DIP Hearing with the Order intact and issuing relief unfavorable to Appellants pending appeal would irreparably harm their property right in the 10.5% Notes by diluting their security interest. (*Id.* ¶ 70). Third, absent a stay, Appellees may later argue that Appellants' appeal has become statutorily moot under § 364(e) of the Bankruptcy Code or equitably moot under the Third Circuit's standard.

Appellees argue that Appellants have failed to demonstrate that any harm would be actual and imminent. I disagree. In absence of stay, the eventual DIP Hearing will proceed on the premise

20

that the Order's declaratory judgment ruling is correct. As the Bankruptcy Court noted, it is not certain that the DIP loan will be approved, as there are potential bases for objecting to the DIP loan that do not depend on the declaratory judgment ruling in the Order. But I agree with the Bankruptcy Court that, as a practical matter, the resolution of the declaratory judgment ruling increased the risk the objecting noteholders face that the DIP loan may be approved and that the 10.5% Notes will thus be placed behind the subsequent loans in priority.

Appellees further argue that Appellants have failed to establish that any harm would be irreparable. Appellees argue that a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement unless the potential economic loss is so great as to threaten the existence of the movant's business—an assertion Appellants have not made. *See Revel AC*, 802 F.3d at 572. Again, I disagree with Appellees.

Like the Bankruptcy Court, this Court does not read the Third Circuit case law to apply equitable mootness outside of the context of a confirmed plan. Statutory mootness, however, presents a very real challenge. If the DIP loan is approved, and Appellants are successful on appeal, they would face a statutory challenge under § 364(e) of the Bankruptcy Code, which provides that the "reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e). Thus, it does not appear that the subsequent reversal of the Order on appeal would provide a basis to restore the prior scheme of priority. According to Appellees, Appellants' remedy, if they are right and the rollup cannot be unwound, would be money damages. (D.I. 10 at 34-35). The Court agrees it would be extremely difficult to fashion a remedy if the DIP loan is approved

and Appellants are later successful on appeal. Based on the foregoing, Appellants have carried their burden of establishing irreparable harm.

### 3.    Balancing of Harms

Despite finding that Appellants have carried their burden of demonstrating irreparable harm, having already determined that Appellants have failed to carry their burden as to likelihood of success, I am satisfied no further analysis is required and the stay should be denied. *See Revel AC*, 802 F.3d at 571. I nevertheless address the remainder of the analysis, however, as I have thought about it and it may assist the Court of Appeals should there be a further appeal. In balancing the harms, the Court should "weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three). The Court should also take into account where the public interest lies (factor four)—in effect, how a stay decision has consequences beyond the immediate parties." *In re Revel AC*, 802 F.3d at 569 (internal quotation and citation omitted).

As the Bankruptcy Court noted, the objecting noteholders have a stake of approximately 10 percent in a $930 million debt issuance. The potential injury Appellants face is thus a reduction in their percentage recovery on that debt.

On the other hand, Appellees have provided substantial evidence of harms the Debtors would face from loss or delay of the DIP loan. In order to obtain approval of the DIP loan, Debtors will be required to make a showing that borrowing money "is necessary to preserve the assets of the estate." Thus, in any circumstance in which the DIP loan would otherwise be approved, loss or delay of the DIP loan will lead to the destruction of value affecting the Debtors' five hundred employees, other creditors holding more than $1 billion in other funded debt, as well as the tort claimants who suffered injury when the Debtors' facility in Port Neches, Texas exploded in November 2019.

