**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.,* | Bankruptcy Case No. 22-10493 (CTG) |
| *Debtors.*[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Bankruptcy Adv. Proc. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants,* | Civ. Action No. 22-mc-00298 (RGA) |
| v. | **Related Docket Nos. 25 and 27** |
| TPC GROUP INC., | |
| *Defendant-Appellee,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant-Appellee.* | |

**<u>DECLARATION OF OSCAR SHINE</u>**

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

OSCAR SHINE, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of the law firm Selendy Gay Elsberg PLLC, counsel to Plaintiffs-Appellants Cerberus Capital Management, L.P and Bayside Capital, Inc. in the above-captioned Action. I submit this declaration in support of the *Reply of Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. in Further Support of Their Emergency Motion for Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal Pursuant to Bankruptcy Rule 8007*, filed contemporaneously herewith.

2.      Attached to this declaration as **Exhibit A** is a true and correct copy of excerpts from the transcript of the deposition of Robert Del Genio, dated July 13, 2022.

3.      Attached to this declaration as **Exhibit B** is a true and correct copy of excerpts from the transcript of the deposition of Zul Jamal, dated July 12, 2022.

4.      Attached to this declaration as **Exhibit C** is a true and correct copy of excerpts from the transcript of the deposition of Alexander Tracy, dated July 14, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2022

/s/ _____ *Oscar Shine* _____
                       Oscar Shine

DOCS_DE:240095.1 13563/001

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Chapter 11

Case No. 22-10493(CTG)

----------------------------------------x

In re:

TPC GROUP INC., et al.,

                    Debtors.

----------------------------------------x

                    July 13, 2022

                    10:09 a.m.

     DEPOSITION of ROBERT DEL GENIO, pursuant to Rule 26 and Rule 30(b)(6) of the Federal Rules of Civil Procedure and Rules 7026, 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, and Delaware Bankruptcy Local Rule 7030-1, held at the offices of Akin Gump Strauss Hauer & Feld LLP, located at One Bryant Park, New York, New York 10036, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

Page 14

ROBERT DEL GENIO

A   And whose definition is that?

Q   Are you familiar with the term minimum liquidity threshold?

A   I understand what that term means, yes.

Q   And what do you understand that term to mean?

A   There's different types of minimum liquidity.  What I testified to was that during this period of time, when we were in what I would call restructuring negotiations, the minimum liquidity that we were looking at was $50 million.

Q   What's the purpose of finding out a minimum liquidity level?

A   Well, what we were focused on during this period is having enough liquidity to operate the business in a constrained environment.

Q   And now you're specifically talking about proceeding the bankruptcy?

A   I'm trying to figure that

Page 15

ROBERT DEL GENIO

out.

Q   You said we were focused on during this period, having enough liquidity to operate the business in a constrained environment.  I'm just trying to understand what period you were referring to.

A   So this business is operated not in a restructuring context and then through a restructuring contest.  And what I testified was that when I first met with management and I asked them about minimum liquidity, it was 75 to 100.  CFO said 75, CEO said 100.

During this period where the business was more constrained, they felt they could run it with 50.  But that wouldn't be a permanent liquidity -- minimum liquidity position for them.

Q   Let's break that apart a little bit.  It sounds like we're talking about two different periods of time.

And I think what you said is one is in a restructuring context, and

Page 16

ROBERT DEL GENIO

one is, I guess, outside of restructuring context; is that fair?

A   Yes, with one exception.

Q   And what is that exception?

A   That the structure that was put in when the company filed with an ABL DIP, a term loan DIP and cash gave the company three buckets of liquidity.  Companies talk to customers and suppliers about they have three types of liquidity, assuming the ABL DIP gets approved and the term loan DIP gets approved.

So although there were minimum levels, what was communicated to the vendor base and the customers is the company had three buckets of liquidity.  They had nothing to worry about because the company would be -- have adequate liquidity, that they would be able to pay them when their -- purchases that they made and those payables were due.  And customers didn't have to worry about their ability to deliver goods because there would be more than enough liquidity

Page 17

ROBERT DEL GENIO

in the company.

