FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>TPC GROUP INC, *et al.,*<br><br>      *Debtors.*[1] | Chapter 11<br><br>Case No. 22-10493 (CTG)<br><br>Jointly Administered |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P<br><br>      *Plaintiffs-Appellants,*<br><br>v.<br><br>TPC GROUP INC.,<br><br>      *Defendant-Appellee,*<br><br>-and-<br><br>THE AD HOC NOTEHOLDER GROUP,<br><br>      *Intervenor-Defendant-Appellee.* | Adv. Pro. No. 22-50372 (CTG)<br><br>Civ. Case No. 22-mc-00298-RGA<br><br>**RE: Docket No. 29** |

**NOTICE OF SUPPLEMENTAL EXHIBITS RELATED TO MOTION TO SEAL (A) MOTION FOR STAY OF EFFECTIVENESS AND ENFORCEMENT OF ORDER AND JUDGMENT PENDING APPEAL, (B) REPLY IN FURTHER SUPPORT OF MOTION FOR STAY, AND (C) DECLARATION OF OSCAR SHINE IN SUPPORT OF REPLY**

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

1

Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. (the "Appellants"), by and through their undersigned counsel, hereby submit the following supplemental exhibits related to the *Motion to Seal (A) Motion For Stay Of Effectiveness And Enforcement Of Order And Judgment Pending Appeal, (B) Reply In Further Support Of Motion For Stay, And (C) Declaration Of Oscar Shine In Support Of Reply* [D.I. 29] (the "Seal Motion"):

**Exhibit A** – [SEALED] *Emergency Motion of Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. For Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal Pursuant To Bankruptcy Rule 8007* (the "Sealed Stay Motion"); and

**Exhibit B** – [REDACTED] *Emergency Motion of Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. For Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal Pursuant To Bankruptcy Rule 8007* (the "Proposed Redacted Stay Motion").

2

Dated:    July 26, 2022              PACHULSKI STANG ZIEHL & JONES LLP

                                By:    /s/ *Timothy P. Cairns*
                                       _____
                                       Laura Davis Jones (DE Bar No. 2436)
                                       Timothy P. Cairns (DE Bar No. 4228)
                                       PACHULSKI STANG ZIEHL & JONES LLP
                                       919 North Market Street, 17th Floor
                                       P.O. Box 8705
                                       Wilmington, Delaware 19899 (Courier 19801)
                                       Tel: 302-652-4100
                                       Facsimile: 302-652-4400
                                       ljones@pszjlaw.com
                                       tcairns@pszjlaw.com

                                       - and -

                                       Jennifer Selendy (*pro hac vice* pending)
                                       Andrew R. Dunlap (*pro hac vice* pending)
                                       Oscar Shine (*pro hac vice* pending)
                                       Max H. Siegel (*pro hac vice* pending)
                                       SELENDY GAY ELSBERG PLLC
                                       1290 Avenue of the Americas
                                       New York, NY 10104
                                       Tel: 212-390-9000
                                       jselendy@selendygay.com
                                       adunlap@selendygay.com
                                       oshine@selendygay.com
                                       msiegel@selendygay.com

                                       *Attorneys for Appellants*

3

DOCS_DE:239929.1 13563/001

**<u>Exhibit A</u>**

**Sealed Stay Motion**

DOCS_DE:239929.1 13563/001

**FILED UNDER SEAL**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.*, | Bankruptcy Case No. 22-10493 (CTG) |
| *Debtors.*[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Bankruptcy Adv. Proc. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants*, | Case No. 22-mc-00298-RGA |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Appellee*, | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant-Appellee*. | |

**EMERGENCY MOTION OF APPELLANTS BAYSIDE CAPITAL, INC. AND CERBERUS CAPITAL MANAGEMENT, L.P. FOR STAY OF EFFECTIVENESS AND ENFORCEMENT OF ORDER AND JUDGMENT <u>PENDING APPEAL PURSUANT TO BANKRUPTCY RULE 8007</u>**

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...........................................................................................1

JURISDICTION AND VENUE .........................................................................................4

FACTUAL AND PROCEDURAL BACKGROUND........................................................4

      A.     The Senior Notes............................................................................................4

      B.     Appellants' Sacred Rights...............................................................................4

      C.     The Usurping Notes .......................................................................................6

      D.     Appellants' Notice of Breaches to TPC.........................................................7

      E.     TPC's Bankruptcy and the Cross-Holder DIP Proposal .................................7

      F.     Appellants Sue to Vindicate Their Sacred Rights..........................................8

REQUESTED RELIEF........................................................................................................9

LEGAL ARGUMENT.........................................................................................................9

I.     APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS .................................9

      A.     Section 9.02(d)(10) Prohibited the Amendments Absent Appellants' Consent .........................................................................................................10

      B.     Section 9.02(d)(10) Applies to Subordination ..........................................12

      C.     The Bankruptcy Court Improperly Invoked Industry Custom and Usage .............16

      D.     Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent Alone...............................................................................................18

II.    APPELLANTS WILL BE IRREPARABLY HARMED IF A STAY IS NOT GRANTED ..........................................................................................................21

III.   A STAY PENDING AN EXPEDITED APPEAL WILL NOT INJURE TPC OR OTHER CREDITORS ..........................................................................................27

IV.   GRANTING A STAY IS IN THE PUBLIC INTEREST.................................................29

V.    APPELLANTS SHOULD NOT BE REQUIRED TO POST A BOND ..........................30

NOTICE..............................................................................................................................31

ii

iii

STATEMENT REQUIRED BY LOCAL RULE 7.1.1 ...................................................................31

CORPORATE DISCLOSURE STATEMENT ..........................................................................31

CONCLUSION..........................................................................................................................31

DOCS_DE:239813.2 13563/001

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    361 B.R. 337 (S.D.N.Y 2007) ...................................................................................................30

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
    2021 WL 3671541 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) ................................................. *passim*

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999) .....................................................................................................25

*Cont'l Oil Co. v. Frontier Ref. Co.*,
    338 F.2d 780 (10th Cir. 1964) .................................................................................................30

*In re Dispirto*,
    371 B.R. 695 (Bankr. D.N.J. 2007) .........................................................................................24

*In re George Ruggiere Chrysler-Plymouth, Inc.*,
    727 F.2d 1017 (7th Cir. 1984) .................................................................................................24

*GJJM Enters., LLC v. City of Atlanta*,
    293 F. Supp. 3d 509 (D.N.J. 2017) .........................................................................................24

*Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*,
    446 F. App'x 453 (3d Cir. 2011) .............................................................................................25

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
    106 A.D.3d 559 (1st Dep't 2013) ............................................................................................17

*In re L.A. Dodgers LLC*,
    457 B.R. 308 (Bankr. D. Del. 2011) ........................................................................................21

*In re L.A. Dodgers LLC*,
    465 B.R. 18 (D. Del. 2011) ................................................................................................26, 29

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) .....................................................................13, 14

*Lehman Bros. Holdings Inc. v. IVC WH HGII, LLC*,
    2016 WL 4703385 (Sup. Ct. N.Y. Cty. Aug. 31, 2016) ..........................................................17

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
    75 F. Supp. 3d 592 (S.D.N.Y. 2014).......................................................................................25

iv

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*,
   258 F.3d 180 (3d Cir. 2001) ...................................................................................30

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
   830 F.3d 152 (2d Cir. 2016) ...................................................................................18

*In re Quanta Res. Corp.*,
   739 F.2d 912 (3d Cir. 1984) ...................................................................................24

*Ratcliff v. Rancher's Legacy Meat*,
   2020 WL 4048509 (D. Minn. July 20, 2020) ..........................................................26

*Republic of Philippines v. Westinghouse Elec. Corp.*,
   949 F.2d 653 (3d Cir. 1991) ...................................................................................26

*In re Revel AC, Inc.*,
   802 F.3d 558 (3d Cir. 2015) ............................................................................. *passim*

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
   13 N.Y.3d 398 (2009) ........................................................................................13, 21

*Siemens Bldg. Techs., Inc. v. Camacho*,
   168 F. Supp. 2d 425 (E.D. Pa. 2001) ......................................................................29

*Stilp v. Contino*,
   613 F.3d 405 (3d Cir. 2010) ...................................................................................25

*In re Swedeland Dev. Grp., Inc.*,
   16 F.3d 552 (3d Cir. 1994) .....................................................................................22

*Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales*,
   2018 WL 4179456 (D. Del. Aug. 31, 2018) ...........................................................25

*In re The Colad Grp., Inc.*,
   324 B.R. 208 (Bankr. W.D.N.Y. 2005) ...................................................................30

*In re Trib. Co.*,
   477 B.R. 465 (Bankr. D. Del. 2012) ...................................................................25, 27

*In re United Merchs. & Mfrs., Inc.*,
   138 B.R. 426 (D. Del. 1992) ...................................................................................30

*Viera v. Life Ins. Co. of N. Am.*,
   642 F.3d 407 (3d Cir. 2011) ...................................................................................10

*Wright v. Union Cent. Life Ins. Co.*,
   311 U.S. 273 (1940) ...............................................................................................24

v

**Statutes**

11 U.S.C. § 364............................................................................................... *passim*

28 U.S.C. § 158.........................................................................................................4

28 U.S.C. § 1334.......................................................................................................4

28 U.S.C. § 1408.......................................................................................................4

28 U.S.C. § 1409.......................................................................................................4

**Constitutional Provisions**

U.S. Const. amend. V..........................................................................................22, 24

**Rules**

D. Del. L.R. 7.1.1...................................................................................................31

Fed. R. Bankr. P. 8007........................................................................................ *passim*

**Other Authorities**

Black's Law Dictionary (10th ed. 2014).................................................................15

H.R. Rep. No. 95-595 (1977)..................................................................................24

DOCS_DE:239813.2 13563/001

vii

DOCS_DE:239813.2 13563/001

Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P., by and through their undersigned counsel, respectfully move this Court, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure, for entry of an order granting a stay pending an expedited appeal[2] of the effectiveness of the Bankruptcy Court's order of July 8, 2022 ("Order"), App'x Ex. 2, and judgment of July 8, 2022 ("Judgment"), App'x Ex. 3, issued pursuant to its Memorandum Opinion of July 6, 2022 ("SJ Opinion"), App'x Ex. 1.[3] Appellants sought a stay in the Bankruptcy Court, which was denied. App'x Exs. 4, 5 ("Stay Opinion"). In relevant part, the Order and Judgment denied Appellants' Motion for Summary Judgment and granted Intervenor's Cross-Motion for Summary Judgment. In support of this Motion, Appellants respectfully state as follows:

## PRELIMINARY STATEMENT

1.     This adversary proceeding concerns the right of senior creditors to receive and recover the value of their Collateral, which TPC intends to irrevocably transfer to other stakeholders. In 2019, TPC issued $930 million of Senior Secured Notes ("Senior Notes") pursuant to an Indenture ("Original Indenture"), App'x Ex. 7. Section 9.02(d)(10) prohibited TPC, "without the consent of each Holder affected thereby," from "mak[ing] any change in the provisions" of the Indenture or the related Intercreditor Agreement, App'x Ex. 21 ("2019 Intercreditor Agreement" or "2019 ICA"), "dealing with the application of proceeds of collateral."[4]

---

[2] Appellants' Motions to Expedite the Hearing on this Motion and to Expedite the Appeal are filed simultaneously herewith.

[3] Citations to the record refer to the Appendix to Emergency Motion of Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. for Stay of Effectiveness and Enforcement of Order Pending Appeal Pursuant to Bankruptcy Rule 8007 ("App'x"), filed concurrently herewith.

[4] Capitalized terms not otherwise defined herein shall have the meaning given to them in Appellants' Complaint, and Appellants' Memoranda of Law in Support of their Motion for Summary Judgment and in Opposition to Intervenor's Motion for Summary Judgment.

2.    In 2021, TPC amended the Original Indenture and supplemented the 2019 Inter-creditor Agreement to issue $153 million of new notes ("Usurping Notes"), and, shortly before filing for bankruptcy in 2022, issue approximately $51.5 million in additional Usurping Notes. TPC entered a supplemental indenture, App'x Ex. 23 ("Supplemental Indenture"), and a new Intercreditor Agreement, App'x Ex. 22 ("2021 Intercreditor Agreement" or "2021 ICA"), that purportedly strip the lien priority for which the Senior Noteholders bargained in the Original Indenture and 2019 Intercreditor Agreement and grant it to the Usurping Notes instead.

3.    TPC executed these contracts without the consent of each adversely affected Senior Noteholder. Appellants are non-consenting Senior Noteholders. They argued below that the amendments and supplements to the Original Indenture and 2019 Intercreditor Agreement, which purport to subordinate the Senior Notes to the Usurping Notes in the application of Collateral proceeds, required unanimous consent pursuant to Section 9.02(d)(10) of the Original Indenture. Appellants sought a declaration that these contracts were void to the extent they granted this new priority. The declaration would have restored the Senior Notes' priority.

4.    The Bankruptcy Court erroneously held that the Original Indenture let TPC and the Usurping Noteholders torpedo Appellants' lien priority, despite a "sacred right" in the Original Indenture requiring Appellants' consent.

5.    Appellants promptly appealed from the Bankruptcy Court's Order and Judgment and moved to expedite. The Bankruptcy Court denied their request for a stay. Appellants now respectfully ask this Court for a stay pending an expedited appeal.

6.    **First**, the Bankruptcy Court acknowledged that Appellants satisfied their burden of showing a likelihood of success on the merits on appeal, Stay Opinion at 15, because they have "colorable" arguments on "challenging" and "complex" issues of contract interpretation. The court

2

misread the governing contracts, misapplied New York law, and improperly cited industry custom and usage, without evidence, to interpret an unambiguous contract. Alternatively, to the extent that the court below identified an ambiguity, it erred by granting summary judgment in favor of Intervenor.

7.    **Second**, the Bankruptcy Court further acknowledged that Appellants "have a substantial claim for irreparable injury." Stay Opinion at 16. On July 15, 2022, Defendants-Appellees will seek final approval of a DIP loan that would roll-up the Usurping Noteholders' TPC debt by granting a priming lien, placings Appellants' loans behind hundreds of millions of Intervenor-Defendant-Appellee's loans. TPC admits that it cannot provide adequate protection, and Appellants did not waive their Fifth Amendment right to that protection. If the Usurping Notes were invalid, approval of this DIP loan would cause "substantial" economic injury to Appellants, likely irreversible under Section 364(e) of the Bankruptcy Code, so "it is not clear that [Appellants] will obtain meaningful relief, absent a stay." *Id.* at 13-14.

8.    **Third**, the Bankruptcy Court erred in balancing the potential harm of a stay to TPC. It compared the acknowledged harm to Appellants to the potential, purely speculative harm to TPC if TPC is unable to secure any DIP financing at all; the court should have compared Appellants' harm to the potential of TPC facing a slight delay (due to a highly expedited appeal) in approval of the specific DIP Proposal before it. Without any new financing, TPC is projected to have tens of millions of dollars more than its historical minimum liquidity threshold. And TPC has an alternative DIP proposal available, that it admits is "more economically attractive," DIP Motion ¶ 35, App'x Ex. 10, offering the same new money without a roll-up that would trample Appellants' sacred rights.

3

9.      **Fourth**, the Court improperly failed to examine the public interest factor supporting a stay. There is a strong public interest here in allowing Appellants to enforce their contractual rights, and the Bankruptcy Court's decision has implications for numerous other cases that contain similar sacred rights regarding the "application of proceeds."

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 158 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The basis for the relief sought herein is Bankruptcy Rule 8007.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Senior Notes

11.      In August 2019, per the Original Indenture, TPC issued $930 million in principal of Senior Notes. *See* App'x Ex. 6 ¶ 38 ("Del Genio Decl."). TPC could not incur additional debt unless it was equal or junior in priority to the Senior Notes. Original Indenture §§ 4.07(b)(1), 4.10(a). At the same time, the Trustee entered the 2019 Intercreditor Agreement, which, among other things, set a Collateral waterfall guaranteeing the Senior Notes' first-priority access to proceeds of the Notes Priority Collateral and second-priority access to proceeds of the ABL Facility Priority Collateral. 2019 ICA § 4.1.[5]

### B.  Appellants' Sacred Rights

12.      The Original Indenture permits some amendments without the consent of all holders, but it proscribes amendments, supplements, or waivers that would subordinate the Senior

---

[5] The 2019 Intercreditor Agreement provides that "the Notes Obligations [of the Senior Notes] are intended to be secured by first priority liens on the Notes Priority Collateral and second priority liens on the ABL Facility Priority Collateral, such priorities and related rights to be established by this Agreement." 2019 ICA Recital E.

4

Noteholders by altering their first-priority right to Collateral proceeds. Article 9 describes the varying levels of consent required to amend or supplement documents relevant to the Senior Notes or to waive rights therein. Some provisions can be amended without holder consent, others only with consent of a majority, others only with a supermajority, and still others with consent of **each** adversely affected Senior Noteholder.