22

The Debtors operate in a volatile business, one impacted by shifts in commodity prices and other factors beyond the Debtors' control, including weather and natural disasters. (D.I. 10-1 ("Del Genio Dec.") ¶¶ 17-25). This is particularly true because the Debtors operate a cash-intensive business with accounts payable and accounts receivables that can vary widely. Appellees submit evidence supporting the potential harm that a further delay of the DIP Hearing may impose, including that: (i) Debtors currently have over $43,000,000 in vendor and supplier bills from May that are due in July (*see id.* ¶¶ 8-9); (ii) with the rise in commodity prices, vendor and supplier expenses have risen to between $100,000,000 and $150,000,000 per month (*id.* at ¶ 20); (iii) the inherent risks that come with the Debtors' business, which can cause large variances in liquidity needs, making the historical minimum liquidity threshold a less than perfect indicator of the Debtors' future liquidity needs (*id.* at ¶ 18-22); (iv) failure to obtain the Final DIP Order would result in a substantial erosion of the liquidity the Debtors currently enjoy from the interim DIP loan and ABL facility (*id.* at ¶ 6-16); and (v) the failure to obtain the Term DIP Facility on a final basis would result in a default of the interim DIP Loan, thereby obligating Debtors, under the terms of those agreements, to repay the current draw of $32,000,000, further eroding the Debtors' liquidity by that amount (*id.* at ¶ 10-12).

Additionally, Debtors have provided the declaration of Zul Jamal that, based on his conversations with Eclipse, the ABL DIP Lender, that the failure of Debtors to obtain entry of a final order on the DIP loan by end of day July 18, 2022 would result in an event of default under Section 7.01(k)(iii)(c) of the Term DIP Facility and ABL DIP Facility. (D.I. 10-2 ("Jamal Dec.") ¶ 13). Appellants argue that the Court's current stay of the Order and Judgment until July 25, 2022 has already triggered an event of default under the ABL DIP Facility yet, "There is no evidence that the ABL DIP lender has stopped providing financing to TPC or has indicated that it will stop doing so." (D.I. 25 at 17). But Appellants do not dispute that Eclipse's willingness to provide the ABL

DIP Loan Facility—which no party disputes is necessary—on the existing negotiated terms is contingent upon approval of the Term DIP Loan Facility on a final basis. (Jamal Dec. ¶¶ 14-15; *see also* 6/2/22 Tr. at 180:16-181:22 (Mr. Jamal testifying that, for Eclipse, "[t]he entire basis for their underwrite was that the expectation that there would be new money coming in in the form of the [DIP] term loan"). If that does not occur, there is no guarantee that Eclipse will continue to provide the ABL DIP Loan Facility (or on what terms). Thus, if the Debtors lose access to the Term DIP Facility due to delays caused by the stay, the ABL DIP Loan Facility will also be in jeopardy, eroding the Debtors' available liquidity and forcing the repayment of amounts borrowed thereunder. (Jamal Dec. ¶¶ 14-15).

Appellants dispute Debtors' view that even a further short delay of the DIP Hearing, to allow the expedited briefing and ruling on the appeal sought by the Appellants, could cause the Debtors to lose over $140,000,000 in liquidity. (Del Genio Dec. ¶¶ 6-16). Along with the over $43,000,000 owed to vendors and suppliers for May orders, this would leave the Debtors substantially short of the bare minimum $50,000,000 in liquidity to operate its business. (*Id*. ¶ 8-9, 16). Such an occurrence would damage relationships with the Debtors' key business partners, the Debtors' workforce, and commercial counterparties by disrupting the Debtors' ordinary-course operations and causing them to fail to meet their financial commitments. (*Id*. ¶¶ 28-30). It would present substantial, if not insurmountable, challenges in holding vendor and supplier relationships— parties that provide better terms and credit when the Debtors can show substantial liquidity exists. (*Id*.)

Appellants' assertion that the Debtors have alternative postpetition financing available discounts the Debtors' business judgment in concluding that the Term DIP Facility is the best and only actionable postpetition financing proposal available to the Debtors. (Jamal Dec. ¶ 14-16). The DIP Facility was negotiated at arms' length and does not require nonconsensual priming of existing

24

prepetition liens. (*Id.*) As the Debtors are unable to provide adequate protection to the 10.5%

Notes collateral agent on account of nonconsensual priming, and the 10.5% Notes collateral agent

has not consented to priming by liens other than those securing the Term DIP Facility, Appellants'

assertions regarding an "alternative proposal" are belied by the facts. (*Id.*; *see also* 6/2/22 Hearing

Tr. at 194:17-23).