Q   So I think that goes beyond my question that I actually asked.

MR. QUIGLEY:  Objection to the speech.  You asked him what he meant by that.  And he answered you.

MS. TIZRAVESH:  No.  I asked what he meant by the two periods.  And he went into a complete sideshow about the DIP.

Q   My question is really focused on, what is minimum liquidity level and what the debtors understand that to mean; okay?  Earlier, when I asked you what is the purpose of finding out minimum liquidity, you said we are focused on having enough liquidity to operate the business in a constrained environment; right?

A   I did say that.

Q   And so is it fair to say that a minimum liquidity level tells you how much money the company needs to operate?

5 (Pages 14 - 17)

Page 22

ROBERT DEL GENIO

throughout the Chapter 11 cases.

Further, the additional liquidity provided by the DIP facilities will facilitate the debtors' comprehensive restructuring and successful emergence from Chapter 11, which will inure to the benefit to all the debtors' stakeholders."

I stand by that statement.

Q     Sitting here today, what's your understanding of the dollar amount that's the minimum liquidity level for the debtors to operate?

A     I don't think it's changed in terms of the constrained level, is 50. The historical threshold is 75 and 200. That's what I said in here.

However, I do think there is benefit to the structure that's set up which I articulated in 14. So I don't think my positions changed at all since this has been submitted.

Q     So then fair to say that the minimum liquidity level for the debtors

Page 23

ROBERT DEL GENIO

in a restructuring environment is 50 million?  Yes or no?

A     Ask that question again.

Q     Sure.

So then is it fair to say that the minimum liquidity level for the debtors in a restructuring environment is 50 million?

A     That's what we had targeted in the forecast.  But it's not the expectation that was set in the marketplace.  You don't talk to the marketplace about traditional minimum liquidity.  What you talk to the marketplace about is your access to liquidity, where to get your liquidity from and how can you generate liquidity.

And remember, they have a very sophisticated vendor base here. We're dealing with some of the largest companies in the world that have very sophisticated financial organizations. So they're going to look at, do you have your DIP in place, what other forms of

Page 24

ROBERT DEL GENIO

financing do you have, ABL DIP, cash. Those questions had been received.  We have an MRO supplier right now that will not ship, even though they have no pre-petition exposure, because they're waiting to see a DIP order signed.

Q     I'm going to object to everything you said after that's what we had targeted in the forecast as non-responsive.

MR. QUIGLEY:  I'm going to object to the objection because he talks about minimum liquidity threshold in the document.  And you asked about something different, minimum liquidity level.  That was your question.

MS. TIZRAVESH:  I will repeat the question.

Q     So is it fair to say that the minimum liquidity threshold for the debtors in a restructuring environment is 50 million?

A     Yes.  But there's a

Page 25

ROBERT DEL GENIO

difference between a minimum liquidity threshold and an expectation on a financial structure in the marketplace which I think now I've answered four or five times.

Q     So you also stated that the company had a historical minimum liquidity threshold of 75 to 100 million; is that right?  I can refer you to paragraph 11 if you're looking to be refreshed.

A     Yes.

Q     We've talked a little bit about this.

But you're involved in the cash flow forecasting process for the debtors; correct?

A     Yes, sir.

Q     And what specifically is your involvement?

A     I review them every week.  I ask questions.  I get on the phone call with members of management as we finalize the forecast.  We have those calls on

7 (Pages 22 - 25)

Page 42

ROBERT DEL GENIO

Q     So I want to look at page 3 of the document.  You see that last row there, titled "Total Liquidity Excluding DIP Avail"?

A     Availability, yes.

Q     And what does that row represent?

A     It's basically the cash, plus the borrowing capacity under the ABL.

Q     Now, take a look at the column, that first column there, actual, 7/1/2022.

A     Yes.

Q     And looking now at that bottom row, total liquidity excluding DIP availability, that cell shows a number of 211,726,000; right?

A     That's correct.

Q     And so does that number, approximately $212 million, represent the most recent actual data for the company's liquidity that has been published to the data room?

Page 43

ROBERT DEL GENIO

MR. QUIGLEY:  Objection to form.