13.    Provisions that need the consent of each affected Holder to be modified are known as "sacred rights." Section 9.02(d) identifies ten sacred rights—each concerning rights to, or priority of, payment.

14.    The right to block amendments affecting the application of Collateral proceeds (the payment "waterfall") is a sacred right. Section 9.02(d)(10) of the Original Indenture provides:

> **[W]ithout the consent of each Holder affected thereby**, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any [Senior] Notes held by a non-consenting Holder): …
>
> (10) **make any change** in the provisions in the [2019 Intercreditor Agreement] or this Indenture dealing with **the application of proceeds of Collateral** that would adversely affect the Holders.

*Id.* (emphasis added). Section 4.1(a) of the 2019 Intercreditor Agreement, "Application of Proceeds of Senior Collateral," provides that, subject to certain costs and expenses, the Senior Noteholders get paid first from the proceeds of the Notes Priority Collateral and second from the ABL Priority Collateral. 2019 ICA § 4.1(a).

15.    Under the Original Indenture, Section 4.07(b) allowed TPC to incur a defined amount of additional debt after the issuance of the Senior Notes ("Permitted Debt"), but required that any liens securing such debt issued under Section 4.07(b)(1) (among the categories of "Permitted Liens") must be "subject to the provisions of" the 2019 Intercreditor Agreement—including the waterfall giving the Senior Notes senior access to the proceeds of the Notes Priority Collateral

5

and junior access to the proceeds of the ABL Priority Collateral. Original Indenture §§ 1.01, 4.07(b)(1).

## C.  The Usurping Notes

16.      In February 2021, TPC issued $153 million in principal of Usurping Notes pursuant to a new 10.875% indenture. Del Genio Decl. ¶ 35. In 2022, TPC issued approximately $51.5 million more of Usurping Notes. *Id.* ¶ 36. To do so, TPC and the Trustee entered the Supplemental Indenture, purporting to amend the Original Indenture, and the Trustee entered the 2021 Intercreditor Agreement.

17.      These amendments and supplements purport to change the application of Collateral proceeds to subordinate the Senior Notes behind the Usurping Notes in at least three ways.

18.      **First**, the Supplemental Indenture purports to amend the Original Indenture to make the Senior Notes subject to the 2021 Intercreditor Agreement, including its new Collateral waterfall. The Supplemental Indenture purports to amend Section 12.01(c) of the Original Indenture to replace the reference to the 2019 Intercreditor Agreement with the new term "Intercreditor Agreements," defined to mean the 2019 Intercreditor Agreement **and** the 2021 Intercreditor Agreement, Supplemental Indenture § 12.01(c), which prioritizes payments to the Usurping Notes before payment on the Senior Notes, 2021 ICA § 4.1.

19.      **Second**, the Supplemental Indenture purports to amend the Original Indenture's definition of "Permitted Liens" to exempt at least $113 million of the Usurping Notes from the requirement that they be subject to the 2019 Intercreditor Agreement. Consequently, the liens securing the Usurping Notes issued under Section 4.07(b)(1) are purportedly **not** subject to the 2019 Intercreditor Agreement, and so not subject to its waterfall.

20.      **Third**, even absent changes to the Original Indenture, the supplemental 2021 Intercreditor Agreement purports to change the Senior Notes' priority with respect to proceeds of

6

DOCS_DE:239813.2 13563/001

Collateral by supplementing Sections 3.1 and 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture. Section 2.1 of the new 2021 Intercreditor Agreement provides that any lien on "Common Collateral," including the Notes Priority Collateral and the ABL Priority Collateral, securing the Usurping Notes "shall have priority over and be senior in all respects and prior to" any liens on the "Common Collateral" securing the Senior Notes. Section 4.1 of the 2021 Intercreditor Agreement (titled "Application of Proceeds") provides that proceeds of Collateral, including the Notes Priority Collateral and the ABL Priority Collateral, shall be applied to the Senior Notes **only after discharge of the Usurping Notes**. And Section 3.1 of the 2021 Intercreditor Agreement provides that the Usurping Notes' agent shall exercise all rights with respect to the Collateral until the Usurping Notes are paid in full. These supplements change Section 4.1(a) of the 2019 Intercreditor Agreement by subordinating the Senior Notes to the Usurping Notes with respect to the proceeds of Collateral. They also change Section 3.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture by delaying the Trustee's receipt of proceeds for payment to the Senior Noteholders.

### D.  Appellants' Notice of Breaches to TPC

21.    On March 31, 2022, counsel for Appellants notified TPC's counsel that TPC had violated Section 9.02(d)(10) of the Original Indenture. App'x Ex. 24. TPC's counsel denied that TPC had breached Section 9.02(d)(10). On April 26, 2022, counsel for Appellants wrote to the Trustee, describing TPC's breaches and asking the Trustee not to take instructions from the Usurping Noteholders. App'x Ex. 8.

### E.  TPC's Bankruptcy and the Cross-Holder DIP Proposal

22.    On June 1, 2022, TPC and affiliates filed a petition for relief under Chapter 11 of the Bankruptcy Code. App'x Ex. 9. At the same time, TPC filed a Motion for Entry of Interim and Final Orders to approve the Cross-Holder DIP Proposal, which purports to allow $238 million of

7

Usurping Notes. *See* App'x Ex. 10. If granted, the Cross Holder DIP would lock in the subordination of the Senior Notes and shift value from Appellants to the Usurping Noteholders. App'x Ex. 11 ¶ 3 ("DIP Objection").

**F.  Appellants Sue to Vindicate Their Sacred Rights**

23.    On June 1, 2022, Appellants commenced this adversary proceeding, seeking, in substance, a declaration that the Senior Notes retain priority over the Usurping Notes. Compl. ¶¶ 46-63, App'x Ex. 12. Appellants moved for summary judgment, App'x Ex. 13, and an Intervenor group cross-moved, App'x Ex. 14.

24.    On July 6, 2022, the Bankruptcy Court issued an opinion that, in relevant part, denied Appellants' Motion for Summary Judgment and granted Intervenor's Cross-Motion.

25.    The Bankruptcy Court's Order and Judgment directly impact the main case, in which Debtors have moved for approval of a $323 million DIP facility ("Proposed DIP"), which Appellants oppose. Debtors' Proposed DIP includes a $238 million roll-up of the Usurping Notes (including interest and make-whole), which locks in the Usurping Noteholders' recovery of the total claim value of the Usurping Notes in cash. But it provides a commitment amount of only $85 million of new money and finances actual new money needs of only $32 million—an egregiously high ratio of roll-up to new money. Tracy Decl. ¶ 13, App'x Ex. 15. The Proposed DIP also preempts the ordinary process for a plan of reorganization in the Usurping Noteholders' favor, by (1) labelling it an "Event of Default" under the Proposed DIP if a court finds that the Senior Notes are senior to the Usurping Notes, *see* DIP Mot. at 32-33, App'x Ex. 10 (Events of Default (xxv)), and (2) locking the Debtors into a Restructuring Support Agreement ("RSA") that is excessively favorable to the Usurping Noteholders. Under that RSA, the Usurping Notes must be paid in full in cash (including a make-whole claim and any Usurping Notes that are not rolled up), the Usurping Noteholders get privileged rights to Debtors' new debt and equity securities, and they receive

8

an unreasonable backstop fee. *See* DIP Objection at 25-26, App'x Ex. 11. Appellants have offered an alternative, economically superior DIP proposal. *Id.*

26.     The court's Order and Judgment determines that the Usurping Notes have priority over the Senior Notes. Without a stay of that Order and Judgment pending appeal, Debtors' motion for approval of its Proposed DIP—scheduled to be heard on July 15, 2022—will be based on a lien-priority determination that is likely to be reversed, prejudicing Appellants with severe implications for all parties.

## REQUESTED RELIEF

27.     Appellants seek entry of an order staying enforcement of the Order and Judgment pending exhaustion of Appellants' appellate rights, pursuant to Bankruptcy Rule 8007(b).

## LEGAL ARGUMENT

28.     A motion for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" may, after first being made to the bankruptcy court, "be made in the court where the appeal is pending." Fed. R. Bankr. P. 8007(a)(1)(A); (b)(1).

29.     Courts balance four factors to determine whether to grant a stay: (1) likelihood of success on the merits; (2) irreparable harm absent a stay; (3) whether issuance of the stay will substantially injure the other parties; and (4) the public interest. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). The likelihood of success and irreparable harm factors are "the most critical." *Id.* at 571.

30.     Each factor favors a stay here.

## I.     APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS

31.     "[A] sufficient degree of success for a strong showing [of success on the merits] exists if there is a reasonable chance, or probability, of winning." *Id.* at 568 (cleaned up). The

chance of success must be "significantly better than negligible" but need "not [be] greater than 50%." *Id.* at 569.

32.    Appellants easily meet that standard, as the Bankruptcy Court acknowledged that they "satisfied" the success-on-the-merits factor, Stay Opinion at 15—one of the two "most critical" factors, *Revel*, 802 F.3d at 571—with "colorable" arguments, that are **not** "negligible," on "challenging" and "complex" legal issues, Stay Opinion at 12.

33.    This appeal presents matters of pure contractual interpretation, which this Court reviews *de novo*. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).

### A.    Section 9.02(d)(10) Prohibited the Amendments Absent Appellants' Consent

34.    Section 9.02(d)(10) of the Original Indenture prohibits any "amendment, supplement or waiver" that "makes any change in the provisions in the [2019] Intercreditor Agreement or th[e] Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders" without "the consent of each Holder affected thereby." This provision sensibly requires that a Holder consent to a change in its priority access to Collateral proceeds, including by shifting its position in the payment waterfall. Section 9.02(d)(10) prohibited TPC's amendments of Section 12.01(c) and the definition of "Permitted Liens," as well as its entry into the 2021 Intercreditor Agreement, because these amendments and supplements changed provisions dealing with the application of Collateral proceeds, to the detriment of the Senior Noteholders.

35.    TPC's purported amendment of Section 12.01(c) of the Original Indenture and the definition of "Intercreditor Agreement" dealt with the application of Collateral proceeds. In Section 1.01, TPC changed "Intercreditor Agreement" to "Intercreditor Agreements"—plural—which it newly defined to include the 2021 Intercreditor Agreement. In Section 12.01(c), it changed "liens and security interests" and "rights and obligations … in respect of the Collateral" from being "expressly subject to the Intercreditor Agreement" to being "expressly subject to the Intercreditor

Agreement**s**" (emphasis added)—and so made them subject to the new 2021 Intercreditor Agreement and its new waterfall. Supplemental Indenture § 12.01(c). These amendments changed the distribution of Collateral proceeds from being subject to the 2019 Intercreditor Agreement's original waterfall for distributing proceeds—first to administrative costs, second to the Senior Noteholders, third to the ABL Lenders, and fourth to TPC, 2019 ICA § 4.1—to the 2021 Intercreditor Agreement's new waterfall—"<u>first</u>, to the [Usurping Noteholders]," "<u>second</u>, to the [Senior Noteholders], and "<u>third</u>, to the Grantors," 2021 ICA § 4.1.[6] These amendments clearly "deal[] with" the application of Collateral proceeds. Section 12.01 gave the 2021 waterfall effect. Without this amendment, the Collateral would still be subject to the 2019 waterfall.[7]

36.     TPC's purported amendments to the Original Indenture's definition of "Permitted Liens," as that term is used in Section 4.10(a), also changed provisions dealing with the application of Collateral proceeds. Section 4.10(a) prohibits TPC from "directly or indirectly, creat[ing,] incur[ring,] or assum[ing] any Lien (other than Permitted Liens) on any asset or property … that secures any Indebtedness." TPC thus could not put any new liens on the Collateral unless they were Permitted Liens. Before the uptiering, the Original Indenture defined "Permitted Liens" to include liens securing debt issued "pursuant to Section 4.07(b)(1)" provided they were "subject to the provisions of the [2019] Intercreditor Agreement," Original Indenture § 1.01, which gave pri-

---

[6] The 2021 Intercreditor Agreement does not address the ABL Collateral.

[7] The 2021 Intercreditor Agreement also purports to prohibit the Senior Noteholders from challenging any DIP Financing by the Usurping Noteholders, even if the financing would "subordinate [the Senior] Liens in the Common Collateral or any other collateral to such DIP Financing." 2021 ICA § 6.1. This provision, purportedly given effect by Section 12.01(c), deals with the application of Collateral proceeds and thus could not be imposed absent compliance with Section 9.02(d)(10).

11

ority to the Senior Notes, 2019 ICA § 4.1. After the uptiering, TPC purportedly redefined "Permitted Liens" so that "New Notes" (*i.e.*, the Usurping Notes) were not "subject to the provisions of the [2019] Intercreditor Agreement," Supplemental Indenture § 1.01, and so not subject to the 2019 Intercreditor Agreement's waterfall. This changed a provision in the Original Indenture "dealing with" the application of proceeds of Collateral, subject to Section 9.02(d)(10).[8]

37.    TPC supplemented Section 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture—provisions that Appellees admitted dealt with the application of Collateral proceeds—by creating a new waterfall in Section 4.1 of the 2021 Intercreditor Agreement that purportedly controls over the waterfall in the 2019 Intercreditor Agreement. The new waterfall supplemented and changed Section 4.1—the 2019 Intercreditor Agreement's waterfall for applying proceeds—by purportedly establishing a new waterfall that put the Usurping Notes ahead of the Senior Notes. 2021 ICA §§ 4.1, 8.17(b) (2021 Intercreditor Agreement controls over 2019 Intercreditor Agreement in case of a conflict). The new waterfall also changed Section 6.10—the provision that dictates what happens "[i]f the Trustee collects any money"—by providing that the Trustee purportedly cannot collect Collateral proceeds or enforce any rights with respect to Collateral until the Usurping Notes are discharged in full. 2021 ICA §§ 4.1, 3.1.

**B.    Section 9.02(d)(10) Applies to Subordination**

38.    The Bankruptcy Court wrongly held that Section 9.02(d)(10) does not prohibit amendments that subordinate the Senior Notes. It held that the provision instead protects only Section 6.10(a) of the Original Indenture, "which sets out the 'waterfall' for the trustee to pay out

---

[8] TPC also purportedly deleted Section 4.10(a)'s rule that TPC could "incur or suffer to exist Liens on assets not constituting Collateral, so long as [TPC] … provides that the [10.5%] Notes … shall be **equally and ratably secured** with (or **on a senior basis** to …) the Indebtedness … secured by such [new] Lien." Original Indenture § 4.10(a) (emphases added); *see* Supplemental Indenture § 4.10(a).

12

the funds it collects," including "the requirement that any proceeds … be paid to the holders on a 'ratable' basis." SJ Opinion at 6-7. But by its plain text, Section 9.02(d)(10) is broader and not limited to that provision: It covers all amendments that make any adverse change in any portion of the Original Indenture or 2019 Intercreditor Agreement "**dealing with**" the application of Collateral proceeds. The contracting parties opted not to limit Section 9.02(d)(10)'s protections to a specific section, unlike other agreements. *Cf., e.g.*, *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.* ("*TriMark*"), 2021 WL 3671541, at *8 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) (Joel M. Cohen, J.) (analyzing sacred right regard amendments that "waive, amend, or modify (i) *Section 7.03* or (ii) *Section 4.02* of the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds" (emphases added)); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (courts may not add terms to contract). "Application of proceeds" refers to the **complete** waterfall by which proceeds are applied, not merely a single step of that waterfall that requires *pro rata* sharing, which is a distinct concept. *Compare TriMark*, 2021 WL 3671541, at *8 (credit agreement that refers to "application of proceeds" protects full waterfall), *with LCM XXII Ltd. v. Serta Simmons Bedding, LLC* ("*Serta*"), 2022 WL 953109, at *9 (S.D.N.Y. Mar. 29, 2022) (credit agreement that mentions only "pro rata" rights concerns only rights within class of noteholders).

39.     *Serta*, which the Bankruptcy Court cited for the proposition that the sacred rights did not cover subordination, SJ Opinion at 25 n.75, proves the Bankruptcy Court's error. *Serta* interpreted a contract provision that required unanimous consent to an amendment that "waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms **alter the *pro rata* sharing of payments required thereby**." 2022 WL 953109,

13

at *2 (emphasis added). That provision explicitly covered only "pro rata sharing."[9] Here, the parties chose the broader phrase "application of proceeds," and the only authority interpreting that phrase in this context is *TriMark*, which supports Appellants' interpretation.