Moreover, as Mr. Jamal has testified without dispute, the Term DIP Facility and the

restructuring support agreement provide the Debtors with new money on reasonable terms under the

circumstances and provide a path to emergence from these chapter 11 cases. (*Id*). The Debtors

determined in their business judgment that the RSA transactions constitute the best and only

restructuring transactions available to the Debtors and maximize value for the benefit of all parties

in these chapter 11 cases. (*Id.*) Appellants' requested relief would put the Debtors into default

under their DIP facilities and allow the RSA to be terminated without providing any alternative

viable path forward for the Debtors. (*Id.* ¶¶ 11-13).

Debtors argue that each month of delay resulting from the requested stay will dramatically

drain the Debtors' estate. (Del Genio Dec. ¶¶ 26-27). In professionals' fees alone, the Debtors

expect to spend between $8 million to $10 million monthly. (*Id*). This forecast—which assumes

professional fees of $9.3 million and $7.3 million for June and July, respectively—was

conceptualized on proceeding consensually through the bankruptcy and does not contemplate the

level of litigation currently occurring. (*Id.*) Extending this process for months to resolve the appeal

would drain estate resources. (*Id.*)

I agree with the Bankruptcy Court that these potential harms far outweigh the potential

reduction in Appellants' percentage recovery.

####     4.      Where the Public Interest Lies

The Court agrees with the Bankruptcy Court that, in the context of this dispute, which is primarily a commercial dispute between private parties, consideration of the public interest does not add materially to the considerations described above.

Because the balance of equities weighs strongly against the entry of a stay, the Emergency Stay Motion will be denied.

####     B.      Emergency Motion to Expedite

Appellants request that the Court consider this appeal on an expedited basis within a matter of weeks. Indeed this is "extraordinary relief under any measure." *In re Mallinckrodt PLC*, 2021 WL 3403799, at *2 (D. Del. Aug. 4, 2021). For an appeal to be considered on an emergency, expedited basis, the Appellants must (i) show justification for "considering the appeal ahead of other matters," and (ii) demonstrate immediate or irreparable harm that would occur in the absence of expediting the appeal. *See In re John Varvatos Enterprises, Inc.*, 2020 WL 3971723, at *2 (D. Del. July 14, 2020) (citing to Fed. R. Bankr. P. 8013(a)(2)(B) & 8013(d)(1)).

That standard is not met here. The breach alleged by Appellants occurred when the Debtors issued the 10.875% Senior Secured Notes in February 2021. In July 2021, Appellants began purchasing 10.5% Notes, and over the ensuing months, Appellants built a small position in the 10.5% Notes. Appellants did not seek judicial relief until the Chapter 11 cases were filed in June of this year, leading to this emergency. As the timeline demonstrates, any exigencies are of Appellants' own making in failing to seek relief before the bankruptcy filing. "Such extraordinary relief [of expediting an appeal] should not be granted to redress a purported emergency that was caused by Appellants' own delay and failure to follow established procedures." *In re Mallinckrodt PLC*, 2021 WL 3403799, at *3 (citing *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021) ("We do not lightly grant emergency relief,

especially where the emergency is largely one of [plaintiff's] own making and the relief sought

would interfere with processes on which many others have reasonably relied.") (internal quotations

omitted); *In re Rosas*, 2010 WL 3075468, at *1 (Bankr. W.D. Tex. Aug. 4, 2010) ("The court is not

obligated to grant relief for emergencies of the [movant]'s own making.").

## V.     CONCLUSION

Appellants have failed to establish that a stay pending appeal of the Order or expedited

consideration of the appeal is warranted.  A separate order will be entered.