A     It shows the ending cash, the net borrowing under the ABL.  And then it shows the availability under the DIP.  Obviously as you pointed out, the last line says total liquidity, excluding DIP availability.

Q     So let me re-ask the question.

So as of the 7/1 forecast, the company had liquidity in the amount of approximately 212 million; right?  The actuals?

A     212 million, yes, that's correct.

Q     So now let's look at page 5.  And page 5 is a little similar to what we just saw.  But it adds an additional previous week of 6/24.  Do you see that?

A     That's just the -- doesn't add.  It's just the prior forecast that was published for the prior week.

Q     Let me rephrase.

Page 44

ROBERT DEL GENIO

It includes an additional week that wasn't on the DIP prior?

A     The way I would say it was this was the prior week's forecast.  And then the 7/1 was the current week because part of the package, we're required to show prior week, current week and the variance between the -- as well as other variance as you could see in here.

Q     That's a fair clarification.

And so looking now at actual, 6/24/2022, and going down to the last row, total liquidity, excluding DIP availability, it shows that the debtors had approximately $215,176,000 in actual liquidity as of 6/24/2022; correct?

A     That's correct.  Again, looking at cash in the DIP ABL as defined on that.

Q     And if we go back to page 3, again, now looking at the most recent 13-week and we look at all the numbers in that bottom row, again, total liquidity, excluding DIP availability, would you

Page 45

ROBERT DEL GENIO

agree with me that the lowest value appears in the forecast week of 9/2/2022?

A     Yes.

Q     And that lowest forecasted value is approximately 153,508,000; is that right?

A     That is correct.

Q     So, in other words, the lowest amount of liquidity projected for the company over the next 13 weeks is 153.5 million as of the company's most recent published forecast; correct?

A     That's correct.

Q     And that's well above the minimum liquidity threshold we discussed earlier; right?

A     Yes.

Q     It's about $100 million over the minimum liquidity level; correct?

A     In a constrained environment.

Q     In a constrained environment?

A     Yes.

12 (Pages 42 - 45)

Page 46

ROBERT DEL GENIO

Q    And it's somewhere between 50 and 75 million over the minimum level of the debtors' historical threshold; correct?

A    The historical internal target, correct.

Q    But regardless, the debtors actually project to increase in liquidity after 9/2/2022; right?

A    That's assuming they have access to their ABL and the cash forecast is correct.

Q    Yes, assuming they have access to the cash foreclosure, yes.

A    That's what the forecast says. And, again, assuming commodity prices are consistent with what's being used in this forecast.

Q    And so looking at the most recent 13-week cash flow forecast, isn't it true that the debtors would never fall below minimum liquidity?

A    Well, that's straight math; right?

Page 47

ROBERT DEL GENIO

Q    Yes.

A    So it's above 50. It's above 75 to 100.

Q    I'm a lawyer. I can't do math.

A    I'm sure you can. That math, I'm sure you can.

Q    Let me just ask that question to make sure the record is clear.

So looking at the most recent, recently published 13-week forecast, isn't it true that the debtors would never fall below minimum liquidity?

A    Below their internal targets, assuming commodity prices stay at the level they're at, assuming their plan operates without any inefficiencies, assuming their customers' plants or their suppliers' plants operate so they're not shut down because they have an operational issue. They are -- the turnaround takes longer than it's supposed to. They decide not to co-crack

Page 48

ROBERT DEL GENIO

or they co-crack light. Those are all things that could affect the business.

So you're asking me about a forecast where there is a certain expectation. But you're assuming this is not an operating business. And all these assumptions are static. So I think that's very important.

Q    But this forecast already bakes into it, the company's expectations as to operations; right?

A    It bakes in the company's expectations on their operations, on their supplies to seek for operations, on their review of where oil prices are at this point in time, yes.

(The above-referred-to document was marked as Exhibit 21 for identification, as of this date.)

Q    You're being handed a document marked Exhibit 21.

Do you recognize this document?

A    Yes. This is the prior week

Page 49

ROBERT DEL GENIO

or the 6/24 forecast.

Q    And similar to the other forecast we discussed, were you involved in the preparation of this particular document?