40.     The Bankruptcy Court also held that Section 9.02(d)(10) is limited to changes in the application of proceeds only (1) as among the Senior Noteholders or (2) between the Senior Noteholders and a class of lenders under an asset-based loan facility ("ABL Lenders"). But Section 9.02(d)(10) is not limited to such changes: It applies to any change in provisions in the Original Indenture or 2019 Intercreditor Agreement "**dealing with** the application of proceeds of Collateral that would adversely affect the Holders" (emphasis added). That broad language covers any amendments that would alter the order in which Collateral proceeds are to be distributed—whether among the Senior Noteholders, between the Senior Noteholders and the ABL Lenders, or between those classes and the new Usurping Noteholders. TPC's amendments changed provisions that dealt with the application of Collateral proceeds by purportedly ranking the Usurping Notes ahead of the Senior Notes, which adversely affected the Senior Noteholders by subordinating their Notes. *See TriMark*, 2021 WL 3671541, at *9 (rejecting argument that similar sacred right was not violated because a similar priming scheme placed new loans ahead of existing loans but maintained the same allocation of proceeds within the class of existing loans).

41.     Section 4.1 of the 2019 Intercreditor Agreement is clear: Senior Noteholders get paid out **first** among creditors from Notes Priority Collateral, following only certain costs and expenses. Nothing in Section 4.1 qualifies the waterfall or confines its application to priorities between the ABL Lenders and Senior Noteholders. A new agreement that puts Senior Noteholders

---

[9] Nothing in the *Serta* agreement required unanimous consent to change the application of Collateral proceeds. *See* App'x Ex. 17.

**second** in line among creditors to Notes Priority Collateral, as the 2021 Intercreditor Agreement does, is a fundamental change to Section 4.1 of the 2019 Intercreditor Agreement that alters the application of Collateral proceeds.

42.    Section 6.10 of the Original Indenture is equally clear. It sets out how any money collected by the Trustee shall be paid out. It is explicitly "subject to the Intercreditor Agreement," including the waterfall created by Section 4.1. It likewise specifies that, subject to administrative costs, Senior Noteholders are first in line—Section 6.10 does not leave room for another class of noteholder to be placed ahead of the Senior Noteholders in the waterfall.

43.    In short, Section 9.02(d)(10) means what it says. It covers all amendments and supplements to "provisions … dealing with the application of proceeds of Collateral that would adversely affect the Holders." It is not limited to amendments of any enumerated list of provisions, and it applies to amendments that change the application of proceeds generally, including between Senior Noteholders and a new class of noteholders who purport to subordinate them.

44.    To conclude that these supplements did not change provisions dealing with the application of Collateral proceeds, the Bankruptcy Court distinguished subordination from application of proceeds. But subordination **is, by its very definition,** a matter of application of proceeds, because it deals with the order in which Collateral proceeds are applied among holders.[10] An amendment that subordinates the Senior Noteholders "alter[s] the order of application of proceeds by subordinating [lenders'] priority interest." *TriMark*, 2021 WL 3671541, at *9 (cleaned up). Simply put, Section 9.02(d)(10) is a sacred right against subordination—which TPC violated.

---

[10] Subordination means placement in a "lower rank" or "position." Black's Law Dictionary 1653 (10th ed. 2014).

15

45.     *TriMark* is squarely on point. There, a credit agreement included a nearly identical prohibition against "amend[ing] or modify[ing] … the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds." *Id.*, at *8. As here, the borrower had existing first-priority debt governed by a collateral waterfall "[s]ubject to the terms of the Inter-creditor Agreements." *Id.* The borrower, TriMark, attempted a similar priming scheme by "chang[ing] the definition of 'Intercreditor Agreements' to include the new Super-Priority Inter-creditor Agreement." *Id.* This change, the court held, "mean[t] the waterfall is now '[s]ubject to' Defendants' new super-senior tranches of debt." *Id.* at *9. The court denied defendants' motion to dismiss the minority lenders' complaint, holding that plaintiffs had sufficiently alleged that their sacred right was violated because the debtor "plac[ed] a[] tranche of debt above Appellants' place in the waterfall, even if the order of distribution [among the plaintiffs, their agents, and more junior lenders] remain[ed] facially unaffected." *Id.* at *9.

46.     As the Bankruptcy Court acknowledged, "the *TriMark* court is more expert in New York law" and held that the "awfully similar" sacred right at issue in that case was "in effect an anti-subordination provision." Tr. at 89:11-15, App'x Ex. 20. The Bankruptcy Court's ruling contrary to *TriMark* is thus highly likely to be reversed. Because the Bankruptcy Court created a split from *TriMark* on an issue of New York law, a stay is necessary to allow this Court to resolve it.

## C.     The Bankruptcy Court Improperly Invoked Industry Custom and Usage

47.     Instead of following the plain text of Section 9.02(d)(10) and a New York court's statement of New York law in *TriMark*, the Bankruptcy Court looked to "the customs, practices, usages and terminology as generally understood in the particular trade or business" to interpret the provision. The Bankruptcy Court held that it "believes" that express anti-subordination clauses "are sufficiently commonplace" that the lack of one in the Original Indenture meant that Sec-tion 9.02(d)(10) applies only to "distributions *within* a class." *Id.* at 24 (emphasis in original).

16

48.     This was error. The Bankruptcy Court expressly acknowledged at the start of oral argument that this dispute was "resolvable by reading the words of the relevant documents"; that **no party** was asking the Bankruptcy Court to consider "commercial norms," "parole evidence [*sic*]," or "other background factors"; and the Bankruptcy Court instructed the parties that, "If anyone does think I'm wrong about that please tell me." Tr. at 30:7-22. Defendants agreed that the Bankruptcy Court was "correct" that there was no need to look to "commercial norms" to interpret the Agreements. *Id.* at 30:18-20. Yet the Bankruptcy Court cited commercial norms in its Opinion.

49.     The Bankruptcy Court cited these commercial norms without any record evidence. A court cannot grant summary judgment based on industry custom or usage evidence unless "(1) the custom and usage 'is of such a **definitive** nature as to establish, as a matter of law, the meaning of that term to the industry; (2) it has been shown either that the **parties are actually aware** of the established usage of the term, or that the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it; and (3) there is **no question** that the intention of the parties was to follow, rather than depart from, the industry custom at issue.'" *Lehman Bros. Holdings Inc. v. IVC WH HGII, LLC*, 2016 WL 4703385, at *6 (Sup. Ct. N.Y. Cty. Aug. 31, 2016) (emphasis added) (quoting *J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*, 106 A.D.3d 559, 559-60 (1st Dep't 2013)). The court erroneously granted summary judgment by relying on custom and usage without any evidence—or even discovery—of the industry's understanding of "application of proceeds" or "subordination," whether the parties were aware of the established usage of the term, or whether the parties intended to follow the custom here. The Bankruptcy Court's "belie[f]" as to how common express anti-

17

subordination clauses are is no substitute for evidence or expert opinion. *TriMark* supports Appellants. No other indentures with express anti-subordination clauses were in the record.[11]

50.     In denying a stay, the Bankruptcy Court all but admitted its error, stating that "[Appellants] are (at least partially) correct in their criticism of this Court's reference to industry customs and norms." Stay Opinion at 9. It acknowledged that "no party contended that the [Original Indenture] was ambiguous, and no party presented extrinsic evidence that purported to prove up industry customs." *Id.* It stated that "but for the fact that the filing of the notice of appeal divests th[e Bankruptcy] Court of jurisdiction over the matter, [the Bankruptcy Court] would amend the opinion to delete the offending reference to 'custom and usage.'" *Id.* at 11.

### D.     Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent Alone

51.     Section 9.02(e) of the Original Indenture does not support the Bankruptcy Court's restrictive reading of the Indenture that obliterates Appellants' sacred rights protected by Section 9.02(d)(10). Section 9.02(e) requires the consent of holders of "at least 66-2/3% in aggregate principal amount" of the Senior Notes for two categories of amendments: (1) those that "ha[ve] the effect of releasing all or substantially all of the Collateral from the Liens securing the [Senior] Notes," and (2) those that "otherwise modif[y] the [2019] Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the [noteholders]."

---

[11] In *Orchard Hill Master Fund Ltd. v. SBA Communications Corp.,* on which the Bankruptcy Court relied, SJ Opinion at 24 n.74, the Second Circuit **rejected** the use of "market convention and industry practice" evidence because the agreement was "unambiguous[]" based on its "language and structure," and there were no "specific facts" or "market convention evidence" to support the claims about custom and practice. 830 F.3d 152, 156-157 (2d Cir. 2016). So too here.

52.    As one of several consent provisions, Section 9.02(e) does not apply to the exclusion of Section 9.02(d). Section 9.02(e) requires consent of "**at least**" a supermajority for amendments adverse to the holders, setting a **floor**; that is, supermajority support is always necessary for such amendments, but is not always sufficient. Section 9.02(d), which applies to any amendment under Section 9.02, sets **additional** requirements of consent of all affected Noteholders for a subset of amendments, including those to the application of Collateral proceeds.

53.    The Bankruptcy Court disregarded this plain reading of the contract based "principal[ly]" on its view that such a reading was "illogical." Stay Opinion at 6-7. The court held that reading Section 9.02(d)(10) to cover subordination would require reading it to also cover release of collateral. In the Bankruptcy Court's view, this was a problem because Section 9.09(d)(10) could not require all adversely affected Holders to consent to a release of collateral while Section 9.02(e) permitted a supermajority to consent to that release. The court resolved this purported problem by reading Section 9.02(d)(10) to apply only to changes that were "more drastic" than a release of all collateral, and it deemed subordination to be less drastic than such a release.

54.    This too was error. To start, reading Section 9.02(d)(10) to cover subordination would not require reading it to also cover release of Collateral. They are distinct concepts: Application of proceeds covers the order and manner in which proceeds of Collateral are paid out; a release of Collateral is the termination of a lien.[12] Appellants contend that changing the "application of proceeds" includes subordinating a lien—they do not contend that it includes releasing the Collateral. The Bankruptcy Court improperly conflated these points.

---

[12] The Bankruptcy Court's confusion may be due to Appellees' argument that they could have accomplished their priming transaction by releasing the Collateral and then attaching it to new priming liens. App'x, Ex. 27, at 26; App'x, Ex. 14, at 25. Appellants responded that Section 4.10(a) of the Original Indenture prohibits this because it requires that "Liens on assets not constituting Collateral" must "be equally and ratably secured with [the Senior Notes]."

DOCS_DE:239813.2 13563/001

55.     Section 9.02(e) also does not conflict with Section 9.02(d)(10). "Releasing" Collateral under Section 9.02(e) is distinct from "dealing with" the application of proceeds of that Collateral under Section 9.02(d)(1), and only the latter occurred in TPC's priming scheme. Amendments that release all Collateral adversely affect **all** Senior Noteholders equally; a supermajority can approve a release because the approving Holders will be affected by the release to the same extent as any nonconsenting Holders. Amendments that deal with the application of Collateral proceeds, by contrast, can adversely affect **some** Senior Noteholders while not adversely affecting—or even while benefitting—others; individual consent is required to ensure that one group of Holders cannot benefit themselves at the expense of others. Absent such a sacred right, there is no check on a supermajority of Holders targeting a disfavored group of Noteholders for subordination. The Bankruptcy Court disregarded this plain reading of Section 9.02.

56.     Contrary to the Bankruptcy Court's reasoning, moreover, a release of Collateral can be less drastic than subordination—to the subordinated Noteholders. For example, if a debtor has $1 billion in equal-priority secured debt and $670 million in collateral, releasing the liens on the collateral would result in a 67% recovery for all creditors, who are now unsecured. Subordinating $330 million of the debt, by contrast, would result in 100% recovery for the supermajority creditors and 0% for the subordinated creditors. In that scenario, subordination is vastly more severe to the minority creditors. Foreseeing that possibility, lenders could rationally bargain for a veto against subordination but only a supermajority vote for releases of all collateral. The Bankruptcy Court erred by comparing the relative effects of release of collateral and subordination on **all** creditors,

---

Appellants argued that amending Section 4.10(a) would change a provision "dealing with the application of proceeds" by changing the rules for lien priority and thus implicate Section 9.02(d)(10). But Appellants did not argue that other releases of Collateral (that do not amend Section 4.10(a)) deal with the application of proceeds. App'x, Ex. 28, at 26 n.20.

20

not on **individual** creditors—even though Section 9.02(d)(10) grants **individual** rights. Many sacred rights, such as "extend[ing] the fixed maturity of any Note," "extend[ing] the time for payment of interest," and "releas[ing] any Guarantor," Original Indenture §§ 9.02(d)(2), (3), (8), are facially less severe than a release of Collateral, but the parties bargained for a requirement that every adversely affected Noteholder consent to these changes. The Bankruptcy Court improperly rewrote Section 9.02(d)(10) out of the contract because it disagreed with the bargain the parties struck, contrary to black-letter contract law. *See, e.g., Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).

57.     Even if the severity of a release of Collateral were relevant (it is not), and even if such a release were always more severe than subordination (it is not), and even if Section 9.02(d)(10) must guard against only changes that are more severe changes than Section 9.02(e) (it need not), the Bankruptcy Court's narrow construction would not rectify the purported tension between Section 9.02(d)(10) and Section 9.02(e). Under the Bankruptcy Court's construction, Section 9.02(d)(10) protects only pro rata payment rights, SJ Opinion at 21-22, 25 n.75; the Noteholders thus get stronger protection of their pro rata payment rights within the Senior Secured class than against complete release of Collateral—which makes much less commercial sense than a veto against outright subordination.

## II.   APPELLANTS WILL BE IRREPARABLY HARMED IF A STAY IS NOT GRANTED

58.     The Bankruptcy Court acknowledged that "in the absence of a stay, [Appellants] face a risk of irreparable injury," Stay Opinion at 12—the other of the two most "critical factors," *Revel*, 802 F.3d at 571. The final DIP approval hearing is scheduled for July 15, 2022.

59.     It will be Debtors' burden to prove that the Proposed DIP is fair, reasonable, and adequate. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011). Debtors acknowledged at the First Day Hearing that the "core of [their] argument" as to the propriety of the DIP is that the Usurping Notes are senior to the Senior Notes. Tr. at 225, App'x Ex. 25. If, as Appellants contend, the Senior Notes have priority—because the contested amendments are invalid—the Proposed DIP, which would grant the Usurping Notes a priming lien through a roll-up, may not be approved.

60.     If the DIP proceedings go forward without a stay of the Order and Judgment pending appeal, Appellants face three independent irreparable harms. **First**, without a stay pending appeal, Appellants will lose access to the proceeds of Collateral without adequate protection or a valid waiver, in violation of the Fifth Amendment.

61.     The Proposed DIP includes a $238 million roll-up of the Usurping Noteholders' TPC debt, App'x Ex. 11, which dwarfs the mere $32 million that TPC requires in new financing. Tracy Decl. ¶ 13, App'x Ex. 15. The Bankruptcy Court acknowledged that granting a priming lien to the Usurping Noteholders—who would rank junior to the Senior Notes if Appellants prevail— "would make the DIP loan very expensive money." SJ Opinion at 12. The transaction would irrevocably transfer $23.8 million of Collateral proceeds from Appellants (as 10% holders of the Senior Notes) to the Usurping Noteholders without adequate protection of the Senior Notes or a valid waiver by the Trustee.

62.     Section 364(d)(1)(B) of the Code provides that a bankruptcy court may "authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if … there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

22

11 U.S.C. § 364(d)(1)(B). It is the Debtor's burden to make this showing. *Id.* § 364(d)(2); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

63.    Debtors admit that the Proposed DIP does not adequately protect the Senior Notes: "[T]he prepetition claims of the [Senior Noteholders] are undersecured" and "the Debtors are unable to provide adequate protection." Decl. of Zul Jamal, at 10, App'x Ex. 18.

64.    Debtors also admit they cannot fully satisfy the $930 million due on the Senior Notes. If, as Appellants contend, the Usurping Notes are junior to the Senior Notes, no money is left for the Usurping Notes. But if the Usurping Notes get a priming lien, their $238 million in rolled-up debt would be repaid in full—a wholesale transfer from Appellants to the Usurping Noteholders.

65.    Debtors cannot rely on a purported waiver by the Trustee of the Senior Notes. Debtors' investment banker, Zul Jamal, testified that he "understands that the Ad Hoc [Noteholder] Group has directed both the [10.875%] Notes Trustee and the [10.5%] Notes Trustee to consent to the priming liens securing the Term DIP Loan Facility and that the trustees under such Indentures have so consented." *Id.* ¶ 25.

66.    But the Trustee did not receive any direction letter from the Ad Hoc Noteholder Group requesting consent (according to its counsel), nor did the Trustee did give consent. *See* App'x Ex. 16, at Ex. A. Debtors confirmed that they also "do not possess any direction letters or similar correspondence" from the Ad Hoc Noteholder Group. *Id.* at Ex. B.[13]

---

[13] Contrary to Debtors' DIP Motion, App'x Ex. 10 at 55-56 & n.22, Section 6.05 of the Original Indenture, which allows the majority to direct the Indenture Trustee, does not commit Appellants to consent to the DIP or provide for deemed consent because the Trustee need not consent to a DIP that "conflicts with … th[e] Indenture" and is "unduly prejudicial to the rights of other Holders."