A    I was.

Q    And is it the same work that you provided on the other forecasts?

A    It was.

Q    And so fair to say that you reviewed and signed off on this forecast before it was published in the data room?

A    Both myself and management.

Q    So fair to say that both yourself and management signed off on the forecast before it was published in the data room?

A    That is correct.

Q    So now looking at page 5 of this document, we see in the second column, forecast, 6/24/2022, the bottom line, total liquidity, excluding DIP availability, that the forecast for that week was approximately 198,064,000;

13 (Pages 46 - 49)

Page 210

ROBERT DEL GENIO

Genio.

We met before. I'm Michael Mervis. I'm with Proskauer, representing Cerberus and Bayside. I'm going to try to do this quickly. I apologize in advance because I'm going to hit some of the things that you've already been asked about. But I'll try really hard not to re-ask questions. I may have to frame things in order to orient you. So I apologize in advance.

A   That's fine.

Q   If you could pull out Exhibit 23, which is your most recently filed declaration, concerning DIP matters, let me know when you have that.

A   I have it in front of me.

Q   I'd like you to turn to paragraph 9 on page 6. You probably looked at that before when you were testifying. But just take a minute and review it. Let me know when you've done so.

A   Yes. I'm there.

Page 211

ROBERT DEL GENIO

Q   Toward the end of that paragraph in the last clause, you make reference to the debtors' adjusted current ending liquidity for July 1. Do you see that?

A   Yes.

Q   What do you mean by adjusted?

A   What I mean, if you go to page 5 and you look at ending liquidity, that was actual ending liquidity on July 1st, 211,726,000. If you subtract the 43132, which is the vendor and supplier bills for May, then you get an adjustment because that's not actual of 168594.

Q   So I think we've agreed on this, that 43 million and change wasn't paid, hasn't been paid yet; right?

A   No, it has not.

Q   So --

A   Let me say this. As of July 1st, it hasn't been paid. It will be paid the 22nd and the 29th.

Page 212

ROBERT DEL GENIO

Q   That's where I'm going. So let's take a look at Exhibit 20, page 3. Just let me know when you're there. That's the most recent cash flow.

A   What page again?

Q   Page 3.

A   Yes. I'm there.

Q   So if you look at the raw materials line under operating disbursements, I think this is what you said, but let me just make sure. Let me back up.

The 43 million and change is money owed on contracts that the debtor has either asked to assume or is considering assuming; is that right?

A   Yes.

Q   And I think you said that at least on page 3 of Exhibit 20, I think you said that the 43 million and change is accounted for in the raw material line item between the week ending 7/22 and then also the week ending 7/29; is that right?

Page 213

ROBERT DEL GENIO

A   Yes. That's the assumption in terms of timing of court hearings and when we expect those payments to be made.

Q   So as of the time that this forecast was published I guess last Friday, it was the debtors' expectation that between those two periods, the 43 million and change would actually be paid?

A   Right. And the only thing I would say is for some reason one of the contracts isn't signed in time, it might get kicked to the next court hearing.

Q   Understood.

So we talked about, or there was some question about double counting. And I just want to close the loop on that.

Your adjustment, the Figure 1 on page 5 of Exhibit 23, in that adjustment, you're making an assumption that liquidity is decreased by that roughly $43 million number as of July 1; is that right?

54 (Pages 210 - 213)

Page 214

ROBERT DEL GENIO

A    The premise is that the 211,726,000 is artificially high because there's payments that we know that traditionally would have been paid if it wasn't for the bankruptcy. And they're not going to be stayed by the bankruptcy because they're tied to contracts. So by negotiating and assuming those contracts, those dollars we know absolutely will be paid.

Q    But going back to Exhibit 20 and again looking at the raw materials line item on page 3, in order to avoid double counting, if you were going to make this adjustment on this page, in other words, move that negative $43 million up to the week ending July 1st, you'd have to also make the same reduction, $43 million and change, between the two period endings 7/22 and 7/29; is that right?

A    Right; in other words, if I subtracted it from -- it's already subtracted from 7/22 and 7/29.