23

67.    Defendants argue that the Trustee implicitly consented through Section 6.1(a) of the 2021 Intercreditor Agreement, which provides, "If the [Usurping Noteholders] shall … consent (or not object) to any Grantor's obtaining financing under Section 364 … then … each [Senior Noteholder] agrees that it will not compete with, will raise no objection to, and will not support any objection to … such use of … DIP Financing and will not seek, request (or be entitled to) adequate protection." *See also* App'x Ex. 10 ¶ 26 (DIP motion referring to Section 6.1(a) of 2021 ICA). Indeed, Intervenor wrote to Appellants on July 11, 2022 asserting that Appellants' DIP objection violates this purported undertaking and must be withdrawn. Shine Decl., Ex. A. Crucially, reversal of the Order and Judgment would render the 2021 Intercreditor Agreement invalid, voiding this purported waiver. In other words, the legitimacy of the Proposed DIP, including the roll-up, is premised on the very amendments thar are the subject of the appeal. Absent a stay, at least $23.8 million of Collateral value that would otherwise flow to Appellants will be redistributed to the Usurping Noteholders, without any adequate protection or a valid waiver.

68.    The violence this will inflict on Appellants cannot be overstated. The requirement of adequate protection or a valid waiver is central to protecting secured creditors' constitutional property rights. This concept is "derived from the Fifth Amendment's protection of property interests." H.R. Rep. No. 95-595, at 338-40 (1977). The protections exist in part because security interests are "'property rights' protected by the Fifth Amendment from public taking without just compensation." *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (7th Cir. 1984) (citing *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940)); *see also In re Dispirto*, 371 B.R. 695, 698 (Bankr. D.N.J. 2007) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests."); *In re Quanta Res. Corp.*, 739 F.2d 912, 922 n.11 (3d Cir. 1984) ("The rights of a secured creditor in the debtor's assets are property subject to

24

a taking.") (cleaned up)), *aff'd sub nom. Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

69.     If the Order and Judgment stand as the Debtors march forward with the DIP Proceedings and Appellants are precluded from objecting to the Proposed DIP or presenting their competing proposal, they will be denied their Fifth Amendment rights. This is irreparable harm. *See GJJM Enters., LLC v. City of Atlanta*, 293 F. Supp. 3d 509, 520-21 (D.N.J. 2017) ("[W]here probable success on the merits of a constitutional claim is shown, and such violation will continue unless enjoined, the continuing constitutional violation can constitute irreparable harm." (citing *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010))).

70.     **Second**, and relatedly, the value of Appellants' security interests will be irremediably diluted if the Proposed DIP goes forward without a stay of the Order and Judgment. If the Proposed DIP is approved and the Usurping Notes are rolled up under an Order and Judgment that are later reversed on appeal, the financing arrangement will be difficult to unwind, and the Usurping Noteholders will effectively lock in greater potential recoveries at the expense of the Non-Consenting Senior Noteholders. *Cf., e.g.*, *In re Trib. Co.*, 477 B.R. 465, 477 (Bankr. D. Del. 2012) ("It will certainly be difficult to 'unscramble the egg' if the [confirmation plan] is allowed to go effective, since it is unlikely that the distributions could be recovered, or, if recoverable, would be challenging and costly."). Appellees would likely argue that, by the terms of the Bankruptcy Code, Appellants cannot undo any priority given to the Usurping Noteholders through a DIP loan, even if they prevail on a later appeal from the DIP approval. *See* 11 U.S.C. § 364(e).

71.     This injury is not compensable. Although economic injury is generally "compensable in money," *Revel*, 802 F.3d at 572, "courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents." *Marblegate Asset Mgmt. v.*

25

*Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 607 (S.D.N.Y. 2014) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999)); *see also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 F. App'x 453, 456-57 (3d Cir. 2011) (quoting *Brenntag*, 175 F.3d at 249).

72.     Where, as here, the value of a movant's security interest in collateral (as beneficial holder of the Trustee's lien) cannot be corrected following even a successful appeal (absent a stay), irreparable harm is established. *See Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales*, 2018 WL 4179456, at *2 (D. Del. Aug. 31, 2018) ("Where secured creditors … seek court intervention to maintain their position, the prospective loss of their status quo security interest has been held sufficient to constitute the irreparable harm needed to justify an injunction." (cleaned up)); *Ratcliff v. Rancher's Legacy Meat*, 2020 WL 4048509 (D. Minn. July 20, 2020) (irreparable harm when "even [if] [movant] succeeds on his appeals … [movant] will not be able to protect collateral that is encumbered by his security interests from being sold at a depressed price.").

73.     **Third**, absent a stay, Defendants may later argue that Appellants' appeal has become moot before Appellants can vindicate their rights. "[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *In re L.A. Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011). Accordingly, "'the fact that the decision on the stay may be dispositive of the appeal … is a factor that [a court] must consider' in determining whether irreparable harm will result from the denial of a stay." *Id.* at 36-37 (quoting *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991)).

74.     If the Bankruptcy Court's Order and Judgment are not stayed, Defendants will invoke statutory mootness and argue that it is impossible to undo any priming lien they are granted under Section 364(e) of the Code, which prevents a reversal on appeal from invalidating the priority of a DIP loan. In fact, Intervenor has already invoked the appealed-from Order as a reason to

26

deny Appellants standing to object to the DIP loan; it argues that the Order is binding law of the case until this appeal is resolved. App'x, Ex. 26, at 19-20. Yet Intervenor has simultaneously invoked Section 364(e) to argue that this appeal will be moot following a final DIP order. *Id.* at 5 n.10. Absent a stay, Defendants may be able to strip Appellants' of their right to appellate review.

75.    Defendants are also likely to argue that the appeal has become equitably moot on the ground that belated relief "would lead to a perverse outcome," such as "injury to third parties" or "the potential for chaos in the bankruptcy court." *In re Trib. Co.*, 477 B.R. at 47 (cleaned up).

76.    Given the imminence of Appellants' irreparable harm—the final DIP hearing is days away—there is a strong likelihood that, absent a stay, Defendants would argue that Appellants' appeal is moot before it is resolved. Denying a stay, and so allowing potential approval of the Proposed DIP roll-up before the appeal is resolved, would lock in senior priority for the Usurping Noteholders over the Senior Noteholders. If the Proposed DIP is approved, but Appellants ultimately prevail on appeal, "unscrambl[ing] the egg"—unwinding a financing arrangement that was approved based on an incorrect ranking of Appellants' lien priority—would be "challenging and costly." *Cf. id.* at 477. This necessitates a stay so that Appellants may vindicate their right to appellate review before their property interests are irreparably lost.

## III.    A STAY PENDING AN EXPEDITED APPEAL WILL NOT INJURE TPC OR OTHER CREDITORS

77.    The Bankruptcy Court erred in the third factor in the stay analysis—injury to Defendants-Appellees. It determined that any potential injury to Appellants is outweighed by the harm to TPC of not approving the DIP loan. The court weighed the wrong harms. It should not have looked at the harm to TPC of receiving no DIP financing **at all**. Rather, it should have considered only the harm to TPC of delaying **past this week** approval of the **specific** DIP proposal at hand, which provides a far larger roll-up than infusion of new money. TPC has adequate liquidity

27

for its short-term needs and could obtain DIP financing via Appellants' proposal without infringing Appellants' sacred rights. TPC would suffer no harm from a short delay in approving a roll-up financing while this Court considers Appellants' appeal, which Appellants seek to expedite.

78.     TPC has not shown a need for any post-petition financing, let alone an **immediate** need. Liquidity analysis based on Debtors' cash flow projections shows that Debtors will consistently maintain liquidity above $159 million during the forecasted period ending September 16, 2022, *without* drawing any more money from the new money DIP loans.[14] Tracy Decl. ¶¶ 4(i), 8. This is tens of millions of dollars above Debtors' historical minimum liquidity threshold of $75-100 million. *See* Del Genio Decl. ¶ 11.

79.     TPC has also received an alternative proposal that it admits is "more economically attractive." DIP Motion ¶ 35. This proposal, which would provide the same amount of new money as the Proposed DIP, would (1) not include a roll-up, (2) provide TPC the flexibility to pay 8% of the 11% of interest on the DIP loans in kind instead of in cash, and (3) charge TPC less in total fees, regardless of any anticipated insurance payments. App'x Ex. 11, at Ex. A. Any slight delay in the DIP proceedings caused by this appeal will not harm TPC.

80.     In opposing Appellants' stay motion before the Bankruptcy Court, TPC claimed that a delay in entering a final DIP order would be an event of default on two of the DIP loan agreements. Jamal Decl. ¶ 12, App'x Ex. 19. TPC offered a hearsay secondhand account of an asset-based ("ABL") DIP lender's claim that it predicated its ABL DIP loan proposal on approval of the accompanying term DIP loan and speculated that "there is no commitment from [the ABL lender] that they will still provide the ABL DIP Facility if the Term DIP Facility is not approved

---

[14] Even if Debtors do not receive any of the insurance proceeds they expect to receive, their total liquidity will remain above $115 million. Tracy Decl. ¶ 11.

on a final basis." *Id.* ¶ 14. The Court should not credit the bare assertion that the ABL DIP lender **could** walk away from the deal because this account does not indicate that the Term DIP Lenders **would** walk away if final approval were merely delayed pending appeal. For good reason. According to TPC, if the Term DIP Lenders walked, the company would collapse, destroying approximately $1.2 billion in going concern value, suffered by the Usurping Noteholders who are the Term DIP Lenders. Although the liquidation value has not yet been disclosed, it is unquestionably a fraction of the going concern value. It is absurd to speculate that the Term DIP Lenders would abandon their deal and imperil their own investments because of a short delay.

81.    Intervenor would similarly be unaffected by a stay pending appeal. If Appellants lose on appeal, the Bankruptcy Court may evaluate the Proposed DIP exactly as it plans to do now. If the Bankruptcy Court approves that proposal, Intervenor will receive the roll-up and lien priority it has sought all along. If the Bankruptcy Court does not approve that Proposal at the hearing, then Intervenor's rights will likewise be unaffected by the stay—Intervenor will be denied the unfair and unreasonable roll-up to which it was not entitled in the first place. If Appellants prevail on their appeal, by contrast, Intervenor will benefit from the stay—it will not be required to endure the complex and expensive unscrambling of a DIP Financing approved based on legal error.

## IV.    GRANTING A STAY IS IN THE PUBLIC INTEREST

82.    The Bankruptcy Court erroneously excluded the public interest from its analysis. *See* Stay Opinion at 17. Granting a stay would preserve the public's interest safeguarding the property and contract rights of all parties, as well as the integrity of the bankruptcy proceeding.

83.    **First**, a stay will serve "[t]he public['s] … interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *In re L.A. Dodgers*, 465 B.R. at 37 (cleaned up); *see also Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d 425 (E.D. Pa. 2001) ("As a general matter, it is in the public interest to enforce valid

29

contractual obligations …."). Appellants brought the adversary proceeding to enforce their contractual rights and thus to protect their property interests—the priority of the Senior Notes. *See Revel*, 802 F.3d at 573.

84.     **Second**, TPC's creditors and the Bankruptcy Court have an interest in the full adjudication of Appellants' case before the Bankruptcy Court evaluates the Proposed DIP, which requires the Bankruptcy Court to make a finding of adequate protection of all senior or equal-priority interests. As long as the priority of Appellants' interests in relation to the Usurping Noteholders' interests remains in dispute, "the court cannot begin to assess the adequacy of protection." *In re The Colad Grp., Inc.*, 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005). A stay will allow all TPC's creditors to have their day in court and ensure that any outstanding questions of lien priority are fully resolved before the Bankruptcy Court assesses DIP proposals.

85.     **Third**, the Bankruptcy Court's decision has implications for many other cases. Other agreements contain a sacred right regarding the "application of proceeds," *e.g.*, *TriMark*, 2021 WL 3671541, at *8, and thus the outcome here will have outsized importance for the credit market. The public interest therefore favors decisive resolution by an appellate court.

## V.     APPELLANTS SHOULD NOT BE REQUIRED TO POST A BOND

86.     Bankruptcy Rule 8007 allows this Court to condition a stay on the posting of a bond. The purpose "is to protect the adverse party from potential losses resulting from the stay." *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992). The Court has "wide discretion …. and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964).

87.     Where, as here, the adverse parties will not suffer any losses because of a stay pending appeal, a bond is not necessary. *See United Merchs.*, 138 B.R. at 430; *see also Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (a stay may be sought "with or

without posting a bond"). A bond is needed only where the stay is "likely to cause harm by diminishing the value of an estate or endanger [the non-moving parties'] interest in the ultimate recovery." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y 2007) (cleaned up).

88.    TPC will suffer no harm if the Court grants a stay pending appeal. TPC simply does not require additional financing. There are no exigent circumstances that require the final DIP hearing to move forward immediately, and Appellants have sufficient funds to pay for the Debtors' attorney's fees and costs should the Debtors prevail on appeal.

## NOTICE

89.    Notice of this Motion has been provided to counsel of record for Appellees. Appellants submit that no other or further notice is required under the circumstances.

## STATEMENT REQUIRED BY LOCAL RULE 7.1.1

90.    Pursuant to District of Delaware Local Rule 7.1.1, counsel certify that they have made a reasonable effort to confer and reach agreement with opposing counsel on the relief sought by this Motion. Opposing counsel does not consent to the requested relief.

## CORPORATE DISCLOSURE STATEMENT

Bayside Capital, Inc., a privately held non-governmental party, has no parent company, and no publicly held corporation owns 10% or more of its stock. Cerberus Capital Management, LP, a privately held non-governmental party, has no parent company and no publicly held corporation owns 10% or more of its stock.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Appellants respectfully request that this Court (1) enter an order, substantially in the form attached hereto as **Exhibit A**, staying the Order and Judgment pending final resolution of Appellants' appeal; and (2) grant such other and further relief as the Court deems equitable and proper.

31

DOCS_DE:239813.2 13563/001

Dated:   July 13, 2022                    Respectfully submitted,

                                          PACHULSKI STANG ZIEHL & JONES LLP

                            By:    /s/ *Timothy P. Cairns*
                                  Laura Davis Jones (DE Bar No. 2436)
                                  Timothy P. Cairns (DE Bar No. 4228)
                                  PACHULSKI STANG ZIEHL & JONES LLP
                                  919 North Market Street, 17th Floor
                                  P.O. Box 8705
                                  Wilmington, Delaware 19899 (Courier 19801)
                                  Tel: 302-652-4100
                                  Facsimile: 302-652-4400
                                  ljones@pszjlaw.com
                                  tcairns@pszjlaw.com

                                  - and -

                                  Jennifer Selendy (*pro hac vice* pending)
                                  Andrew R. Dunlap (*pro hac vice* pending)
                                  Oscar Shine (*pro hac vice* pending)
                                  Max H. Siegel (*pro hac vice* pending)
                                  SELENDY GAY ELSBERG PLLC
                                  1290 Avenue of the Americas
                                  New York, New York 10104
                                  Tel: 212-390-9000
                                  jselendy@selendygay.com
                                  adunlap@selendygay.com
                                  oshine@selendygay.com
                                  msiegel@selendygay.com

                                  *Attorneys for the Appellants*

32

## **Exhibit A**

Proposed Order

DOCS_DE:239813.2 13563/001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.,* | Case No. 22-10493 (CTG) |
| *Debtors.*[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Adv. Pro. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants,* | Civ. Action No. _____ |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Appellee,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant-Appellee.* | |

## ORDER GRANTING EMERGENCY MOTION OF APPELLANTS BAYSIDE CAPITAL, INC. AND CERBERUS CAPITAL MANAGEMENT, L.P. FOR STAY OF EFFECTIVENESS AND ENFORCEMENT OF ORDER AND JUDGMENT PENDING APPEAL PURSUANT TO BANKRUPTCY RULE 8007

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

2

Upon the motion (the "Motion")[2] of Plaintiffs-Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. (collectively, "Appellants") for entry of an order, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedures, granting a stay pending Appellants' appeal of the Bankruptcy Court's *Order* dated July 8, 2022 [Adv. Proc. No. 22-50372, A.D.I. 74] and *Judgment* dated July 8, 2022 [Adv. Proc. No. 22-50372, A.D.I. 75], all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 158 and 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, IT IS HEREBY ORDERED THAT:

1. The Motion is granted to the extent set forth herein.

2. The effectiveness of the Order and Judgment and enforcement thereof, including any matters attendant thereto, are stayed pending resolution of Appellants' pending appeal of the Order and Judgment.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

2

**Exhibit A**

**Proposed Redacted Stay Motion**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.,* | Bankruptcy Case No. 22-10493 (CTG) |
| *Debtors.*[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Bankruptcy Adv. Proc. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants,* | Case No. 22-mc-00298-RGA |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Appellee,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant-Appellee.* | |