Page 215

ROBERT DEL GENIO

Q    Right.

A    So, therefore, if I moved it up, then I would subtract it from there.

Q    But you would also add it back or add it to the forecast for 7/22 and 7/29; correct?

A    If those payment -- well, this is a cumulative number, like, in other words, this is cash; right? So if it's lower here, I would add it back. But I'd end up in the same place by the time I got that because I have those dollars are running through.

Q    Right.

So just taking a look, for example, at the ending balance for the 7/22 forecast period, in order to avoid double counting, you'd make an adjustment that would make that ending cash number higher to some degree; right?

A    Yeah. But my beginning balance should be lower because I subtracted from my beginning balance.

Q    I understand.

Page 216

ROBERT DEL GENIO

But what I'm trying to confirm is that you get to the forecast period for 7/22 and 7/29, in order to avoid double counting, you would need to make a corresponding increase to total liquidity and ending cash balance?

A    Yeah. And that's why I said by 8/12, it washes out because then effectively, it's already factored in.

Q    And, again, I'm isolating now just on these vendor payments. I realize you have other pieces.

But on your bridge, liquidity is more constrained for the period ending 7/1, compared to what's shown on page of Exhibit 20; right?

A    Yes.

Q    But it's less constrained or would be less constrained for the periods ending 7/22 and 7/29 on page 3 of Exhibit 20?

A    My beginning cash would be lower by that amount. Then I would add it back here. So I would end up with the

Page 217

ROBERT DEL GENIO

same -- should end up with the same number.

Q    The same what number? Oh. The same total liquidity?

A    Yeah, because if I -- in other words --

Q    That's fair. I get it.

A    That's why I said in my mind, the easy way to look at it by 8/12, it's totally washed through. But then again, beginning's lower, I add it back here. I end up with the same number. By 8/12, it's a work -- it's worked its way through.

Q    I'm sorry. I just didn't hear the answer completely.

Earlier, you were asked some questions about the company's historical minimum liquidity threshold. And I think you said that you talked to company officers and got two different numbers; is that right?

A    What I normally do when I meet with a company working on liquidity,

55 (Pages 214 - 217)

Page 234

ROBERT DEL GENIO

going to pay until they get the court order.

Q    No.  I understand that.

That's something you heard from somebody else?

A    I heard it from the company's treasurer.

Q    But other than that condition that you heard about, all the other consents and approvals have been done for 11 and 11A?

MR. QUIGLEY:  Objection.

You could answer.

A    The normal process was you get a signed POL, which Andrew signed, and then you get approvals from Eclipse and the ad hoc group.  Those have all been met.

Q    Right.

And, again, the historical practice, payment comes in roughly four weeks later?

A    They're supposed to pay within 30 days.  I would say the majority

Page 235

ROBERT DEL GENIO

of the money comes in.  There's always been a couple of stragglers that miss the 30-day.

Q    The 7 million that has come in since June 1st, to your knowledge, was that money that was covered by POL 11 or 11A?

A    Technically, it was covered by PO L11.

Q    Okay.  That's what I was asking.

A    Yes.

Q    So some of that money's come in; you're waiting on the rest?

A    Yes.  And, again, we were expecting all of it to come in until we heard they needed court approval.  The insurance companies need court approval to pay.

Q    Let's go back to Exhibit 23, please, and if you could take a look at paragraph 12.  Let me know when you're finished.  Just read it to yourself.

A    Yes.  I've read it.

Page 236

ROBERT DEL GENIO

Q    The requirement to repay the current draw of 32 million on the DIP term loan is something that to your understanding could happen?

A    If there's a default.

Q    If the DIP lenders want to demand repayment, they can?

MR. QUIGLEY:  Objection.

You can answer.

Q    If there is a default.

A    That's my understanding.

Q    Do you have any view, one way or the other, of how likely that is to happen?

A    Based on this case, I have no idea.

Q    I'll accept that.  I think that's probably a metaphysical truth.

Paragraph 14, again, just take a moment to read that to yourself, and let me know when you're done.

A    Yes.  I've read that.