**EMERGENCY MOTION OF APPELLANTS BAYSIDE CAPITAL, INC.
AND CERBERUS CAPITAL MANAGEMENT, L.P. FOR STAY OF
EFFECTIVENESS AND ENFORCEMENT OF ORDER AND JUDGMENT
<u>PENDING APPEAL PURSUANT TO BANKRUPTCY RULE 8007</u>**

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ......................................................................................1

JURISDICTION AND VENUE .....................................................................................4

FACTUAL AND PROCEDURAL BACKGROUND......................................................4

      A.      The Senior Notes...................................................................................4

      B.      Appellants' Sacred Rights......................................................................4

      C.      The Usurping Notes ..............................................................................6

      D.      Appellants' Notice of Breaches to TPC..................................................7

      E.      TPC's Bankruptcy and the Cross-Holder DIP Proposal ...........................7

      F.      Appellants Sue to Vindicate Their Sacred Rights......................................8

REQUESTED RELIEF..................................................................................................9

LEGAL ARGUMENT...................................................................................................9

I.      APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS ..................................9

      A.      Section 9.02(d)(10) Prohibited the Amendments Absent Appellants'
                Consent .............................................................................................10

      B.      Section 9.02(d)(10) Applies to Subordination .......................................12

      C.      The Bankruptcy Court Improperly Invoked Industry Custom and Usage.............16

      D.      Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent
                Alone.................................................................................................18

II.     APPELLANTS WILL BE IRREPARABLY HARMED IF A STAY IS NOT
         GRANTED ..............................................................................................21

III.    A STAY PENDING AN EXPEDITED APPEAL WILL NOT INJURE TPC OR
         OTHER CREDITORS..................................................................................27

IV.    GRANTING A STAY IS IN THE PUBLIC INTEREST....................................................29

V.     APPELLANTS SHOULD NOT BE REQUIRED TO POST A BOND ..........................30

NOTICE......................................................................................................................31

ii

STATEMENT REQUIRED BY LOCAL RULE 7.1.1 ...................................................................31

CORPORATE DISCLOSURE STATEMENT ...........................................................................31

CONCLUSION.............................................................................................................................31

iii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y 2007)..................................................................................30

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
2021 WL 3671541 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) .................................... *passim*

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)...................................................................................25

*Cont'l Oil Co. v. Frontier Ref. Co.*,
338 F.2d 780 (10th Cir. 1964) ...............................................................................30

*In re Dispirto*,
371 B.R. 695 (Bankr. D.N.J. 2007) ........................................................................24

*In re George Ruggiere Chrysler-Plymouth, Inc.*,
727 F.2d 1017 (7th Cir. 1984) ...............................................................................24

*GJJM Enters., LLC v. City of Atlanta*,
293 F. Supp. 3d 509 (D.N.J. 2017).........................................................................24

*Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*,
446 F. App'x 453 (3d Cir. 2011) ...........................................................................25

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
106 A.D.3d 559 (1st Dep't 2013) ...........................................................................17

*In re L.A. Dodgers LLC*,
457 B.R. 308 (Bankr. D. Del. 2011) .......................................................................21

*In re L.A. Dodgers LLC*,
465 B.R. 18 (D. Del. 2011)...............................................................................26, 29

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
2022 WL 953109 (S.D.N.Y. Mar. 29, 2022)....................................................13, 14

*Lehman Bros. Holdings Inc. v. IVC WH HGII, LLC*,
2016 WL 4703385 (Sup. Ct. N.Y. Cty. Aug. 31, 2016) .........................................17

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
75 F. Supp. 3d 592 (S.D.N.Y. 2014).......................................................................25

iv

*Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*,
  258 F.3d 180 (3d Cir. 2001)................................................................................30

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
  830 F.3d 152 (2d Cir. 2016)...............................................................................18

*In re Quanta Res. Corp.*,
  739 F.2d 912 (3d Cir. 1984)...............................................................................24

*Ratcliff v. Rancher's Legacy Meat*,
  2020 WL 4048509 (D. Minn. July 20, 2020) ......................................................26

*Republic of Philippines v. Westinghouse Elec. Corp.*,
  949 F.2d 653 (3d Cir. 1991)...............................................................................26

*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015)........................................................................ *passim*

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
  13 N.Y.3d 398 (2009) ..................................................................................13, 21

*Siemens Bldg. Techs., Inc. v. Camacho*,
  168 F. Supp. 2d 425 (E.D. Pa. 2001) ..................................................................29

*Stilp v. Contino*,
  613 F.3d 405 (3d Cir. 2010)...............................................................................25

*In re Swedeland Dev. Grp., Inc.*,
  16 F.3d 552 (3d Cir. 1994)................................................................................22

*Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales*,
  2018 WL 4179456 (D. Del. Aug. 31, 2018) .........................................................25

*In re The Colad Grp., Inc.*,
  324 B.R. 208 (Bankr. W.D.N.Y. 2005) ..............................................................30

*In re Trib. Co.*,
  477 B.R. 465 (Bankr. D. Del. 2012) ..............................................................25, 27

*In re United Merchs. & Mfrs., Inc.*,
  138 B.R. 426 (D. Del. 1992)..............................................................................30

*Viera v. Life Ins. Co. of N. Am.*,
  642 F.3d 407 (3d Cir. 2011)...............................................................................10

*Wright v. Union Cent. Life Ins. Co.*,
  311 U.S. 273 (1940)..........................................................................................24

v

**Statutes**

11 U.S.C. § 364 ................................................................................................... *passim*

28 U.S.C. § 158 .............................................................................................................4

28 U.S.C. § 1334 ...........................................................................................................4

28 U.S.C. § 1408 ...........................................................................................................4

28 U.S.C. § 1409 ...........................................................................................................4

**Constitutional Provisions**

U.S. Const. amend. V ............................................................................................22, 24

**Rules**

D. Del. L.R. 7.1.1 .......................................................................................................31

Fed. R. Bankr. P. 8007 ......................................................................................... *passim*

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)......................................................................15

H.R. Rep. No. 95-595 (1977).......................................................................................24

DOCS_DE:239813.1 13563/001

vii

DOCS_DE:239813.1 13563/001

Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P., by and through their undersigned counsel, respectfully move this Court, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure, for entry of an order granting a stay pending an expedited appeal[2] of the effectiveness of the Bankruptcy Court's order of July 8, 2022 ("Order"), App'x Ex. 2, and judgment of July 8, 2022 ("Judgment"), App'x Ex. 3, issued pursuant to its Memorandum Opinion of July 6, 2022 ("SJ Opinion"), App'x Ex. 1.[3] Appellants sought a stay in the Bankruptcy Court, which was denied. App'x Exs. 4, 5 ("Stay Opinion"). In relevant part, the Order and Judgment denied Appellants' Motion for Summary Judgment and granted Intervenor's Cross-Motion for Summary Judgment. In support of this Motion, Appellants respectfully state as follows:

## PRELIMINARY STATEMENT

1.    This adversary proceeding concerns the right of senior creditors to receive and recover the value of their Collateral, which TPC intends to irrevocably transfer to other stakeholders. In 2019, TPC issued $930 million of Senior Secured Notes ("Senior Notes") pursuant to an Indenture ("Original Indenture"), App'x Ex. 7. Section 9.02(d)(10) prohibited TPC, "without the consent of each Holder affected thereby," from "mak[ing] any change in the provisions" of the Indenture or the related Intercreditor Agreement, App'x Ex. 21 ("2019 Intercreditor Agreement" or "2019 ICA"), "dealing with the application of proceeds of collateral."[4]

---

[2] Appellants' Motions to Expedite the Hearing on this Motion and to Expedite the Appeal are filed simultaneously herewith.

[3] Citations to the record refer to the Appendix to Emergency Motion of Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. for Stay of Effectiveness and Enforcement of Order Pending Appeal Pursuant to Bankruptcy Rule 8007 ("App'x"), filed concurrently herewith.

[4] Capitalized terms not otherwise defined herein shall have the meaning given to them in Appellants' Complaint, and Appellants' Memoranda of Law in Support of their Motion for Summary Judgment and in Opposition to Intervenor's Motion for Summary Judgment.

2

2.    In 2021, TPC amended the Original Indenture and supplemented the 2019 Inter-creditor Agreement to issue $153 million of new notes ("Usurping Notes"), and, shortly before filing for bankruptcy in 2022, issue approximately $51.5 million in additional Usurping Notes. TPC entered a supplemental indenture, App'x Ex. 23 ("Supplemental Indenture"), and a new In-tercreditor Agreement, App'x Ex. 22 ("2021 Intercreditor Agreement" or "2021 ICA"), that pur-portedly strip the lien priority for which the Senior Noteholders bargained in the Original Indenture and 2019 Intercreditor Agreement and grant it to the Usurping Notes instead.

3.    TPC executed these contracts without the consent of each adversely affected Senior Noteholder. Appellants are non-consenting Senior Noteholders. They argued below that the amendments and supplements to the Original Indenture and 2019 Intercreditor Agreement, which purport to subordinate the Senior Notes to the Usurping Notes in the application of Collateral proceeds, required unanimous consent pursuant to Section 9.02(d)(10) of the Original Indenture. Appellants sought a declaration that these contracts were void to the extent they granted this new priority. The declaration would have restored the Senior Notes' priority.

4.    The Bankruptcy Court erroneously held that the Original Indenture let TPC and the Usurping Noteholders torpedo Appellants' lien priority, despite a "sacred right" in the Original Indenture requiring Appellants' consent.

5.    Appellants promptly appealed from the Bankruptcy Court's Order and Judgment and moved to expedite. The Bankruptcy Court denied their request for a stay. Appellants now respectfully ask this Court for a stay pending an expedited appeal.

6.    **First**, the Bankruptcy Court acknowledged that Appellants satisfied their burden of showing a likelihood of success on the merits on appeal, Stay Opinion at 15, because they have "colorable" arguments on "challenging" and "complex" issues of contract interpretation. The court

DOCS_DE:239813.1 13563/001

misread the governing contracts, misapplied New York law, and improperly cited industry custom and usage, without evidence, to interpret an unambiguous contract. Alternatively, to the extent that the court below identified an ambiguity, it erred by granting summary judgment in favor of Intervenor.

7.    **Second**, the Bankruptcy Court further acknowledged that Appellants "have a substantial claim for irreparable injury." Stay Opinion at 16. On July 15, 2022, Defendants-Appellees will seek final approval of a DIP loan that would roll-up the Usurping Noteholders' TPC debt by granting a priming lien, placings Appellants' loans behind hundreds of millions of Intervenor-Defendant-Appellee's loans. TPC admits that it cannot provide adequate protection, and Appellants did not waive their Fifth Amendment right to that protection. If the Usurping Notes were invalid, approval of this DIP loan would cause "substantial" economic injury to Appellants, likely irreversible under Section 364(e) of the Bankruptcy Code, so "it is not clear that [Appellants] will obtain meaningful relief, absent a stay." *Id.* at 13-14.

8.    **Third**, the Bankruptcy Court erred in balancing the potential harm of a stay to TPC. It compared the acknowledged harm to Appellants to the potential, purely speculative harm to TPC if TPC is unable to secure any DIP financing at all; the court should have compared Appellants' harm to the potential of TPC facing a slight delay (due to a highly expedited appeal) in approval of the specific DIP Proposal before it. Without any new financing, TPC is projected to have tens of millions of dollars more than its historical minimum liquidity threshold. And TPC has an alternative DIP proposal available, that it admits is "more economically attractive," DIP Motion ¶ 35, App'x Ex. 10, offering the same new money without a roll-up that would trample Appellants' sacred rights.

3

9.      **Fourth**, the Court improperly failed to examine the public interest factor supporting a stay. There is a strong public interest here in allowing Appellants to enforce their contractual rights, and the Bankruptcy Court's decision has implications for numerous other cases that contain similar sacred rights regarding the "application of proceeds."

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 158 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The basis for the relief sought herein is Bankruptcy Rule 8007.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Senior Notes

11.     In August 2019, per the Original Indenture, TPC issued $930 million in principal of Senior Notes. *See* App'x Ex. 6 ¶ 38 ("Del Genio Decl."). TPC could not incur additional debt unless it was equal or junior in priority to the Senior Notes. Original Indenture §§ 4.07(b)(1), 4.10(a). At the same time, the Trustee entered the 2019 Intercreditor Agreement, which, among other things, set a Collateral waterfall guaranteeing the Senior Notes' first-priority access to proceeds of the Notes Priority Collateral and second-priority access to proceeds of the ABL Facility Priority Collateral. 2019 ICA § 4.1.[5]

### B.  Appellants' Sacred Rights

12.     The Original Indenture permits some amendments without the consent of all holders, but it proscribes amendments, supplements, or waivers that would subordinate the Senior

---

[5] The 2019 Intercreditor Agreement provides that "the Notes Obligations [of the Senior Notes] are intended to be secured by first priority liens on the Notes Priority Collateral and second priority liens on the ABL Facility Priority Collateral, such priorities and related rights to be established by this Agreement." 2019 ICA Recital E.

4

Noteholders by altering their first-priority right to Collateral proceeds. Article 9 describes the varying levels of consent required to amend or supplement documents relevant to the Senior Notes or to waive rights therein. Some provisions can be amended without holder consent, others only with consent of a majority, others only with a supermajority, and still others with consent of **each** adversely affected Senior Noteholder.

13.    Provisions that need the consent of each affected Holder to be modified are known as "sacred rights." Section 9.02(d) identifies ten sacred rights—each concerning rights to, or priority of, payment.

14.    The right to block amendments affecting the application of Collateral proceeds (the payment "waterfall") is a sacred right. Section 9.02(d)(10) of the Original Indenture provides:

> **[W]ithout the consent of each Holder affected thereby**, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any [Senior] Notes held by a non-consenting Holder): …
>
> (10) **make any change** in the provisions in the [2019 Intercreditor Agreement] or this Indenture dealing with **the application of proceeds of Collateral** that would adversely affect the Holders.

*Id.* (emphasis added). Section 4.1(a) of the 2019 Intercreditor Agreement, "Application of Proceeds of Senior Collateral," provides that, subject to certain costs and expenses, the Senior Noteholders get paid first from the proceeds of the Notes Priority Collateral and second from the ABL Priority Collateral. 2019 ICA § 4.1(a).

15.    Under the Original Indenture, Section 4.07(b) allowed TPC to incur a defined amount of additional debt after the issuance of the Senior Notes ("Permitted Debt"), but required that any liens securing such debt issued under Section 4.07(b)(1) (among the categories of "Permitted Liens") must be "subject to the provisions of" the 2019 Intercreditor Agreement—including the waterfall giving the Senior Notes senior access to the proceeds of the Notes Priority Collateral

5

and junior access to the proceeds of the ABL Priority Collateral. Original Indenture §§ 1.01, 4.07(b)(1).

## C.  The Usurping Notes

16.    In February 2021, TPC issued $153 million in principal of Usurping Notes pursuant to a new 10.875% indenture. Del Genio Decl. ¶ 35. In 2022, TPC issued approximately $51.5 million more of Usurping Notes. *Id.* ¶ 36. To do so, TPC and the Trustee entered the Supplemental Indenture, purporting to amend the Original Indenture, and the Trustee entered the 2021 Intercreditor Agreement.

17.    These amendments and supplements purport to change the application of Collateral proceeds to subordinate the Senior Notes behind the Usurping Notes in at least three ways.

18.    **First**, the Supplemental Indenture purports to amend the Original Indenture to make the Senior Notes subject to the 2021 Intercreditor Agreement, including its new Collateral waterfall. The Supplemental Indenture purports to amend Section 12.01(c) of the Original Indenture to replace the reference to the 2019 Intercreditor Agreement with the new term "Intercreditor Agreements," defined to mean the 2019 Intercreditor Agreement **and** the 2021 Intercreditor Agreement, Supplemental Indenture § 12.01(c), which prioritizes payments to the Usurping Notes before payment on the Senior Notes, 2021 ICA § 4.1.

19.    **Second**, the Supplemental Indenture purports to amend the Original Indenture's definition of "Permitted Liens" to exempt at least $113 million of the Usurping Notes from the requirement that they be subject to the 2019 Intercreditor Agreement. Consequently, the liens securing the Usurping Notes issued under Section 4.07(b)(1) are purportedly **not** subject to the 2019 Intercreditor Agreement, and so not subject to its waterfall.