Q    And here, you talk about the debtors risking a loss of close to

Page 237

ROBERT DEL GENIO

$57 million of funding under the ABL; is that right?

A    Yes.

Q    And also a risk of having to repay close to $3 million that has already been drawn under the DIP ABL?

A    Correct.

Q    And, again, that risk would materialize if there is a default and the ABL lenders decide to enforce their rights; correct?

A    That's my understanding.

Q    Do you have any view, one way or the other, how likely that is to happen if there were a default?

A    Based on my conversation, they said they're just evaluating the situation.

Q    They're careful.  I think that's what you said.

A    Yes.

Q    And then paragraph 15, again, take a minute just to refresh yourself.  Let me know when you're done.

60 (Pages 234 - 237)

Page 238

ROBERT DEL GENIO

A    Yes.  I'm done.

Q    I just want to make sure.  I think this is clear.  But I just want to make sure.

Your statement in the second sentence about the bridge priming notes then being subject to repayment is based on information that you received from counsel?

A    Yes.

Q    And you did not ask counsel's view on when the repayment would be required?

A    No, I did not.

Q    Let's go to page 8 of Exhibit 23.

So you have a heading here, "Commodities Market Volatility."  And there's a discussion about that.

I think you said that you've had other petrochemical cases?

A    Yes.  I worked on other chemical-related businesses.

Q    How about oil and gas?

Page 239

ROBERT DEL GENIO

A    Yes.  I've done a lot of -- I've actually done a lot of work in the helicopter services industry that services the oil and gas and shipping.  So I'm pretty familiar with the cycles in those businesses because they're driven by the oil and gas.

Q    I think I know one of the helicopter cases you're talking about.  But that's for another time.

So fair to say that volatility in the commodity markets is an ever-present risk?

A    Yes.

Q    And fair to say that that's been true for the last five years?

A    Forever through history, yeah.

Q    I was going to go forever.  But you beat me there.

Go to paragraph 23, please.  And, again, if you could read that to yourself.

A    Yes.

Page 240

ROBERT DEL GENIO

Q    In the second sentence on the second clause, you say, "The debtors have historically and over the past two years been required to contend with ever-present risks from equipment and operational issues."

Did I read that right?

A    You did.

Q    You used the word historically.

What's your understanding of the equipment and operational risks that the debtors faced prior to two years ago?

A    They always have operational issues in the business.  And this business also requires significant capital expenditures.  And since Ed Dineen has been there, he's made a lot of significant investments to upgrade the plant because it's an older plant, one that needs investment.

So I think that the continued investment, and then you do have just by nature, operational, not as

Page 241

ROBERT DEL GENIO

severe as some of the things that have occurred.  But there is variability in these petrochemical companies.

Q    So equipment could fail, and that could impact the business?

A    Yeah.  You could have equipment failures, or you need to upgrade something because it's not performing exactly up to specs and those types of things which could affect the business, yes.

Q    And based on your understanding of the debtors' history, that risk was present for years going backwards, not just the last two years?

A    Yeah.  They have had that risk over the years.  But some periods have been more severe.  The storm had occurred that then created operational issues.

Q    Let's be clear.

More severe in their risk profile or more severe in what's actually happened?

61 (Pages 238 - 241)

# Exhibit B

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Chapter 11

Case No. 22-10493(CTG)

----------------------------------------x

In re:

TPC GROUP INC., et al.,

                    Debtors.

----------------------------------------x

                    July 12, 2022

                    9:06 a.m.

        DEPOSITION of ZUL JAMAL, pursuant to Rule 26 and Rule 30(b)(6) of the Federal Rules of Civil Procedure and Rules 7026, 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, and Delaware Bankruptcy Local Rule 7030-1, held at the offices of Akin Gump Strauss Hauer & Feld LLP, located at One Bryant Park, New York, New York 10036, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

Page 26

ZUL JAMAL

MR. QUIGLEY: He didn't say he remembered it. He said he understood it.

Q    Do you remember what the question was?

A    Not exactly.

Q    So you understood it, but you don't remember it?

MR. QUIGLEY: Objection. Badgering the witness.

A    I was formulating my answer. And I don't remember exactly what you asked after I finished my answer.