20.    **Third**, even absent changes to the Original Indenture, the supplemental 2021 Intercreditor Agreement purports to change the Senior Notes' priority with respect to proceeds of

DOCS_DE:239813.1 13563/001

Collateral by supplementing Sections 3.1 and 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture. Section 2.1 of the new 2021 Intercreditor Agreement provides that any lien on "Common Collateral," including the Notes Priority Collateral and the ABL Priority Collateral, securing the Usurping Notes "shall have priority over and be senior in all respects and prior to" any liens on the "Common Collateral" securing the Senior Notes. Section 4.1 of the 2021 Intercreditor Agreement (titled "Application of Proceeds") provides that proceeds of Collateral, including the Notes Priority Collateral and the ABL Priority Collateral, shall be applied to the Senior Notes **only after discharge of the Usurping Notes**. And Section 3.1 of the 2021 Intercreditor Agreement provides that the Usurping Notes' agent shall exercise all rights with respect to the Collateral until the Usurping Notes are paid in full. These supplements change Section 4.1(a) of the 2019 Intercreditor Agreement by subordinating the Senior Notes to the Usurping Notes with respect to the proceeds of Collateral. They also change Section 3.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture by delaying the Trustee's receipt of proceeds for payment to the Senior Noteholders.

### D.  Appellants' Notice of Breaches to TPC

21.    On March 31, 2022, counsel for Appellants notified TPC's counsel that TPC had violated Section 9.02(d)(10) of the Original Indenture. App'x Ex. 24. TPC's counsel denied that TPC had breached Section 9.02(d)(10). On April 26, 2022, counsel for Appellants wrote to the Trustee, describing TPC's breaches and asking the Trustee not to take instructions from the Usurping Noteholders. App'x Ex. 8.

### E.  TPC's Bankruptcy and the Cross-Holder DIP Proposal

22.    On June 1, 2022, TPC and affiliates filed a petition for relief under Chapter 11 of the Bankruptcy Code. App'x Ex. 9. At the same time, TPC filed a Motion for Entry of Interim and Final Orders to approve the Cross-Holder DIP Proposal, which purports to allow $238 million of

7

Usurping Notes. *See* App'x Ex. 10. If granted, the Cross Holder DIP would lock in the subordination of the Senior Notes and shift value from Appellants to the Usurping Noteholders. App'x Ex. 11 ¶ 3 ("DIP Objection").

**F.   Appellants Sue to Vindicate Their Sacred Rights**

23.    On June 1, 2022, Appellants commenced this adversary proceeding, seeking, in substance, a declaration that the Senior Notes retain priority over the Usurping Notes. Compl. ¶¶ 46-63, App'x Ex. 12. Appellants moved for summary judgment, App'x Ex. 13, and an Intervenor group cross-moved, App'x Ex. 14.

24.    On July 6, 2022, the Bankruptcy Court issued an opinion that, in relevant part, denied Appellants' Motion for Summary Judgment and granted Intervenor's Cross-Motion.

25.    The Bankruptcy Court's Order and Judgment directly impact the main case, in which Debtors have moved for approval of a $323 million DIP facility ("Proposed DIP"), which Appellants oppose. Debtors' Proposed DIP includes a $238 million roll-up of the Usurping Notes (including interest and make-whole), which locks in the Usurping Noteholders' recovery of the total claim value of the Usurping Notes in cash. But it provides a commitment amount of only $85 million of new money and finances actual new money needs of only $32 million—an egregiously high ratio of roll-up to new money. Tracy Decl. ¶ 13, App'x Ex. 15. The Proposed DIP also preempts the ordinary process for a plan of reorganization in the Usurping Noteholders' favor, by (1) labelling it an "Event of Default" under the Proposed DIP if a court finds that the Senior Notes are senior to the Usurping Notes, *see* DIP Mot. at 32-33, App'x Ex. 10 (Events of Default (xxv)), and (2) locking the Debtors into a Restructuring Support Agreement ("RSA") that is excessively favorable to the Usurping Noteholders. Under that RSA, the Usurping Notes must be paid in full in cash (including a make-whole claim and any Usurping Notes that are not rolled up), the Usurping Noteholders get privileged rights to Debtors' new debt and equity securities, and they receive

8

an unreasonable backstop fee. *See* DIP Objection at 25-26, App'x Ex. 11. Appellants have offered an alternative, economically superior DIP proposal. *Id.*

26.     The court's Order and Judgment determines that the Usurping Notes have priority over the Senior Notes. Without a stay of that Order and Judgment pending appeal, Debtors' motion for approval of its Proposed DIP—scheduled to be heard on July 15, 2022—will be based on a lien-priority determination that is likely to be reversed, prejudicing Appellants with severe implications for all parties.

## REQUESTED RELIEF

27.     Appellants seek entry of an order staying enforcement of the Order and Judgment pending exhaustion of Appellants' appellate rights, pursuant to Bankruptcy Rule 8007(b).

## LEGAL ARGUMENT

28.     A motion for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" may, after first being made to the bankruptcy court, "be made in the court where the appeal is pending." Fed. R. Bankr. P. 8007(a)(1)(A); (b)(1).

29.     Courts balance four factors to determine whether to grant a stay: (1) likelihood of success on the merits; (2) irreparable harm absent a stay; (3) whether issuance of the stay will substantially injure the other parties; and (4) the public interest. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). The likelihood of success and irreparable harm factors are "the most critical." *Id.* at 571.

30.     Each factor favors a stay here.

## I.     APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS

31.     "[A] sufficient degree of success for a strong showing [of success on the merits] exists if there is a reasonable chance, or probability, of winning." *Id.* at 568 (cleaned up). The

DOCS_DE:239813.1 13563/001

chance of success must be "significantly better than negligible" but need "not [be] greater than 50%." *Id.* at 569.

32. Appellants easily meet that standard, as the Bankruptcy Court acknowledged that they "satisfied" the success-on-the-merits factor, Stay Opinion at 15—one of the two "most critical" factors, *Revel*, 802 F.3d at 571—with "colorable" arguments, that are **not** "negligible," on "challenging" and "complex" legal issues, Stay Opinion at 12.

33. This appeal presents matters of pure contractual interpretation, which this Court reviews *de novo*. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).

### A. Section 9.02(d)(10) Prohibited the Amendments Absent Appellants' Consent

34. Section 9.02(d)(10) of the Original Indenture prohibits any "amendment, supplement or waiver" that "makes any change in the provisions in the [2019] Intercreditor Agreement or th[e] Indenture dealing with the application of proceeds of Collateral that would adversely affect the Holders" without "the consent of each Holder affected thereby." This provision sensibly requires that a Holder consent to a change in its priority access to Collateral proceeds, including by shifting its position in the payment waterfall. Section 9.02(d)(10) prohibited TPC's amendments of Section 12.01(c) and the definition of "Permitted Liens," as well as its entry into the 2021 Intercreditor Agreement, because these amendments and supplements changed provisions dealing with the application of Collateral proceeds, to the detriment of the Senior Noteholders.

35. TPC's purported amendment of Section 12.01(c) of the Original Indenture and the definition of "Intercreditor Agreement" dealt with the application of Collateral proceeds. In Section 1.01, TPC changed "Intercreditor Agreement" to "Intercreditor Agreements"—plural—which it newly defined to include the 2021 Intercreditor Agreement. In Section 12.01(c), it changed "liens and security interests" and "rights and obligations … in respect of the Collateral" from being "expressly subject to the Intercreditor Agreement" to being "expressly subject to the Intercreditor

10

Agreement**s**" (emphasis added)—and so made them subject to the new 2021 Intercreditor Agreement and its new waterfall. Supplemental Indenture § 12.01(c). These amendments changed the distribution of Collateral proceeds from being subject to the 2019 Intercreditor Agreement's original waterfall for distributing proceeds—first to administrative costs, second to the Senior Noteholders, third to the ABL Lenders, and fourth to TPC, 2019 ICA § 4.1—to the 2021 Intercreditor Agreement's new waterfall—"first, to the [Usurping Noteholders]," "second, to the [Senior Noteholders], and "third, to the Grantors," 2021 ICA § 4.1.[6] These amendments clearly "deal[] with" the application of Collateral proceeds. Section 12.01 gave the 2021 waterfall effect. Without this amendment, the Collateral would still be subject to the 2019 waterfall.[7]

36.    TPC's purported amendments to the Original Indenture's definition of "Permitted Liens," as that term is used in Section 4.10(a), also changed provisions dealing with the application of Collateral proceeds. Section 4.10(a) prohibits TPC from "directly or indirectly, creat[ing,] incur[ring,] or assum[ing] any Lien (other than Permitted Liens) on any asset or property … that secures any Indebtedness." TPC thus could not put any new liens on the Collateral unless they were Permitted Liens. Before the uptiering, the Original Indenture defined "Permitted Liens" to include liens securing debt issued "pursuant to Section 4.07(b)(1)" provided they were "subject to the provisions of the [2019] Intercreditor Agreement," Original Indenture § 1.01, which gave pri-

---

[6] The 2021 Intercreditor Agreement does not address the ABL Collateral.

[7] The 2021 Intercreditor Agreement also purports to prohibit the Senior Noteholders from challenging any DIP Financing by the Usurping Noteholders, even if the financing would "subordinate [the Senior] Liens in the Common Collateral or any other collateral to such DIP Financing." 2021 ICA § 6.1. This provision, purportedly given effect by Section 12.01(c), deals with the application of Collateral proceeds and thus could not be imposed absent compliance with Section 9.02(d)(10).

ority to the Senior Notes, 2019 ICA § 4.1. After the uptiering, TPC purportedly redefined "Permitted Liens" so that "New Notes" (*i.e.*, the Usurping Notes) were not "subject to the provisions of the [2019] Intercreditor Agreement," Supplemental Indenture § 1.01, and so not subject to the 2019 Intercreditor Agreement's waterfall. This changed a provision in the Original Indenture "dealing with" the application of proceeds of Collateral, subject to Section 9.02(d)(10).[8]

37.    TPC supplemented Section 4.1 of the 2019 Intercreditor Agreement and Section 6.10 of the Original Indenture—provisions that Appellees admitted dealt with the application of Collateral proceeds—by creating a new waterfall in Section 4.1 of the 2021 Intercreditor Agreement that purportedly controls over the waterfall in the 2019 Intercreditor Agreement. The new waterfall supplemented and changed Section 4.1—the 2019 Intercreditor Agreement's waterfall for applying proceeds—by purportedly establishing a new waterfall that put the Usurping Notes ahead of the Senior Notes. 2021 ICA §§ 4.1, 8.17(b) (2021 Intercreditor Agreement controls over 2019 Intercreditor Agreement in case of a conflict). The new waterfall also changed Section 6.10—the provision that dictates what happens "[i]f the Trustee collects any money"—by providing that the Trustee purportedly cannot collect Collateral proceeds or enforce any rights with respect to Collateral until the Usurping Notes are discharged in full. 2021 ICA §§ 4.1, 3.1.

### B.    Section 9.02(d)(10) Applies to Subordination

38.    The Bankruptcy Court wrongly held that Section 9.02(d)(10) does not prohibit amendments that subordinate the Senior Notes. It held that the provision instead protects only Section 6.10(a) of the Original Indenture, "which sets out the 'waterfall' for the trustee to pay out

---

[8] TPC also purportedly deleted Section 4.10(a)'s rule that TPC could "incur or suffer to exist Liens on assets not constituting Collateral, so long as [TPC] … provides that the [10.5%] Notes … shall be **equally and ratably secured** with (or **on a senior basis** to …) the Indebtedness … secured by such [new] Lien." Original Indenture § 4.10(a) (emphases added); *see* Supplemental Indenture § 4.10(a).

the funds it collects," including "the requirement that any proceeds … be paid to the holders on a 'ratable' basis." SJ Opinion at 6-7. But by its plain text, Section 9.02(d)(10) is broader and not limited to that provision: It covers all amendments that make any adverse change in any portion of the Original Indenture or 2019 Intercreditor Agreement "**dealing with**" the application of Collateral proceeds. The contracting parties opted not to limit Section 9.02(d)(10)'s protections to a specific section, unlike other agreements. *Cf., e.g.*, *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.* ("*TriMark*"), 2021 WL 3671541, at *8 (Sup. Ct. N.Y. Cty. Aug. 19, 2021) (Joel M. Cohen, J.) (analyzing sacred right regard amendments that "waive, amend, or modify (i) *Section 7.03* or (ii) *Section 4.02* of the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds" (emphases added)); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (courts may not add terms to contract). "Application of proceeds" refers to the **complete** waterfall by which proceeds are applied, not merely a single step of that waterfall that requires *pro rata* sharing, which is a distinct concept. *Compare TriMark*, 2021 WL 3671541, at *8 (credit agreement that refers to "application of proceeds" protects full waterfall), *with LCM XXII Ltd. v. Serta Simmons Bedding, LLC* ("*Serta*"), 2022 WL 953109, at *9 (S.D.N.Y. Mar. 29, 2022) (credit agreement that mentions only "pro rata" rights concerns only rights within class of noteholders).

39.     *Serta*, which the Bankruptcy Court cited for the proposition that the sacred rights did not cover subordination, SJ Opinion at 25 n.75, proves the Bankruptcy Court's error. *Serta* interpreted a contract provision that required unanimous consent to an amendment that "waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms **alter the *pro rata* sharing of payments required thereby**." 2022 WL 953109,

13

at *2 (emphasis added). That provision explicitly covered only "pro rata sharing."[9] Here, the parties chose the broader phrase "application of proceeds," and the only authority interpreting that phrase in this context is *TriMark*, which supports Appellants' interpretation.

40.     The Bankruptcy Court also held that Section 9.02(d)(10) is limited to changes in the application of proceeds only (1) as among the Senior Noteholders or (2) between the Senior Noteholders and a class of lenders under an asset-based loan facility ("ABL Lenders"). But Section 9.02(d)(10) is not limited to such changes: It applies to any change in provisions in the Original Indenture or 2019 Intercreditor Agreement "**dealing with** the application of proceeds of Collateral that would adversely affect the Holders" (emphasis added). That broad language covers any amendments that would alter the order in which Collateral proceeds are to be distributed—whether among the Senior Noteholders, between the Senior Noteholders and the ABL Lenders, or between those classes and the new Usurping Noteholders. TPC's amendments changed provisions that dealt with the application of Collateral proceeds by purportedly ranking the Usurping Notes ahead of the Senior Notes, which adversely affected the Senior Noteholders by subordinating their Notes. *See TriMark*, 2021 WL 3671541, at *9 (rejecting argument that similar sacred right was not violated because a similar priming scheme placed new loans ahead of existing loans but maintained the same allocation of proceeds within the class of existing loans).

41.     Section 4.1 of the 2019 Intercreditor Agreement is clear: Senior Noteholders get paid out **first** among creditors from Notes Priority Collateral, following only certain costs and expenses. Nothing in Section 4.1 qualifies the waterfall or confines its application to priorities between the ABL Lenders and Senior Noteholders. A new agreement that puts Senior Noteholders

---

[9] Nothing in the *Serta* agreement required unanimous consent to change the application of Collateral proceeds. *See* App'x Ex. 17.

**second** in line among creditors to Notes Priority Collateral, as the 2021 Intercreditor Agreement does, is a fundamental change to Section 4.1 of the 2019 Intercreditor Agreement that alters the application of Collateral proceeds.

42.     Section 6.10 of the Original Indenture is equally clear. It sets out how any money collected by the Trustee shall be paid out. It is explicitly "subject to the Intercreditor Agreement," including the waterfall created by Section 4.1. It likewise specifies that, subject to administrative costs, Senior Noteholders are first in line—Section 6.10 does not leave room for another class of noteholder to be placed ahead of the Senior Noteholders in the waterfall.

43.     In short, Section 9.02(d)(10) means what it says. It covers all amendments and supplements to "provisions … dealing with the application of proceeds of Collateral that would adversely affect the Holders." It is not limited to amendments of any enumerated list of provisions, and it applies to amendments that change the application of proceeds generally, including between Senior Noteholders and a new class of noteholders who purport to subordinate them.

44.     To conclude that these supplements did not change provisions dealing with the application of Collateral proceeds, the Bankruptcy Court distinguished subordination from application of proceeds. But subordination **is, by its very definition,** a matter of application of proceeds, because it deals with the order in which Collateral proceeds are applied among holders.[10] An amendment that subordinates the Senior Noteholders "alter[s] the order of application of proceeds by subordinating [lenders'] priority interest." *TriMark*, 2021 WL 3671541, at *9 (cleaned up). Simply put, Section 9.02(d)(10) is a sacred right against subordination—which TPC violated.

---

[10] Subordination means placement in a "lower rank" or "position." Black's Law Dictionary 1653 (10th ed. 2014).

45.     *TriMark* is squarely on point. There, a credit agreement included a nearly identical prohibition against "amend[ing] or modify[ing] … the Collateral Agreement in a manner that would by its terms alter the order of application of proceeds." *Id.*, at \*8. As here, the borrower had existing first-priority debt governed by a collateral waterfall "[s]ubject to the terms of the Intercreditor Agreements." *Id.* The borrower, TriMark, attempted a similar priming scheme by "chang[ing] the definition of 'Intercreditor Agreements' to include the new Super-Priority Intercreditor Agreement." *Id.* This change, the court held, "mean[t] the waterfall is now '[s]ubject to' Defendants' new super-senior tranches of debt." *Id.* at \*9. The court denied defendants' motion to dismiss the minority lenders' complaint, holding that plaintiffs had sufficiently alleged that their sacred right was violated because the debtor "plac[ed] a[] tranche of debt above Appellants' place in the waterfall, even if the order of distribution [among the plaintiffs, their agents, and more junior lenders] remain[ed] facially unaffected." *Id.* at \*9.