Q    I believe that.

Let's try it again. Again, if you'll just answer my questions, you'll have plenty of time to give whatever speeches you want to give whenever you want to give them; sound fair?

A    Okay.

Q    Here's the question.

Assume for me that the court doesn't approve the term loan DIP; okay?

Page 27

ZUL JAMAL

A    Okay.

Q    Sitting here today, Eclipse has not told you that it would not go forward with the ABL facility exactly as proposed; correct?

MR. QUIGLEY: Objection to form. You could answer if you understand the question.

A    Sorry. Can you say that again? I just want to make sure I fully understand.

Q    Yes.

Assume for me that the court doesn't approve the term loan DIP?

A    Okay.

Q    As it's currently proposed; okay?

A    Yes.

Q    As you're sitting here today testifying under oath, Eclipse has not told you that it would not go forward with the ABL facility as it's currently proposed; correct?

MR. QUIGLEY: Objection to

Page 28

ZUL JAMAL

form. You could answer if you understand the question.

A    I just want to make sure I fully understand the question. I'm getting confused in the way you're phrasing it.

Q    You've had conversations with Eclipse; right?

A    Yes.

Q    And Eclipse has not told you that it would not go forward with the ABL facility if the court didn't approve the term loan, did it; correct?

A    Eclipse has said that they don't know what they will do if the court doesn't go forward.

Q    And they have not told you that they would refuse to go forward with the facility as it's currently proposed; correct?

A    They told me they would be very uncomfortable. I don't know whether that means they told me they wouldn't go forward or they would go forward. I

Page 29

ZUL JAMAL

think they're preserving their rights to decide what they want to do, depending on what happens. But they're clearly very uncomfortable.

Q    Let me object as non-responsive.

I didn't ask you about their comfort level, did I?

A    I'm trying to answer your question.

Q    It's not that hard.

To date, if the term loan DIP facility is not approved by the court, you have not been told by Eclipse that it would not go forward with the ABL facility as it's currently proposed; correct?

MR. QUIGLEY: Objection to form.

A    I have not been told by Eclipse whether they would or would not go forward, one way or the other.

Q    And, again, there's no document that says Eclipse would not go

8 (Pages 26 - 29)

Page 30

ZUL JAMAL

forward if the term loan DIP is not approved by the court; correct?

A    There's no document that memorializes the conversations we've had, no.

Q    Let's turn to Exhibit 2, if we could.  It's your first declaration.

A    Okay.

Q    Let's turn to paragraph 11, if we could.  In paragraph 11, one of the things you say is, "Term loan facility in the aggregate amount of 323 million"; correct?

A    Yes.

Q    Can you break down, what are the component pieces of that 323 million?

A    There's 85 million of new money.  And the remainder is a rollup of the priority -- the senior priority pre-petition notes.

Q    Help me out.
What's 323, minus 85?

A    Like 200 and 40 -- 38, something like that.

Page 31

ZUL JAMAL

Q    I'm not trying to give you a math test.  I really don't know.
238; is that right?

A    Yes.

Q    So 238 of the 323 million is pre-petition indebtedness; correct?

A    Yes.

Q    And then 85 of that you said is the new money; right?

A    Yes.

Q    And the 238 million is getting rolled up into the new facility; is that correct?

A    Yes.

Q    What does rollup mean?

A    I'm not a legal expert.  But my understanding is it's basically a conversion of a pre-petition loan to a post-petition loan.

Q    Let's set some ground rules real quick.
Are you an attorney?

A    No.

Q    Any questions I ask you, I'm

Page 32

ZUL JAMAL

not intending to get a legal definition or a legal understanding from you.  I just want to know what you think about it; is that fair?

A    Yes.

Q    So 238 of the 323 is rolling up pre-petition indebtedness to post-petition indebtedness; correct?

A    Yes.

Q    Now, let's talk about the 85 million in new money.
Tell me how the 85 million in new money works.

A    I don't understand the question.

Q    Let me ask you this.
What's the relationship to insurance proceeds to the 85 million?

A    In what sense?  I'm not sure.