46.     As the Bankruptcy Court acknowledged, "the *TriMark* court is more expert in New York law" and held that the "awfully similar" sacred right at issue in that case was "in effect an anti-subordination provision." Tr. at 89:11-15, App'x Ex. 20. The Bankruptcy Court's ruling contrary to *TriMark* is thus highly likely to be reversed. Because the Bankruptcy Court created a split from *TriMark* on an issue of New York law, a stay is necessary to allow this Court to resolve it.

**C.     The Bankruptcy Court Improperly Invoked Industry Custom and Usage**

47.     Instead of following the plain text of Section 9.02(d)(10) and a New York court's statement of New York law in *TriMark*, the Bankruptcy Court looked to "the customs, practices, usages and terminology as generally understood in the particular trade or business" to interpret the provision. The Bankruptcy Court held that it "believes" that express anti-subordination clauses "are sufficiently commonplace" that the lack of one in the Original Indenture meant that Section 9.02(d)(10) applies only to "distributions *within* a class." *Id.* at 24 (emphasis in original).

16

48.    This was error. The Bankruptcy Court expressly acknowledged at the start of oral argument that this dispute was "resolvable by reading the words of the relevant documents"; that **no party** was asking the Bankruptcy Court to consider "commercial norms," "parole evidence [*sic*]," or "other background factors"; and the Bankruptcy Court instructed the parties that, "If anyone does think I'm wrong about that please tell me." Tr. at 30:7-22. Defendants agreed that the Bankruptcy Court was "correct" that there was no need to look to "commercial norms" to interpret the Agreements. *Id.* at 30:18-20. Yet the Bankruptcy Court cited commercial norms in its Opinion.

49.    The Bankruptcy Court cited these commercial norms without any record evidence. A court cannot grant summary judgment based on industry custom or usage evidence unless "(1) the custom and usage 'is of such a **definitive** nature as to establish, as a matter of law, the meaning of that term to the industry; (2) it has been shown either that the **parties are actually aware** of the established usage of the term, or that the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it; and (3) there is **no question** that the intention of the parties was to follow, rather than depart from, the industry custom at issue.'" *Lehman Bros. Holdings Inc. v. IVC WH HGII, LLC*, 2016 WL 4703385, at *6 (Sup. Ct. N.Y. Cty. Aug. 31, 2016) (emphasis added) (quoting *J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*, 106 A.D.3d 559, 559-60 (1st Dep't 2013)). The court erroneously granted summary judgment by relying on custom and usage without any evidence—or even discovery—of the industry's understanding of "application of proceeds" or "subordination," whether the parties were aware of the established usage of the term, or whether the parties intended to follow the custom here. The Bankruptcy Court's "belie[f]" as to how common express anti-

17

subordination clauses are is no substitute for evidence or expert opinion. *TriMark* supports Appellants. No other indentures with express anti-subordination clauses were in the record.[11]

50.     In denying a stay, the Bankruptcy Court all but admitted its error, stating that "[Appellants] are (at least partially) correct in their criticism of this Court's reference to industry customs and norms." Stay Opinion at 9. It acknowledged that "no party contended that the [Original Indenture] was ambiguous, and no party presented extrinsic evidence that purported to prove up industry customs." *Id.* It stated that "but for the fact that the filing of the notice of appeal divests th[e Bankruptcy] Court of jurisdiction over the matter, [the Bankruptcy Court] would amend the opinion to delete the offending reference to 'custom and usage.'" *Id.* at 11.

**D.     Section 9.02(e) Did Not Allow TPC to Act with Supermajority Consent Alone**

51.     Section 9.02(e) of the Original Indenture does not support the Bankruptcy Court's restrictive reading of the Indenture that obliterates Appellants' sacred rights protected by Section 9.02(d)(10). Section 9.02(e) requires the consent of holders of "at least 66-2/3% in aggregate principal amount" of the Senior Notes for two categories of amendments: (1) those that "ha[ve] the effect of releasing all or substantially all of the Collateral from the Liens securing the [Senior] Notes," and (2) those that "otherwise modif[y] the [2019] Intercreditor Agreement or other Security Documents in any manner adverse in any material respect to the [noteholders]."

---

[11] In *Orchard Hill Master Fund Ltd. v. SBA Communications Corp.,* on which the Bankruptcy Court relied, SJ Opinion at 24 n.74, the Second Circuit **rejected** the use of "market convention and industry practice" evidence because the agreement was "unambiguous[]" based on its "language and structure," and there were no "specific facts" or "market convention evidence" to support the claims about custom and practice. 830 F.3d 152, 156-157 (2d Cir. 2016). So too here.

52.     As one of several consent provisions, Section 9.02(e) does not apply to the exclusion of Section 9.02(d). Section 9.02(e) requires consent of "**at least**" a supermajority for amendments adverse to the holders, setting a **floor**; that is, supermajority support is always necessary for such amendments, but is not always sufficient. Section 9.02(d), which applies to any amendment under Section 9.02, sets **additional** requirements of consent of all affected Noteholders for a subset of amendments, including those to the application of Collateral proceeds.

53.     The Bankruptcy Court disregarded this plain reading of the contract based "principal[ly]" on its view that such a reading was "illogical." Stay Opinion at 6-7. The court held that reading Section 9.02(d)(10) to cover subordination would require reading it to also cover release of collateral. In the Bankruptcy Court's view, this was a problem because Section 9.09(d)(10) could not require all adversely affected Holders to consent to a release of collateral while Section 9.02(e) permitted a supermajority to consent to that release. The court resolved this purported problem by reading Section 9.02(d)(10) to apply only to changes that were "more drastic" than a release of all collateral, and it deemed subordination to be less drastic than such a release.

54.     This too was error. To start, reading Section 9.02(d)(10) to cover subordination would not require reading it to also cover release of Collateral. They are distinct concepts: Application of proceeds covers the order and manner in which proceeds of Collateral are paid out; a release of Collateral is the termination of a lien.[12] Appellants contend that changing the "application of proceeds" includes subordinating a lien—they do not contend that it includes releasing the Collateral. The Bankruptcy Court improperly conflated these points.

---

[12] The Bankruptcy Court's confusion may be due to Appellees' argument that they could have accomplished their priming transaction by releasing the Collateral and then attaching it to new priming liens. App'x, Ex. 27, at 26; App'x, Ex. 14, at 25. Appellants responded that Section 4.10(a) of the Original Indenture prohibits this because it requires that "Liens on assets not constituting Collateral" must "be equally and ratably secured with [the Senior Notes]."

DOCS_DE:239813.1 13563/001

55.    Section 9.02(e) also does not conflict with Section 9.02(d)(10). "Releasing" Collateral under Section 9.02(e) is distinct from "dealing with" the application of proceeds of that Collateral under Section 9.02(d)(1), and only the latter occurred in TPC's priming scheme. Amendments that release all Collateral adversely affect **all** Senior Noteholders equally; a supermajority can approve a release because the approving Holders will be affected by the release to the same extent as any nonconsenting Holders. Amendments that deal with the application of Collateral proceeds, by contrast, can adversely affect **some** Senior Noteholders while not adversely affecting—or even while benefitting—others; individual consent is required to ensure that one group of Holders cannot benefit themselves at the expense of others. Absent such a sacred right, there is no check on a supermajority of Holders targeting a disfavored group of Noteholders for subordination. The Bankruptcy Court disregarded this plain reading of Section 9.02.

56.    Contrary to the Bankruptcy Court's reasoning, moreover, a release of Collateral can be less drastic than subordination—to the subordinated Noteholders. For example, if a debtor has $1 billion in equal-priority secured debt and $670 million in collateral, releasing the liens on the collateral would result in a 67% recovery for all creditors, who are now unsecured. Subordinating $330 million of the debt, by contrast, would result in 100% recovery for the supermajority creditors and 0% for the subordinated creditors. In that scenario, subordination is vastly more severe to the minority creditors. Foreseeing that possibility, lenders could rationally bargain for a veto against subordination but only a supermajority vote for releases of all collateral. The Bankruptcy Court erred by comparing the relative effects of release of collateral and subordination on **all** creditors,

---

Appellants argued that amending Section 4.10(a) would change a provision "dealing with the application of proceeds" by changing the rules for lien priority and thus implicate Section 9.02(d)(10). But Appellants did not argue that other releases of Collateral (that do not amend Section 4.10(a)) deal with the application of proceeds. App'x, Ex. 28, at 26 n.20.

20

not on **individual** creditors—even though Section 9.02(d)(10) grants **individual** rights. Many sacred rights, such as "extend[ing] the fixed maturity of any Note," "extend[ing] the time for payment of interest," and "releas[ing] any Guarantor," Original Indenture §§ 9.02(d)(2), (3), (8), are facially less severe than a release of Collateral, but the parties bargained for a requirement that every adversely affected Noteholder consent to these changes. The Bankruptcy Court improperly rewrote Section 9.02(d)(10) out of the contract because it disagreed with the bargain the parties struck, contrary to black-letter contract law. *See, e.g.*, *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).

57.    Even if the severity of a release of Collateral were relevant (it is not), and even if such a release were always more severe than subordination (it is not), and even if Section 9.02(d)(10) must guard against only changes that are more severe changes than Section 9.02(e) (it need not), the Bankruptcy Court's narrow construction would not rectify the purported tension between Section 9.02(d)(10) and Section 9.02(e). Under the Bankruptcy Court's construction, Section 9.02(d)(10) protects only pro rata payment rights, SJ Opinion at 21-22, 25 n.75; the Noteholders thus get stronger protection of their pro rata payment rights within the Senior Secured class than against complete release of Collateral—which makes much less commercial sense than a veto against outright subordination.

## II.    APPELLANTS WILL BE IRREPARABLY HARMED IF A STAY IS NOT GRANTED

58.    The Bankruptcy Court acknowledged that "in the absence of a stay, [Appellants] face a risk of irreparable injury," Stay Opinion at 12—the other of the two most "critical factors," *Revel*, 802 F.3d at 571. The final DIP approval hearing is scheduled for July 15, 2022.

21

59.     It will be Debtors' burden to prove that the Proposed DIP is fair, reasonable, and adequate. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011). Debtors acknowledged at the First Day Hearing that the "core of [their] argument" as to the propriety of the DIP is that the Usurping Notes are senior to the Senior Notes. Tr. at 225, App'x Ex. 25. If, as Appellants contend, the Senior Notes have priority—because the contested amendments are invalid—the Proposed DIP, which would grant the Usurping Notes a priming lien through a roll-up, may not be approved.

60.     If the DIP proceedings go forward without a stay of the Order and Judgment pending appeal, Appellants face three independent irreparable harms. **First**, without a stay pending appeal, Appellants will lose access to the proceeds of Collateral without adequate protection or a valid waiver, in violation of the Fifth Amendment.

61.     The Proposed DIP includes a $238 million roll-up of the Usurping Noteholders' TPC debt, App'x Ex. 11, which dwarfs the mere $32 million that TPC requires in new financing. Tracy Decl. ¶ 13, App'x Ex. 15. The Bankruptcy Court acknowledged that granting a priming lien to the Usurping Noteholders—who would rank junior to the Senior Notes if Appellants prevail— "would make the DIP loan very expensive money." SJ Opinion at 12. The transaction would irrevocably transfer $23.8 million of Collateral proceeds from Appellants (as 10% holders of the Senior Notes) to the Usurping Noteholders without adequate protection of the Senior Notes or a valid waiver by the Trustee.

62.     Section 364(d)(1)(B) of the Code provides that a bankruptcy court may "authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if … there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

22

11 U.S.C. § 364(d)(1)(B). It is the Debtor's burden to make this showing. *Id.* § 364(d)(2); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

63.    Debtors admit that the Proposed DIP does not adequately protect the Senior Notes: "[T]he prepetition claims of the [Senior Noteholders] are undersecured" and "the Debtors are unable to provide adequate protection." Decl. of Zul Jamal, at 10, App'x Ex. 18.

64.    Debtors also admit they cannot fully satisfy the $930 million due on the Senior Notes. If, as Appellants contend, the Usurping Notes are junior to the Senior Notes, no money is left for the Usurping Notes. But if the Usurping Notes get a priming lien, their $238 million in rolled-up debt would be repaid in full—a wholesale transfer from Appellants to the Usurping Noteholders.

65.    Debtors cannot rely on a purported waiver by the Trustee of the Senior Notes. Debtors' investment banker, Zul Jamal, testified that he "understands that the Ad Hoc [Noteholder] Group has directed both the [10.875%] Notes Trustee and the [10.5%] Notes Trustee to consent to the priming liens securing the Term DIP Loan Facility and that the trustees under such Indentures have so consented." *Id.* ¶ 25.

66.    But the Trustee did not receive any direction letter from the Ad Hoc Noteholder Group requesting consent (according to its counsel), nor did the Trustee did give consent. *See* App'x Ex. 16, at Ex. A. Debtors confirmed that they also "do not possess any direction letters or similar correspondence" from the Ad Hoc Noteholder Group. *Id.* at Ex. B.[13]

---

[13] Contrary to Debtors' DIP Motion, App'x Ex. 10 at 55-56 & n.22, Section 6.05 of the Original Indenture, which allows the majority to direct the Indenture Trustee, does not commit Appellants to consent to the DIP or provide for deemed consent because the Trustee need not consent to a DIP that "conflicts with … th[e] Indenture" and is "unduly prejudicial to the rights of other Holders."

67.     Defendants argue that the Trustee implicitly consented through Section 6.1(a) of the 2021 Intercreditor Agreement, which provides, "If the [Usurping Noteholders] shall … consent (or not object) to any Grantor's obtaining financing under Section 364 … then … each [Senior Noteholder] agrees that it will not compete with, will raise no objection to, and will not support any objection to … such use of … DIP Financing and will not seek, request (or be entitled to) adequate protection." *See also* App'x Ex. 10 ¶ 26 (DIP motion referring to Section 6.1(a) of 2021 ICA). Indeed, Intervenor wrote to Appellants on July 11, 2022 asserting that Appellants' DIP objection violates this purported undertaking and must be withdrawn. Shine Decl., Ex. A. Crucially, reversal of the Order and Judgment would render the 2021 Intercreditor Agreement invalid, voiding this purported waiver. In other words, the legitimacy of the Proposed DIP, including the roll-up, is premised on the very amendments thar are the subject of the appeal. Absent a stay, at least $23.8 million of Collateral value that would otherwise flow to Appellants will be redistributed to the Usurping Noteholders, without any adequate protection or a valid waiver.

68.     The violence this will inflict on Appellants cannot be overstated. The requirement of adequate protection or a valid waiver is central to protecting secured creditors' constitutional property rights. This concept is "derived from the Fifth Amendment's protection of property interests." H.R. Rep. No. 95-595, at 338-40 (1977). The protections exist in part because security interests are "'property rights' protected by the Fifth Amendment from public taking without just compensation." *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (7th Cir. 1984) (citing *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940)); *see also In re Dispirto*, 371 B.R. 695, 698 (Bankr. D.N.J. 2007) ("The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests."); *In re Quanta Res. Corp.*, 739 F.2d 912, 922 n.11 (3d Cir. 1984) ("The rights of a secured creditor in the debtor's assets are property subject to

24

DOCS_DE:239813.1 13563/001

a taking.") (cleaned up)), *aff'd sub nom. Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

69.     If the Order and Judgment stand as the Debtors march forward with the DIP Proceedings and Appellants are precluded from objecting to the Proposed DIP or presenting their competing proposal, they will be denied their Fifth Amendment rights. This is irreparable harm. *See GJJM Enters., LLC v. City of Atlanta*, 293 F. Supp. 3d 509, 520-21 (D.N.J. 2017) ("[W]here probable success on the merits of a constitutional claim is shown, and such violation will continue unless enjoined, the continuing constitutional violation can constitute irreparable harm." (citing *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010))).

70.     **Second**, and relatedly, the value of Appellants' security interests will be irremediably diluted if the Proposed DIP goes forward without a stay of the Order and Judgment. If the Proposed DIP is approved and the Usurping Notes are rolled up under an Order and Judgment that are later reversed on appeal, the financing arrangement will be difficult to unwind, and the Usurping Noteholders will effectively lock in greater potential recoveries at the expense of the Non-Consenting Senior Noteholders. *Cf., e.g.*, *In re Trib. Co.*, 477 B.R. 465, 477 (Bankr. D. Del. 2012) ("It will certainly be difficult to 'unscramble the egg' if the [confirmation plan] is allowed to go effective, since it is unlikely that the distributions could be recovered, or, if recoverable, would be challenging and costly."). Appellees would likely argue that, by the terms of the Bankruptcy Code, Appellants cannot undo any priority given to the Usurping Noteholders through a DIP loan, even if they prevail on a later appeal from the DIP approval. *See* 11 U.S.C. § 364(e).