Q    Do insurance proceeds play a role in the DIP facility?

A    Yes.

Q    What role do they play?

Page 33

ZUL JAMAL

A    They are part of the collateral package of the DIP facility.

Q    Okay.  We'll talk about that in a minute.  That's a good answer.
What about insurance proceed receipts?  How do those relate to the term loan DIP facility?

A    Certain insurance proceed receipts, to the extent they are made available to the company, would reduce the amount of funds available to the company under the term debt.

Q    How do they reduce the amount of funds available?

A    To the extent the money comes in to the company at that point, the availability of the term debt would be reduced.

Q    The availability of the 85 million in new money?

A    Yes.

Q    Because the 238 is already indebtedness; right?  So we're talking about impact on the new money?

9 (Pages 30 - 33)

# Exhibit C

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 22-10493(CTG)

- - - - - - - - - - - - - - - - - - x

IN RE: TPC GROUP

- - - - - - - - - - - - - - - - - - x

July 14, 2022

9:30 a.m.

VIDEO RECORDED DEPOSITION of ALEXANDER TRACY, taken by the Debtors, held remotely via Zoom before Sara K. Killian, a Registered Professional Reporter, Certified Court Reporter and Notary Public.

Page 66

A. Tracy

A.    Well, if there were an event of default under the DIP, then the company would either need to get a waiver from the DIP lenders or we would need to replace the DIP.

Q.    That didn't go into your analysis in Exhibit 2? It wasn't a possibility you considered in your declaration in this case?

A.    Well, I mean it's always a possibility. It's a question of what are the economic interests of the DIP lenders. Right? In this case, the DIP lenders are also the majority of the ten and seventh/eighths and ten and a half notes. Therefore, to the extent the company misses a milestone, the likely outcome is a negotiated modification to the milestone, which then results in some other incremental economics provided in connection with the waiver of that default under the debt.

Q.    You haven't spoken to anyone about that?

A.    No. I mean, it's sort of --

Page 67

A. Tracy

it's a fact that under any DIP loan to the extent there are milestones, if you breach the milestone, it's an event of default on the DIP. It goes without saying.

Q.    Have you looked into your analysis in TPC what the effect of a default under the term loan DIP would have on the ABL?

A.    I think there's a cross default if I remember correctly.

Q.    Did you consider the potential for cross default -- the potential of a cross default in your liquidity analysis in the TPC case in Exhibit 2?

A.    No. Again, the liquidity analysis in my declaration is focused on whether the company needs to draw under the DIP term loan and the roll up ratio. Those are the points that are focused on in there. It does not -- it's not intended to show what the parties would do in connection with a default under the DIP, either the term loan or the ABL.

Q.    Okay.

Page 68

A. Tracy

But you submitted in support of a motion to suspend the proceedings, correct?

A.    Correct.

MR. QUIGLEY: Let's take five. We've been going about an hour.

MR. MERVIS: Yes.

THE VIDEOGRAPHER: The time is 10:42 a.m. We are off the record.

(Recess taken)

THE VIDEOGRAPHER: The time is 10:56 a.m. We are back on the record. You may proceed.

Q.    How are you doing, Mr. Tracy?

A.    Good.

Q.    Just focusing back on Exhibit 3, which is your Oasis declaration again, drawing your attention to the last sentence of paragraph 28 --

A.    Okay.

Q.    -- you say "Importantly, obtaining access to the DIP facility will also send a clear message to debtor's customers and their vendor base that the

Page 69

A. Tracy

case is limited to financial restructuring with clarity of outcome and a consensual path forward."

Do you see that?

A.    I do.

Q.    You thought that was important in the context of that case, correct?

A.    Sure.

Q.    You also -- in the next paragraph, you said -- in the second sentence, you said that you believed that in the event that either the court does not approve the proposed DIP facility or the debtors are denied access to the cash collateral, there's a substantial risk of immediate and irreparable harm to the debtor's estates.

Do you see that?

A.    I do.

Q.    And part of that irreparable harm was potentially the message that you talked about in the preceding paragraph, right?

MR. MERVIS: Object to the

18 (Pages 66 - 69)