71.     This injury is not compensable. Although economic injury is generally "compensable in money," *Revel*, 802 F.3d at 572, "courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents." *Marblegate Asset Mgmt. v.*

*Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 607 (S.D.N.Y. 2014) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999)); *see also Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 F. App'x 453, 456-57 (3d Cir. 2011) (quoting *Brenntag*, 175 F.3d at 249).

72.     Where, as here, the value of a movant's security interest in collateral (as beneficial holder of the Trustee's lien) cannot be corrected following even a successful appeal (absent a stay), irreparable harm is established. *See Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales*, 2018 WL 4179456, at *2 (D. Del. Aug. 31, 2018) ("Where secured creditors … seek court intervention to maintain their position, the prospective loss of their status quo security interest has been held sufficient to constitute the irreparable harm needed to justify an injunction." (cleaned up)); *Ratcliff v. Rancher's Legacy Meat*, 2020 WL 4048509 (D. Minn. July 20, 2020) (irreparable harm when "even [if] [movant] succeeds on his appeals … [movant] will not be able to protect collateral that is encumbered by his security interests from being sold at a depressed price.").

73.     **Third**, absent a stay, Defendants may later argue that Appellants' appeal has become moot before Appellants can vindicate their rights. "[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *In re L.A. Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011). Accordingly, "'the fact that the decision on the stay may be dispositive of the appeal … is a factor that [a court] must consider' in determining whether irreparable harm will result from the denial of a stay." *Id.* at 36-37 (quoting *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991)).

74.     If the Bankruptcy Court's Order and Judgment are not stayed, Defendants will invoke statutory mootness and argue that it is impossible to undo any priming lien they are granted under Section 364(e) of the Code, which prevents a reversal on appeal from invalidating the priority of a DIP loan. In fact, Intervenor has already invoked the appealed-from Order as a reason to

26

deny Appellants standing to object to the DIP loan; it argues that the Order is binding law of the case until this appeal is resolved. App'x, Ex. 26, at 19-20. Yet Intervenor has simultaneously invoked Section 364(e) to argue that this appeal will be moot following a final DIP order. *Id.* at 5 n.10. Absent a stay, Defendants may be able to strip Appellants' of their right to appellate review.

75.     Defendants are also likely to argue that the appeal has become equitably moot on the ground that belated relief "would lead to a perverse outcome," such as "injury to third parties" or "the potential for chaos in the bankruptcy court." *In re Trib. Co.*, 477 B.R. at 47 (cleaned up).

76.     Given the imminence of Appellants' irreparable harm—the final DIP hearing is days away—there is a strong likelihood that, absent a stay, Defendants would argue that Appellants' appeal is moot before it is resolved. Denying a stay, and so allowing potential approval of the Proposed DIP roll-up before the appeal is resolved, would lock in senior priority for the Usurping Noteholders over the Senior Noteholders. If the Proposed DIP is approved, but Appellants ultimately prevail on appeal, "unscrambl[ing] the egg"—unwinding a financing arrangement that was approved based on an incorrect ranking of Appellants' lien priority—would be "challenging and costly." *Cf. id.* at 477. This necessitates a stay so that Appellants may vindicate their right to appellate review before their property interests are irreparably lost.

## III.     A STAY PENDING AN EXPEDITED APPEAL WILL NOT INJURE TPC OR OTHER CREDITORS

77.     The Bankruptcy Court erred in the third factor in the stay analysis—injury to Defendants-Appellees. It determined that any potential injury to Appellants is outweighed by the harm to TPC of not approving the DIP loan. The court weighed the wrong harms. It should not have looked at the harm to TPC of receiving no DIP financing **at all**. Rather, it should have considered only the harm to TPC of delaying **past this week** approval of the **specific** DIP proposal at hand, which provides a far larger roll-up than infusion of new money. TPC has adequate liquidity

27

for its short-term needs and could obtain DIP financing via Appellants' proposal without infringing Appellants' sacred rights. TPC would suffer no harm from a short delay in approving a roll-up financing while this Court considers Appellants' appeal, which Appellants seek to expedite.

78.     TPC has not shown a need for any post-petition financing, let alone an **immediate** need. Liquidity analysis based on Debtors' cash flow projections shows that Debtors will consistently maintain liquidity above $███████ during the forecasted period ending September 16, 2022, *without* drawing any more money from the new money DIP loans.[14] Tracy Decl. ¶¶ 4(i), 8. This is tens of millions of dollars above Debtors' historical minimum liquidity threshold of $75-100 million. *See* Del Genio Decl. ¶ 11.

79.     TPC has also received an alternative proposal that it admits is "more economically attractive." DIP Motion ¶ 35. This proposal, which would provide the same amount of new money as the Proposed DIP, would (1) not include a roll-up, (2) provide TPC the flexibility to pay 8% of the 11% of interest on the DIP loans in kind instead of in cash, and (3) charge TPC less in total fees, regardless of any anticipated insurance payments. App'x Ex. 11, at Ex. A. Any slight delay in the DIP proceedings caused by this appeal will not harm TPC.

80.     In opposing Appellants' stay motion before the Bankruptcy Court, TPC claimed that a delay in entering a final DIP order would be an event of default on two of the DIP loan agreements. Jamal Decl. ¶ 12, App'x Ex. 19. TPC offered a hearsay secondhand account of an asset-based ("<u>ABL</u>") DIP lender's claim that it predicated its ABL DIP loan proposal on approval of the accompanying term DIP loan and speculated that "there is no commitment from [the ABL lender] that they will still provide the ABL DIP Facility if the Term DIP Facility is not approved

---

[14] Even if Debtors do not receive any of the insurance proceeds they expect to receive, their total liquidity will remain above $███████. Tracy Decl. ¶ 11.

on a final basis." *Id.* ¶ 14. The Court should not credit the bare assertion that the ABL DIP lender **could** walk away from the deal because this account does not indicate that the Term DIP Lenders **would** walk away if final approval were merely delayed pending appeal. For good reason. According to TPC, if the Term DIP Lenders walked, the company would collapse, destroying approximately $1.2 billion in going concern value, suffered by the Usurping Noteholders who are the Term DIP Lenders. Although the liquidation value has not yet been disclosed, it is unquestionably a fraction of the going concern value. It is absurd to speculate that the Term DIP Lenders would abandon their deal and imperil their own investments because of a short delay.

81.    Intervenor would similarly be unaffected by a stay pending appeal. If Appellants lose on appeal, the Bankruptcy Court may evaluate the Proposed DIP exactly as it plans to do now. If the Bankruptcy Court approves that proposal, Intervenor will receive the roll-up and lien priority it has sought all along. If the Bankruptcy Court does not approve that Proposal at the hearing, then Intervenor's rights will likewise be unaffected by the stay—Intervenor will be denied the unfair and unreasonable roll-up to which it was not entitled in the first place. If Appellants prevail on their appeal, by contrast, Intervenor will benefit from the stay—it will not be required to endure the complex and expensive unscrambling of a DIP Financing approved based on legal error.

## IV.    GRANTING A STAY IS IN THE PUBLIC INTEREST

82.    The Bankruptcy Court erroneously excluded the public interest from its analysis. *See* Stay Opinion at 17. Granting a stay would preserve the public's interest safeguarding the property and contract rights of all parties, as well as the integrity of the bankruptcy proceeding.

83.    **First**, a stay will serve "[t]he public['s] … interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *In re L.A. Dodgers*, 465 B.R. at 37 (cleaned up); *see also Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d 425 (E.D. Pa. 2001) ("As a general matter, it is in the public interest to enforce valid

29

contractual obligations ….”). Appellants brought the adversary proceeding to enforce their contractual rights and thus to protect their property interests—the priority of the Senior Notes. *See Revel*, 802 F.3d at 573.

84.     **Second**, TPC’s creditors and the Bankruptcy Court have an interest in the full adjudication of Appellants’ case before the Bankruptcy Court evaluates the Proposed DIP, which requires the Bankruptcy Court to make a finding of adequate protection of all senior or equal-priority interests. As long as the priority of Appellants’ interests in relation to the Usurping Noteholders’ interests remains in dispute, “the court cannot begin to assess the adequacy of protection.” *In re The Colad Grp., Inc.*, 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005). A stay will allow all TPC’s creditors to have their day in court and ensure that any outstanding questions of lien priority are fully resolved before the Bankruptcy Court assesses DIP proposals.

85.     **Third**, the Bankruptcy Court’s decision has implications for many other cases. Other agreements contain a sacred right regarding the “application of proceeds,” *e.g.*, *TriMark*, 2021 WL 3671541, at *8, and thus the outcome here will have outsized importance for the credit market. The public interest therefore favors decisive resolution by an appellate court.

## V.     APPELLANTS SHOULD NOT BE REQUIRED TO POST A BOND

86.     Bankruptcy Rule 8007 allows this Court to condition a stay on the posting of a bond. The purpose “is to protect the adverse party from potential losses resulting from the stay.” *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992). The Court has “wide discretion …. and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary.” *Cont’l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964).

87.     Where, as here, the adverse parties will not suffer any losses because of a stay pending appeal, a bond is not necessary. *See United Merchs.*, 138 B.R. at 430; *see also Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (a stay may be sought “with or

30

without posting a bond"). A bond is needed only where the stay is "likely to cause harm by diminishing the value of an estate or endanger [the non-moving parties'] interest in the ultimate recovery." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y 2007) (cleaned up).

88.     TPC will suffer no harm if the Court grants a stay pending appeal. TPC simply does not require additional financing. There are no exigent circumstances that require the final DIP hearing to move forward immediately, and Appellants have sufficient funds to pay for the Debtors' attorney's fees and costs should the Debtors prevail on appeal.

## NOTICE

89.     Notice of this Motion has been provided to counsel of record for Appellees. Appellants submit that no other or further notice is required under the circumstances.

## STATEMENT REQUIRED BY LOCAL RULE 7.1.1

90.     Pursuant to District of Delaware Local Rule 7.1.1, counsel certify that they have made a reasonable effort to confer and reach agreement with opposing counsel on the relief sought by this Motion. Opposing counsel does not consent to the requested relief.

## CORPORATE DISCLOSURE STATEMENT

Bayside Capital, Inc., a privately held non-governmental party, has no parent company, and no publicly held corporation owns 10% or more of its stock. Cerberus Capital Management, LP, a privately held non-governmental party, has no parent company and no publicly held corporation owns 10% or more of its stock.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Appellants respectfully request that this Court (1) enter an order, substantially in the form attached hereto as **Exhibit A**, staying the Order and Judgment pending final resolution of Appellants' appeal; and (2) grant such other and further relief as the Court deems equitable and proper.

31

Dated:    July 12, 2022

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By:    /s/ *Timothy P. Cairns*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899 (Courier 19801)
Tel: 302-652-4100
Facsimile: 302-652-4400
ljones@pszjlaw.com
tcairns@pszjlaw.com

- and -

Jennifer Selendy (*pro hac vice* pending)
Andrew R. Dunlap (*pro hac vice* pending)
Oscar Shine (*pro hac vice* pending)
Max H. Siegel (*pro hac vice* pending)
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
Tel: 212-390-9000
jselendy@selendygay.com
adunlap@selendygay.com
oshine@selendygay.com
msiegel@selendygay.com

*Attorneys for the Appellants*

32

**Exhibit A**

Proposed Order

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| TPC GROUP INC, *et al.,* | Case No. 22-10493 (CTG) |
| *Debtors.*[1] | Jointly Administered |
| | |
| BAYSIDE CAPITAL, INC. and CERBERUS CAPITAL MANAGEMENT, L.P | Adv. Pro. No. 22-50372 (CTG) |
| *Plaintiffs-Appellants,* | Civ. Action No. _____ |
| v. | |
| TPC GROUP INC., | |
| *Defendant-Appellee,* | |
| -and- | |
| THE AD HOC NOTEHOLDER GROUP, | |
| *Intervenor-Defendant-Appellee.* | |

**ORDER GRANTING EMERGENCY MOTION OF APPELLANTS
BAYSIDE CAPITAL, INC. AND CERBERUS CAPITAL MANAGEMENT, L.P.
FOR STAY OF EFFECTIVENESS AND ENFORCEMENT OF ORDER AND
<u>JUDGMENT PENDING APPEAL PURSUANT TO BANKRUPTCY RULE 8007</u>**

---

[1] The Debtors in these Chapter 11 cases, and the last four digits of their federal tax identification numbers, are: TPC Group Inc. (3618); TPC Holdings, Inc. (7380); TPC Group LLC (8313); Texas Butylene Chemical Corporation (7440); Texas Olefins Domestic International Sales Corporation (4241); TPC Phoenix Fuels LLC (9133); Port Neches Fuels, LLC (1641); and TP Capital Corp. (6248). Each Debtor's corporate headquarters and mailing address is 500 Dallas St., Suite 2000, Houston, Texas 77042.

2

Upon the motion (the "Motion")[2] of Plaintiffs-Appellants Bayside Capital, Inc. and Cerberus Capital Management, L.P. (collectively, "Appellants") for entry of an order, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedures, granting a stay pending Appellants' appeal of the Bankruptcy Court's *Order* dated July 8, 2022 [Adv. Proc. No. 22-50372, A.D.I. 74] and *Judgment* dated July 8, 2022 [Adv. Proc. No. 22-50372, A.D.I. 75], all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 158 and 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted to the extent set forth herein.

2.    The effectiveness of the Order and Judgment and enforcement thereof, including any matters attendant thereto, are stayed pending resolution of Appellants' pending appeal of the Order and Judgment.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

DOCS_DE:239813.1 13563/001

## Other Documents

1:22-mc-00298-RGA Bayside Capital, Inc. et al v. TPC Group Inc.

### U.S. District Court

### District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Cairns, Timothy on 7/26/2022 at 11:21 AM EDT and filed on 7/26/2022

**Case Name:**  Bayside Capital, Inc. et al v. TPC Group Inc.
**Case Number:**  1:22-mc-00298-RGA
**Filer:**  Bayside Capital, Inc.
Cerberus Capital Management, L.P.
**Document Number:** 35

**Docket Text:**
**[SEALED] EXHIBIT re [29] MOTION to Seal <** *Notice of Supplemental Exhibits Related to Mtoion to Seal (A) Motion for Stay of Effectiveness and Enforcement of Order and Judgment Pending Appeal, (B) Reply in Further Support of Motion for Stay, and (C) Declaration of Oscar Shine in Support of Reply* **by Bayside Capital, Inc., Cerberus Capital Management, L.P.. (Cairns, Timothy)**

**1:22-mc-00298-RGA Notice has been electronically mailed to:**

Brian Loughnane      bloughnane@morrisnichols.com, jlawrence@morrisnichols.com, john-lawrence-0804@ecf.pacerpro.com, rweidman@morrisnichols.com

Curtis S. Miller      cmiller@mnat.com, bcornely@morrisnichols.com, jlawrence@morrisnichols.com, john-lawrence-0804@ecf.pacerpro.com, rweidman@morrisnichols.com

Daniel Bryan Butz      dbutz@mnat.com, jlawrence@morrisnichols.com, john-lawrence-0804@ecf.pacerpro.com, rweidman@morrisnichols.com

Laura Davis Jones      ljones@pszjlaw.com

Matthew Talmo      mtalmo@mnat.com, jlawrence@morrisnichols.com, john-lawrence-0804@ecf.pacerpro.com, rweidman@morrisnichols.com

Robert F. Poppiti , Jr      rpoppiti@ycst.com, bankfilings@ycst.com, carolinediaz@paulhastings.com, ccorazza@ycst.com, davidmohamed@paulhastings.com, dlaskin@ycst.com, emilykuznick@paulhastings.com, erezgilad@paulhastings.com, gabesasson@paulhastings.com, izzymuncan@paulhastings.com, joncanfield@paulhastings.com, kenpasquale@paulhastings.com, matlaskowski@paulhastings.com, michaelmagzamen@paulhastings.com, samashuraey@paulhastings.com, winniewu@paulhastings.com

Robert J. Dehney      rdehney@mnat.com

Timothy P. Cairns      tcairns@pszjlaw.com

Tori Lynn Remington    tremington@morrisnichols.com, jlawrence@morrisnichols.com, john-lawrence-0804@ecf.pacerpro.com, rweidman@morrisnichols.com

**1:22-mc-00298-RGA Filer will deliver document by other means to:**

The following document(s) are associated with t his transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=7/26/2022] [FileNumber=4943243-0
] [2f8ce5f27ecc56bbe6cea07d565f66b1d4d0afbb4dcf99694823813dcfd64bdf98d
6193826022075f97fc7d7d2a78aabf114a8718c1c2bbe19d835e3ed85cf78]]